UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CASE NO. 11-CR-512 (DRD)

UNITED STATES OF AMERICA,

vs.

FRANK PEAKE,
        *Defendant.*
_____/

**FRANK PEAKE'S POST-TRIAL MOTION FOR NEW TRIAL
AND FOR JUDGMENT OF ACQUITTAL
(AND REQUEST FOR ORAL ARGUMENT)**

Frank Peake, through undersigned counsel, files this motion for judgment of acquittal and for new trial and states[1]:

As evidenced by the notes during deliberations and this Court's statement after the verdict, "this was a close case." This close case ended up in conviction, but we respectfully submit to this Court that the conviction should not be left to stand.

We renew our motion for judgment of acquittal here on all elements of the one count offense, and also renew all pretrial motions and objections/motions made during the trial. We additionally move for a new trial based on a number of decisions by this Court which ended up improperly tipping the scales for the prosecution. The five issues supporting a new trial are as follows.[2]

_____

[1]Generally these motions must be made within 14 days of the verdict, but the Court granted the defense until March 4, 2013, to file these post-trial motions.

[2]The first two of the five issues we will brief in detail as the Court has not had the opportunity for briefing. The other three were previously briefed and argued, and we will not repeat those arguments in detail here. Any one of these issues is sufficient grounds for granting a new trial, or the Court can take them as a whole to grant a new trial.

1.      **Deadlocked deliberations**. After the jury sent out a second note regarding their deadlocked position at 7:15pm on day 2 of deliberations, stating that "after strong debates and discussions, members of the jury have expressed a final individual verdict," the Court should have granted the defense's motion for mistrial.  In the alternative, if the Court was going to send them back to deliberate, the Court should have instructed them—as required by the First Circuit—that 1) both the majority as well as the minority can reexamine its position; 2) a reminder of the burden of proof; and 3) the jury has the right to fail to agree.    To simply "order the jury to return tomorrow ... to continue deliberations" (at 7:25 pm) without any guidance (after having already told them once earlier in the day to continue deliberations) misled the jury to believe that it was not going to be released until it reached a verdict. As a result, on day 3 of deliberations, jurors favoring acquittal gave up. *See* Exhibit A, article interviewing juror (explaining that jurors were not sure how long Court would keep them deliberating if they were deadlocked).

2.      **The theory of defense instruction.**  The First Circuit requires a district court to instruct the jury on the theory of defense so long as it is an accurate statement of the law and there is evidentiary support in the record.  Because both of these standards were met, the Court should have given the proposed instruction.

3.      **The prosecution's wrongful attempt to appeal to jury bias and prejudice.**  This includes the "the school lunch issue" that has been briefed and argued to the Court.  Although the Court gave a curative instruction during the trial and as part of the jury instructions, the prosecution's improper arguments and questioning of witnesses in this regard helped to tip this very close case.  Below we set forth in more detail the offending portions of the transcript.

4.      **The hearsay rulings regarding the taped phone calls, the statements made after the calls (which were taped), and Glova's statement.**  The Court's rulings on these three issues – 1) precluding the defense from introducing Glova's written statement, 2) excluding Glova's exchange with the FBI agent after his phone call message to Serra, and 3) the admission of the tape-recorded phone calls with Glova and Serra – were not only wrong as a matter of law, but also had the effect of misleading the jury about what actually occurred here.

5.      **Frank Peake's compensation and Sea Star's Profits & Losses.**  This issue was argued to the Court, but we ask the Court to reconsider its ruling as it improperly tipped the scales in this close case.

## STANDARD FOR MOTION

Under Fed. R. Crim. P. 33, this Court must determine whether it is in the "interest of justice" to allow the guilty verdict against Mr. Peake to stand.  A district court's disposition of a Rule 33 motion for a new trial in a criminal case is ordinarily a "judgment call." *United States v. Maldonado-Rivera*, 489 F.3d 60, 65 (1st Cir. 2007). Hence, at least where the trial judge revisits the case to pass upon a new trial motion, an appreciable measure of respect is due to the "presider's sense of the ebb and flow of the recently concluded trial." *United States v. Natanel*, 938 F.2d 302, 313 (1st Cir.1991); *United States v. Connolly*, 504 F.3d 206 (1st Cir. 2007).

Moreover, as this Court stated in *United States v. Santiago-Mendez*, 2009 WL 1767666 (D.P.R. 2009): "The standard under Fed. R. Crim. P. 29 is identical in both the trial and the Court of Appeals, 'the [trial] tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" *Id.* at 1 (citing *United States v. Hernández*, 146 F.3d 30, 32 (1st Cir. 1998) and *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994)).

I.    **The Court should order a new trial because it erred in "order[ing] the jury ... to continue deliberations" without the guidance required by the First Circuit, after the jury had sent two notes saying that its deadlock was "final."**

Procedural Background: This was a relatively short trial, lasting parts of 7 trial days, with 3 substantive witnesses, two very short victim witnesses, and one summary witness. Deliberations started on Friday afternoon (1/25/13) after closing statements.  The jury was asked whether it would like to deliberate or go home for the weekend.  The jury initially indicated that it wanted to deliberate and did so for a short time, including picking a foreperson.  Then it sent a second note saying that

it would recess until Monday.

On Monday, January 28, the jury began day two of deliberations at approximately 9:00am. Around lunchtime, the jury asked to have transcripts of the trial, but when told of the procedure for acquiring those transcripts, the jury opted against it.

At 2:45pm that day, after nearly 6 hours of conferring, the jury sent a note saying that they could not reach a verdict: "Members of the jury have issued their respective verdicts. After discussions and revisions to the evidence we are not able to reach a unanimous verdict." This Court sent them back to "continue [their] deliberations" without any further guidance:

This same day, the air-conditioning in the building turned off around 6pm, but the Court did not stop deliberations for the day. Instead, after 10 straight hours of deliberation on one day, the jury sent a note at 7:15pm saying: "After strong debates and discussions, **members of the jury have expressed a _final_ individual verdict**. We are still unable to reach a unanimous verdict." (Emphasis added). The Court responded at 7:25pm: "The Court orders the jury to return tomorrow... to continue deliberations."



Even though the jury indicated that its inability to reach a verdict was final, no other guidance was given. The defense objected to continued deliberations and requested a mistrial. The Court said that it was too soon for a mistrial, but this was incorrect. *United States v. McIntosh*, 380 F.3d 548, 555 (1st Cir. 2004) ("There is no per se minimum period of deliberation that must expire before a mistrial may be declared on account of a hung jury."). Because the jury expressed that its verdict was final, it was wrong to just send them back to continue deliberations, especially without any guidance.

Because the air conditioning system malfunctioned and did not come back on the next day, the jury was sent to the courthouse in Hato Rey, and did not start their deliberations until 11:35am. The judge took the lawyers back into chambers and indicated that if the jury was at an impasse, then the Court may have to give certain guidance and cautionary elements from the *Allen* charge. Ultimately though the Court simply ordered the jury continue deliberating. Less than three hours later, the jury convicted.

After the verdict, at least one juror indicated that the jury did not know how long the Court would require them to continue deliberating even though they were deadlocked, so they decided they had to make a decision one way or the other. *See* Exhibit A.

Analysis: In cases where a jury is clear that it is deadlocked and a mistrial is not ordered, the First Circuit law requires that any supplemental instruction given regarding continued deliberations must include guidance to the jury in the form of the following three principles: 1) both the majority as well as the minority can reexamine its position; 2) the government always maintains the burden of proof; and most importantly here, 3) the jury has the right to fail to agree. Here, none of this guidance was provided, which requires a new trial. Moreover, this jury has stated that it felt pressured to reach a verdict as a result of the repeated instruction to continue deliberations (or remain

captive indefinitely), demonstrating that the lack of guidance had an impact.[3]  *See United States v. Angiulo*, 485 F.2d 37, 40 (1st Cir. 1973) ("[W]henever a jury first informed the court that it is deadlocked, any supplement instruction which urges the jury to return to its deliberations **must** include the three balancing elements stated above.") (emphasis added); *United States v. Paniagua-Ramos*, 135 F.3d 193, 198-99 (1st Cir. 1998) (finding plain error where the court did not clearly refer to the jury's right to fail to agree); *United States v. Hernandez-Albino*, 177 F.3d 33, 38 (1st Cir. 1999) (court's instruction to jury after it indicated that it was at "an impasse" to "continue the deliberations" as well as "consider instructions as a whole" and "ask yourself whether you should question the correctness of your present position" was error because it did not explain to the jury that it was free not to reach a verdict).  Because the Court failed to inform the jurors of these three important elements, a new trial is required.

Here, the jury very clearly indicated that it was deadlocked, and there was no ambiguity in their note regarding "a <u>final</u> individual verdict," which was provided after a straight 10-hour deliberation period with no break.  *Cf. United States v. Figueroa-Encarnacion*, 343 F.3d 23, 31-32 (1st. Cir. 2003) (allowing a judge's response to continue deliberating <u>only</u> where it is not clear that the jury is deadlocked: "Where, as here, the judge reasonably concludes that the jury is not deadlocked in the first instance, the defendant is not prejudiced by a simple instruction to continue deliberating.").  Consequently, the Court was compelled to tell the jury that it was free not to reach

---

[3]Not only did the jurors feel like they were being held hostage, but the two alternates were kept in a small room during deliberations without any communication whatsoever.  When the jurors were released each day, the alternates were also released but they had no idea what was going on or how long they were going to be kept.  They interacted with the actual jurors, so the jurors must have known that the alternates were just sitting around all day in a small room.  This too put pressure on the jurors to reach a verdict.

a verdict.[4]  Otherwise, as the above First Circuit cases discuss, a jury may believe that it has a duty to achieve unanimity: "Any supplemental instruction in response to a jury's deadlock can have a significant coercive effect by intimating that some jury members should capitulate to others' views, or by suggesting that the members should compromise their rational positions in order to reach an agreement." *Hernandez-Albino*, 177 F. 3d at 38 (*citing Angiulo*, 485 F.2d at 39).

This is exactly what happened here, according to a post-trial interview of a juror. *See* Exhibit A, article summarizing interview of juror one day after verdict (explaining that jurors were not sure how long Court would keep them deliberating if they were deadlocked); *see also Jenkins v. United States*, 380 U.S. 445 (1965) (reversing conviction where a judge's statement to jury after they declared that they could not reach a verdict had the effect of making the jury believe that it would not be released until it reached a verdict).

After the jury's definitive report that it was at an impasse, the defense objected to further deliberations and requested a mistrial.  The Court denied this motion and instead simply ordered the jury to continue deliberating.  The jury did not understand and was never told that it had a right *not* to reach a verdict.  The jury was also not given the other guidance – 1) a reminder of the burden of proof, and 2) both the majority and minority should reexamine their positions.  Because this was error, the Court should order a new trial in the interest of justice.  *See, e.g., Paniagua-Ramos*, 135 F.3d at 193 (upholding new trial ordered by Judge Fuste where he did not instruct jury as to required elements when jury indicated it was deadlocked even though defendant did not even object saying that where complete guidance was not given to jury "this court has found reversible error without

---

[4]*See also Monforto v. State*, 28 So. 3d 65 (Fla. 2d DCA 2009) ("A defendant has the right to have a hung jury, and nothing should be said by the trial court to the jury that would or could likely influence the decision of a single juror to abandon his conscientious belief as to the correctness of his position.") (quotations omitted).

further inquiry").

It is no argument to say that the guidance was not required because the Court did not actually give an *Allen* charge. As the First Circuit has said, this argument is circular. *Hernandez-Albino*, 177 F.3d at 38 (government's argument that guidance need not be given if *Allen* charge is not given was a "tautological argument," which "ignore[d] our explicit ruling that 'any supplemental instruction which urges the jury to return to its deliberations must include the three balancing elements stated above.'"). Any supplemental charge to the jury, including a charge to continue deliberations, after a jury is understood to be deadlocked, must include the three areas of guidance required by the First Circuit. Because the substance of these elements was not communicated to the jury, no other inquiry is needed and a new trial must be ordered. *Anguilo*, 485 F.2d at 39-40.

## II.     The Court erred in refusing to give a theory of defense instruction.

The First Circuit has repeatedly confirmed that "[i]t is a basic tenet of criminal law that a defendant is entitled to an instruction on his theory of defense." *United States v. Powers*, 702 F.3d 1 (1st Cir. 2012). In fact, it is well-established law in the First Circuit that a theory of defense instruction should be given "so long as the theory is a valid one and there is evidence in the record to support it. In making this determination, the district court is not allowed to weigh the evidence, make credibility determinations, or resolve conflicts in the proof. Rather, the court's function is to examine the evidence on the record and to draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can *plausibly* support the theory of the defense. This is not a very high standard to meet, for in its present context, to be 'plausible' is to be 'superficially reasonable.'" *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998) (citations omitted) (emphasis in original). Here, the defense's proposed instruction was valid and the evidence more than "plausibly" supported it. The proposed instruction

was:

> *Mr. Peake does not contest that there was a conspiracy that existed between Gabriel Serra, Kevin Gill, Gregory Glova, and Peter Baci. Rather, he contends that he did not knowingly and intentionally participate in this conspiracy and did not knowingly and intentionally join the conspiracy as a member. Mr. Peake further contends that any discussions he had with Gabriel Serra were legitimate and competitive discussions and not anti-competitive conspiracy related. Mr. Peake also contends that he was competing with Horizon, including on market share and price.*

> *Although this is Mr. Peake's defense, the burden always remains on the government to prove the elements of the offense beyond a reasonable doubt. If you do not believe the government has proven beyond a reasonable doubt that Mr. Peake intentionally and knowingly joined the conspiracy, you must find him not guilty.*

The government incorrectly argued to the Court, however, that the instruction allowed the defense to present hearsay testimony of the defendant, Mr. Peake. This argument invited the Court to err. There is no requirement that a defendant testify in order to present a theory of defense instruction. To the contrary, as long as there is any plausible evidence—in the light most favorable to the defense—in the record to support the instruction, it should be given.

The prosecution's argument in this regard constituted an improper burden upon Peake's exercise of his Fifth Amendment right not to testify. Penalizing Peake for exercising this right by using it as a reason to justify blocking his theory of defense instruction constituted reversible error. *See Carter v. Kentucky*, 450 U.S. 288, 301 (1981) (summarizing well-settled law that a defendant must pay no court-imposed price for the exercise of his constitutional privilege not to testify).

Putting aside this unconstitutional argument, the instruction should have been given as the defense uncovered and admitted a great deal of evidence to support it, including numerous documents and testimony from the government's witnesses. For example, there were numerous instances revealed by cross-examination where key government conspirators did not indicate pre-trial (before the influence of the government and an opportunity to obtain a more lenient sentence arose)

that Frank Peake was a participant in the conspiracy. It was the defense that disclosed to the jury that both Peter Baci and Gregory Glova kept detailed concurrent notes regarding conspiracy discussions, events, and meetings. In the 29 notebooks that Baci kept during the course of the conspiracy, there were no entries documenting any involvement by Frank Peake. On the other hand, Baci's diaries contained countless notations regarding Gregory Glova, Gabe Serra, Kevin Gill and their illegal communications. Glova too kept specific notes in his calendar regarding the conspiracy, none of which contained information about Frank Peake's involvement, conspiracy meetings with Peake, or inappropriate communications with the Sea Star President. In addition, immediately after Greg Glova was confronted for the first time about his illegal activity by the FBI, he wrote and revised a statement detailing his involvement in the conspiracy and naming the other key participants. Frank Peake was <u>not</u> mentioned. Further, in Peter Baci's Sentencing Memorandum to the Honorable Timothy Corrigan (which Baci testified was a true and accurate document), Baci's attorney explicitly explained how the conspiracy started and who participated during its existence. Leonard Shapiro, Kevin Gill, Gregory Glova, and Gabriel Serra were all cited. Frank Peake was <u>not</u> included. Accordingly, there was more than sufficient corroboration to back the defense's theory that a conspiracy existed among the government's witnesses, but did not include Frank Peake.

In support of Mr. Peake's assertions that his communications with competitors were legitimate, Gabriel Serra testified that there were many appropriate reasons for employees of competing companies to speak, including port issues, legislative concerns, transportation service agreements (TSAs), and social communications. *See* Tr. Jan. 22, 2013 at p. 57, lines 3-7. Serra admitted that he had all of these legitimate discussions with Frank Peake.[5] Additionally, contrary

---

[5]During Serra's cross-examination, the following exchange took place:

to the government's misrepresentation to the jury that there would be no need for Peake and Serra to discuss their companies' TSAs after a contract has been signed, Serra admitted after defense questioning that TSA issues came up all the time that needed to be discussed.  These are a few of the questions and answers from Serra's cross-examination:

- Q. And, in fact, the TSA issues that would come up wouldn't only come up when contract time came up, right?

  A. There would be sometimes issues -- of course.

  Q. Issues regarding service. Regarding all sort of stuff would come one [sic] the TSA?

  A. Absolutely.

  Q. Right. And you guys would talk about those issues, right, Mr. Serra?

  A. Yes, sir.

Tr. Jan. 23, 2013 at p. 71, lines 10-18.

- Q. Frank would call you often about issues regarding service, correct?

  A. Yes.

*Id.* at p. 75, lines 18-20.

- Q. There are other reasons to talk about the TSA other than negotiation, right?

  A. There was ongoing negotiations with the TSA.

  Q. And you even get upset because Frank Peake stays on you on these issues, right? You say here that you keep getting blind sided here from Peake, right?

---

  Q.  And I think you spoke about valid reasons that you would speak to Frank Peake. Social reasons. Business reasons, TSA reasons. There were lots of legitimate reasons to speak to him, right?

  A. Yes, there were.

Tr. Jan. 23, 2013 at p. 71, lines 5-9.

A. He was a tough customer.

Q. Frank was a tough customer?

A. Absolutely.

*Id.* at p. 77, lines 10-16.  Numerous defense exhibits (numbers 76, 77, 78, 79, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 95, and 96) also demonstrated the frequency and legitimacy of discussions between Peake and Serra.  Gabe Serra was asked about each of these exhibits during his testimony and acknowledged they were evidence of legal, appropriate discussions between competitors.  Thus, there is abundant support in the record to justify this portion of the theory of defense instruction.

Moreover, there is confirmation in the record of Frank Peake's desire to compete with Horizon Lines by taking the competitor's customers, market share, and capacity.  A lot of the cross-examination of  Gabriel Serra and Peter Baci was devoted to Sea Star's introduction of a third ship in the Florida/Puerto Rico trade lane.  Frank Peake was extremely aggressive about putting a third Sea Star ship into the water expecting that it would lead to Sea Star having 50% of the market within four months, 53% of the market in less than a year, then 55% of the market in just over a year.  *See* Defense Exhibit 137.  *See* also Defense Exhibits 113 and 127 (regarding Sea Star's <u>internal</u> goal of achieving a 50% market share).  This proof contradicted the government theory of a Florida 50/50 conspiracy agreement.  Further, Serra testified to the following:

• Q.  You know what I am talking about when I refer to Sea Star's third ship?

A. Yes, sir.

Q. This was a big issue between Horizon and Sea Star, correct?

A. Well, it was a big issue we would lose a customer, a tough but big customer.

. . .

Q. What Frank wanted was for Sea Star to put another ship from Jacksonville to Puerto Rico?

A. That's correct.

Q. And this would change their relationship with you all, right? They wouldn't need to buy all that space on your boats anymore, right?

A. That is correct.

Q. And it would increase capacity in the market, right?

A. If we were to retain the same ship deployment, yes.

Q. In other words, if everything remained the same, and Frank Peake's third ship came into the water, supply would go up, right?

A. That is correct.

Q. Okay. And you got into a number of fights with Frank Peake about that third ship, did you not?

A. We got into arguments where we didn't want to lose a big customer, that's correct.

Q. Not just customer, but you didn't agree with the philosophy that he was putting forward about putting a third ship in the market, right?

A. Well, it was, yeah, it was very negative to us because they would no longer need to buy space from us.

Q. Negative to you and positive to him?

A. I don't know if it was positive to him. That was part of the argument. I didn't think it was.

Q. But he did?

A. He did.

Q. And he told you that, right?

A. That's correct.

. . .

> Q. Because you guys were fighting with each other.  I am not talking physically now. I am talking competing now, right?
>
> A. Yes, sir.

*Id.* at pp. 80-83.

- Q. Frank Peake was being really aggressive on this third ship, was he not?

  A. Yes, sir.

*Id.* at p. 103, lines 4-6.

- Q.  And when you were dealing with your tough customer, Frank Peake, he writes an E-mail about how he was disappointed in your counteroffer, correct?

  A. Yes, sir.

  Q. This wasn't [a] physical poke, but you write back, none of this is for kicks, Frank?

  A. That's right.

  Q. You guys were going at it, right?

  A. Absolutely.

*Id.* at 104, lines 9-18.  This testimony and defense exhibits 137, 140, 141, 142, 146, 149, 150, 159, 160, 164, 167, 168, 169, and 171 provide sufficient confirmation in the record of Peake's desire to compete.  Consequently, the defense's theory of defense instruction was valid, factually supported, and should have been given to the jury.  *United States v. Gamache*, 156 F.3d 1 (1st Cir. 1998).

### III.    The prosecution's wrongful attempt to appeal to jury bias and prejudice.

"If government counsel in a criminal suit is allowed to inflame the jurors by irrelevantly arousing their deepest prejudices, the jury may become in his hands a lethal weapon directed against defendants who may be innocent.  He should not be permitted to summon that thirteenth juror, prejudice." *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 659 (2d Cir. 1946) (Frank, J., dissenting)

We initially briefed this issue before we had the transcript of opening statement or witnesses.[6] As we have said before, any argument that "encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence" is strictly prohibited. *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 491 (1st Cir. 2010) (citing *Forrestal v. Magendantz*, 848 F.2d 303, 305 (1st Cir.1988)).[7] Accordingly, we supplement our previous motions for mistrial, and our motion to transfer, with the following portions from the opening and witness testimony.

The Government's Opening Statement:[8]

- p. 1: "Shipping is very important in Puerto Rico. . . . Most consumer goods travel to Puerto Rico from the shipping lanes of Jacksonville, Florida, Elizabeth, New Jersey, and Houston, Texas.  Food for Pueblo supermarkets, medicine at Walgreens, most things at Walmart.  Most things made in Puerto Rico for sale in the states travel through those same shipping lanes, things like pharmaceuticals, electronics and rum."

- p. 2: "Sea Star and Horizon carried most of the freight moving through Puerto Rico shipping lanes and they took advantage of their position by fixing the rates they charged their customers to and from Puerto Rico."

---

[6]This argument also comprised a large portion of Mr. Peake's Reply in Support of his Motion to Transfer Case Under Rule 21(b) and Motion to Transfer Under Rule 21(a).  Despite the government's assurance to this Court that it would not make such an improper argument, we correctly anticipated then that the government would argue at trial that every citizen of Puerto Rico was affected by Mr. Peake's actions, thus making the jurors victims of the alleged crime itself.  D.E. 33.  Had the government been honest with this Court that it not only planned on making such an argument, but that it planned on making it the theme of its opening statement, this Court may have granted the motion to transfer pretrial.

[7]Justice Sotomayor recently underscored this point: "[B]y threatening to cultivate bias in the jury, it equally offends the defendant's right to an impartial jury." *See Calhoun v. United States*, 568 U.S. ___ at p. 5 (2013) (Sotomayor, J., respecting the denial of the petition for writ of certiorari), citing ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.8(c), p. 106 (3d ed. 1993) (stating that "it is a settled professional standard that a 'prosecutor should not make arguments calculated to appeal to the prejudices of the jury'").

[8]Tr., Jan. 18, 2013 at pp. 1-11.

- p. 3: "It was so significant that it affected billions of dollars of freight to and from Puerto Rico.  Billions of dollars.  This case is about Puerto Rico because the conspiracy affected so much of what is sold here and what is exported from here."

- p. 4: "Congress passed the Sherman Act because it was so concerned that consumers need to buy things to feed and clothe their families. ... They [customers] try to get the best price for what they buy, especially in times when money is tight."

- p. 5: "For customers, making ends meet often depends on getting the best prices. Unfortunately, the customers that ship freight to and from Puerto Rico between at least 2005 and 2008 were not getting the benefits of price competition from the shipping companies.  You will hear instead that they were the victims of price fixing and they were paying more because of it.  Businesses like Burger King, Office Max and Walgreens, businesses that have stores all over Puerto Rico, they were all paying more than they should have to ship freight to Puerto Rico because Sea Star and Horizon were conspiring, not competing."

- p. 6: "Those three shipping companies could gather and ship about 85 percent of the freight that moves to and from Puerto Rico."

- p. 9: "You will hear from a witness named Gabriel Lafitte from Caribbean Restaurants who owns all the Burger Kings in Puerto Rico.  He will tell you that the shipping costs are factored into the costs of the whoppers sold at Burger King."

- pp. 9-10: "Burger King ended up paying more to ship everything it needs to make its whoppers.  You will hear how they took advantage of victims of the conspiracy."

- p. 10: "The victims never knew why, but they did know that they were paying more and more and more for their shipping each year.  That is exactly what the shipping companies were trying to get them to do."

- pp. 10-11: "The conspiracy didn't just affect business.  It also affected the federal government.  The federal government used these shipping companies to ship freight to Puerto Rico.  For instance, there will be evidence that the government used the shipping companies to ship food for the school lunch program.  The federal program gives free and reduced price lunches to families who can't afford to pay for their lunches.  You will hear from the Department of Agriculture, USDA which will tell you that paying more for shipping meant that the government had less money in the school lunch program to buy food for school children."

Although the Court instructed the jury that these issues were not relevant, the damage already had been done.  And the Court's instruction did not deter the government.  It subsequently called

Ron Reynolds, from the United States Department of Agriculture (USDA).  The defense objected to this witness, but the government assured the Court that it wouldn't discuss the school lunch program.  Tr., Jan. 18, 2013 at p. 103 (Government counsel: "we won't go into the effect on school lunch prices.").  With this assurance, the Court allowed the government to call Mr. Reynolds.  But the government deceived the defense and the Court, and went right ahead asking questions (over defense objection) about the school lunch program:

- "You mentioned that the USDA has a need to transport goods to Puerto Rico and you mentioned some programs and one of those programs you mentioned was the school lunch program?"  *Id.* at pp. 114-115.

- "Does the USDA purchase food for the school luncheon program?"  *Id.* at p. 115, lines 21-22.

- (Again) "Does the USDA purchase food for the school lunch program?"  *Id.* at p. 116, lines 3-4.

- "Does the USDA arrange for transportation for food of the school lunch program?"  *Id.* at p. 116, lines 6-7.

- "And does the USDA receive funds to purchase the food for school lunch programs?"  *Id.* at p. 116, lines 16-17.

- (Again) "Does the USDA receive funds to purchase food for the school lunch program?"  *Id.* at p. 116, lines 19-20.

- "Does the USDA ever receive separate funding to arrange for the transportation of that program?"  *Id.* at p. 116, lines 22-23.

- "From 2003 to 2008, was food for the school lunch program transported from the states, from Jacksonville to Puerto Rico, with a transport on ships operated by Sea Star and Horizon?"  *Id.* at p. 117, lines 1-4.

- "Was food for the school lunch program transported from Jacksonville, Florida to San Juan, Puerto Rico on ships operated by Sea Star and Horizon?"  *Id.* at p. 117, lines 23-25.

Apparently, the school lunch program was not enough for the government as it tried to appeal to bias and prejudice in other ways as well by asking about other programs: "Q. Were there other

programs that the USDA purchased food for?  A. Yes, there is also the food assistance to low income

families, which is administered by the Puerto Rican Department of the Family." *Id.* at p. 118; "Q.

And did the USDA arrange for transportation of food for that program from Jacksonville to Puerto

Rico?  A. Yes, it did."; "Q. Did food for that program, was it transported on ships operated by Sea

Star and Horizon?  A. Yes, it was." *Id.* at p. 118, lines 7-12.

    As we explained throughout trial, no instruction could cure these sorts of over-the-top and

inappropriate appeals to sympathy and bias.  Because this was such a close case built on cooperating

witness testimony, these unlawful arguments certainly had the effect the government intended,

tipping the scales in favor of conviction for reasons other than the evidence.

    This is even more of a problem because the government failed to prove venue was

appropriate in this District as no conspiratorial meeting or overt act of the conspiracy occurred in

Puerto Rico.  *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) ( in a conspiracy case,

venue properly lies only in a judicial district where the conspiracy was formed or where a

coconspirator took an act in furtherance of the conspiracy).  *See also Hyde v. United States*, 225 U.S.

347 (1912); *United States v. Overshon*, 494 F.2d 894, 900 (8th Cir. 1974).   Accordingly, we

respectfully request that the Court order a new trial and order the government not to pursue these

arguments in the retrial.

    **IV.    The hearsay rulings regarding the taped phone calls, the statements made after
the calls (which were taped), and Glova's written statement were error.**

    The Court's rulings on these three issues – 1) precluding the defense from introducing

Glova's written statement, 2) excluding Glova's exchange with the FBI agent after his phone call

message to Serra, and 3) the admission of the tape-recorded phone calls with Glova and Serra – were

not only wrong as a matter of law, but also had the effect of misleading the jury about what actually

occurred here.

We briefly touch upon the Court's ruling that precluded the defense from cross-examining Mr. Serra regarding the statements that Glova and the FBI agent made on tape after Glova left the message for Serra.  As background, during the cross-examination of Gregory Glova, the defense sought to establish that Glova never mentioned Frank Peake during his hours-long interview with the FBI on the day he was caught, thus proving that Peake was not part of the government-charged conspiracy (or Glova would have told the FBI about him).  When the defense pressed to introduce Greg Glova's written statement, the government argued that the statement was hearsay and should not be admitted.  That statement did not mention Frank Peake.  Upon attempting to admit the 302 interview of Glova from the same day as the written statement, the government also argued that the agent's 302 report was hearsay and should not be admitted.  That 302 report listed 16 people that Glova mentioned during the interview, but did not mention Frank Peake.

After keeping those defense items out, the government was permitted by the Court to introduce two Glova tape-recordings (a message to Serra and a conversation with Serra) to make the argument that Glova did in fact mention Frank Peake during the earlier FBI Glova interviews.  The defense objected that these calls were hearsay and that admission of the tapes, without allowing the jury to see the Glova statement and 302 report of investigation, would mislead the jury.

To combat this deception, the defense also attempted to admit the statements that Glova made after leaving Serra a message, which demonstrated that Glova did not in fact mention Peake during the interview process.

> F.B.I. agent:     Were you referring to Frank Peake?
>
> Greg Glova:     Yeah, is he on your list?

*See* Tr. Jan. 23, 2013 at p. 5, lines 5-7.  Glova's question to the FBI here indicates that they had not

previously spoken about Peake, just as Glova had not mentioned Peake in his written statement and the FBI did not write in their 302 that Glova included Peake as a co-conspirator. Accordingly, it was proper impeachment that the defense should have been allowed to admit and it was necessary to correct the government's deceptive argument.

Without admission of those post-message statements between the FBI and Glova, the jury was left with the misimpression that Glova <u>did</u> mention Frank Peake during his interview, when he did not. These statements were admissible under Federal Rule of Evidence 806, which states: "When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked ... by any evidence which would be admissible for those purposes if declarant had testified as a witness."

That is exactly what happened here. The Court admitted (over defense objection) the tape recordings of Glova-Serra under Rule 801(d)(2)(E). That triggered Rule 806, which allows the credibility of the declarant (Glova) to be attacked even though the declarant was not on the stand. Accordingly, the government led the Court to err when it argued that we could not attack Glova's credibility because he was no longer on the stand. Not only were we permitted to make these arguments under Rule 806, *see United States v. Nardi*, 633 F.2d 972, 976-77 (1st Cir. 1980) (permitting questioning under Rule 806 "for limited purpose of impeachment"), but the end result was that the jury was not able to see Glova's signed statement or Glova's 302, or hear Glova's exchange with the FBI agent after he left a message for Serra. Each of these items would have seriously undermined the government's position that Glova had mentioned Frank Peake to the agent during his interview, and would have bolstered the defense. Because the jury was left with a misimpression, one which was not harmless, the Court should order a new trial. *See* Exhibit A. (Mlex article of juror explaining that the tape recordings were important to the final decision to

convict Peake).

Although we have briefed and argued the admissibility of the Glova statement and the tape recordings in detail, we feel compelled to address here some of the rulings in the Court's Opinion and Order, D.E. 174. First, permitting the government to admit the audio recording in which Glova leaves a message for Serra, was clear error, requiring a new trial.[9] In its opinion, the Court concluded that the first call was admissible under Rule 801(d)(2)(E), in part, because the declarant (Glova) was a member of the conspiracy at the time of the call. *Id.* at 5. Yet this finding is contrary to well-established law regarding conspirators *turned informants*. A tape recording made solely <u>by</u> a government informant is classic hearsay and is not properly admitted.[10] Greg Glova stopped being a co-conspirator the moment the FBI appeared at his home on April 17, 2008, and he agreed to cooperate in their investigation. From that moment on, his involvement in the conspiracy ended and he became a government cooperator. A co-conspirator-turned-government-informant is no longer a "conspirator" within the meaning of Rule 801(d)(2)(E). Thus, statements that Glova (the cooperator) made on a recorded phone call at the FBI's direction were not admissible under Rule 801(d)(2)(E) because he was a government informant rather than a co-conspirator at the time the statements were made and, obviously, the statements were not made in furtherance of the conspiracy. *See  United States v. Darden*, 70 F.3d 1507, 1530 (8th Cir. 1995) (finding statements on tape recordings of co-conspirator who became an informant not admissible ); *United States v. Smith*, 578

---

[9]We also maintain that the second call was inadmissible hearsay for all of the reasons we argued orally and in writing.

[10]The Court cited two cases on this point in its Order, *United States v. Cianci*, 378 F.3d 71, 101 (1st Cir. 2004) and *United States v. McCarthy*, 961 F.2d 972, 977 (1st Cir. 1992). These cases are relied upon in error since they consider the admissibility of a current co-conspirator's statement (pre-arrest and pre-exposure of the conspiracy by law enforcement), <u>not</u> the admissibility of a cooperator's statement.

F.2d 1227, 1233 (8th Cir. 1978) (holding inadmissible under Rule 801(d)(2)(E) statements of co-conspirator turned government informant made after declarant agreed to assist government because declarant was no longer member of conspiracy). *See also United State v. Abou-Saada*, 785 F.2d 1 (1st Cir. 1986) (hearsay by former co-conspirator turned government cooperator was not admissible). The government did not argue otherwise. Even though the government has never asserted in its pleadings or oral argument that Glova was a member of the conspiracy at the time he made the recorded phone calls, the Court erroneously found that Glova was a "member[] of the conspiracy at the time of the calls." Order at 5.[11] As a result of Glova's discontinued membership in the conspiracy, element three of the four conditions fails and the first tape-recorded call should not have been admitted.[12]

With regard to Glova's written statement (Defense exhibit 451) and the statements memorialized in his 302 report (Defense exhibit 452), it was error not to admit this evidence. For starters, it was evidence of a prior inconsistent statement. *See* Fed. R. Evid. 613. It is well-settled that the rules of evidence allow impeachment of a witness by the omission of a fact within a previous statement – so-called "negative impeachment." *United States v. Catalan-Roman*, 585 F.3d 453 (1st Cir. 2009) (abuse of discretion for trial court to exclude witness's omissions in previous 302 report of interview); *United States v. Meserve*, 271 F.3d 314, 320-21 (1st Cir. 2001) ("Prior statements ... that omit details include in a witness's trial testimony are inconsistent if it would have been 'natural'

---

[11]It is the law in every Circuit, including the First Circuit, that one cannot conspire with a government agent. *See, e.g., United States v. Paret-Ruiz*, 567 F.3d 1, 6 (1st Cir. 2009).

[12]Hearsay statements are not admissible under rule 801(d)(2)(E) unless 4 elements are met: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; (3) the declarant was a member of the conspiracy at the time of the statement; and (4) the declarant's statements was made in furtherance of the conspiracy. Order at 3.

for the witness to include the details in the earlier statement.").  It is undisputed that the calls that the prosecution admitted were made at the same time to the same agents as the statements in the 302 report and the written signed statement by Glova himself.  It is not legally justifiable to admit the Glova statements that advances the government's theory and exclude the Glova statements that undermine the government's theory when all of the statements were made under the same circumstances.  In other words, Glova's statements cannot be both admissible and inadmissible under the application of the same evidentiary principles.  What's good for the goose is good for the gander.

Glova testified at trial (nearly 5 years after his criminal behavior was exposed) that Frank Peake was a key participant and problem-solver in the conspiracy.  These claims were drastically different from Glova's first statements to the FBI, including the signed, sworn statement he provided, which never once mentioned Peake.  Glova's failure to include Frank Peake in this signed, written statement was crucial to the defense's case.  It was further proof that Peake was not a participant in the charged conspiracy; otherwise Gregory Glova would have included him in this first statement as he did all the other main players of the conspiracy.  "After all, the pretrial statements were made when memory was fresher and when there was less time for the play of bias.  Thus, they are often more trustworthy than the testimony." *Catalan-Roman,* 585 F.3d at 468, n. 19 (citing 1 *McCormick on Evidence* § 34 (6th ed. 2006)).  If Glova's trial testimony were true, it would have been only "natural," normal, and appropriate to also mention Peake at this early stage where the FBI was gathering as much information about the conspiracy as possible.  *Meserve*, 271 F.3d at 320-21.  Consequently, the jury should have been given the statement.  It was not enough to simply question Glova about the statement.  The actual written statement should have been admitted, as well, because it was not hearsay.  Prior inconsistent statements are not admissible to prove the truth of the matter asserted in the earlier statement, but rather, to demonstrate that the witness's testimony at trial is not

credible because he is changing his story. Failure to admit this key piece of evidence, which showed that Glova thoughtfully and consciously made decisions to add, delete, and change things within the statement, was highly prejudicial to the defense's case.

### V. Testimony linking Frank Peake's compensation and Sea Star's Profits & Losses to the conspiracy should not have been admitted.

The Court should reconsider its ruling regarding the admission of Frank Peake's compensation and bonuses and Sea Star Lines' financial statements as the government improperly argued that Sea Star and Frank Peake made more money because of the conspiracy, rendering the Court's ruling further erroneous. The government did not call any expert witness (such as an economist) to show that Sea Star's profits were in any way linked to the conspiracy. In fact, there was an equally valid explanation for the increased profits of Sea Star – one of the competitors went out of business. This led to prices going up and to Sea Star making more money. It also led to Frank Peake's bonuses going up. The government's own witnesses said this. Gabriel Serra testified on cross-examination:

Q.    Sometimes they [Navieras] were charging less than their costs just to generate some money, correct?

A.    At that time all carriers were charging below costs.

Q.    And when all the carriers charging below costs, everybody was losing a lot of money, right?

A.    The press reports were that in 2001 the industry lost $100 million.

Q.    And the market, I mean, it was just a mess, wasn't it?

A.    It was difficult.

Q.    And then Navieras goes out of business, correct?

A.    Yes.

Q.      And that helps to sort of normalize the market, does it not?

A.      It eliminated some capacity and it also showed that some of those prices were unsustainable. In our discussions with our customers we can certainly point to their failure as proof that the prices was sustainable and not remunerative.

Q.      And one of the reasons the market turned around is because Navieras goes out of business and you are able to tell customers, it is not going to happen like that anymore, am I correct?

A.      In a way, yes.

Q.       And the customers understood that, right?

A.      To some extent, yes.

. . .

Q.      Supply is going down, right?

A.      At that point, yes.

Q.      And when supply goes down prices can go up, right?

A.      Yes.

*See* Tr. Jan. 23, 2013 at pp. 33-34.

Despite this testimony, the government argued in opening statement all the way to closing that the conspiracy *caused* profits to go up and was, therefore, the motivation behind Peake joining the conspiracy because if profits went up, so would his bonus.  *See* Tr., Jan. 14, 2013, Opening at pg. 18 ("Why did Frank Peake do it?  Why did Sea Star and Frank Peake get out of this conspiracy? ... Frank Peake received large bonuses that were based in part on the profits of the company. Basically you will hear the illegal conspiracy made more money for Sea Star. It made more money for Frank Peake.").  This argument and testimony elicited from lay witnesses was improper.

## CONCLUSION

As evidenced by the jury's difficulty in reaching a verdict and this Court's comments, this was an extremely close case.  Unfortunately, some of the errors during trial, as well as some of the government's improper arguments, caused the verdict to go one way instead of the other. Accordingly, if the Court is not inclined to grant a judgment of acquittal, we respectfully request that this Court order a new trial in the interests of justice. **We also respectfully request oral argument on this motion.**

Respectfully Submitted,

**MARKUS & MARKUS, PLLC**
DAVID OSCAR MARKUS
Florida Bar Number 119318
Dmarkus@markuslaw.com

40 N.W. 3rd Street, Penthouse One
Miami, Florida 33128
Telephone (305) 379-6667
Facsimile (305) 379-6668
www.markuslaw.com

By:      /s/ David Oscar Markus
               David Oscar Markus

          /s/ Francisco Rebollo-Casalduc
          Francisco Rebollo-Casalduc
          P.O. Box 195571
          San Juan, P.R. 00919
          USDC # 205603
          Tel (787) 765-0505
          Fax (787) 765-0585
          rebollo@onelinkpr.net

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed this 4th day

of March 2013, and served on all appropriate parties through that system.

/s/ David Oscar Markus
David Oscar Markus