```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF PUERTO RICO
2
      UNITED STATES OF AMERICA,      )
3                                    )   Case No:
                         Plaintiff, )   11-CR-512 (DRD)
4                                    )
      vs.                            )   SENTENCING
5                                    )   HEARING
      FRANK PEAKE,                   )
6                        Defendant. )

7     _____

8              TRANSCRIPT OF SENTENCING HEARING
                        HELD BEFORE
9          THE HONORABLE JUDGE DANIEL R. DOMINGUEZ
                 Friday, December 6, 2013
10
      _____
11

12                 A P P E A R A N C E S

13    For the Plaintiff:

14            Mr. Brent Snyder, Esq.
              Mr. Craig Y. Lee, Esq.
15            Ms. Heather Tewksbury, Esq.

16

17    For the Defendant:

18            Mr. David O. Markus, Esq.
              Ms. A. Margot Moss, Esq.

19

20

21

22

23

24

25
```

```
 1                    (WHEREUPON, commencing at 10:27 a.m., the

 2        following proceedings were had in open court, to wit:)

 3                    THE COURT:  Good morning to all.

 4                    For the ladies and gentlemen relating to the case

 5        of Mr. Peake, the case of Mr. Peake is a sentencing after a

 6        trial.

 7                    These two first sentences are plea agreements.  So

 8        the sentence of Mr. Peake will normally take a longer time

 9        and more effort of the Court, so I don't expect to start

10        that case until 11:30.  So if you want to take a brief

11        coffee, Cuatro Sombras on the corner over there is a good

12        place to go.  There are other nice Puerto Rican coffee

13        places that you can all go.

14                    MR. SNYDER:  Thank you, Your Honor.

15                    MR. MARKUS:  Thank you.

16                    THE COURT:  And, anyway, I had to read 140 or more

17        pages yesterday.  We normally restrict them to 30, but I

18        didn't have the opportunity to advise you that we consider

19        after 30 pages extra baggage, but the Court read all 140

20        pages.  Thank you.

21                    MR. MARKUS:  Thank you, Your Honor.

22                    THE COURT:  So the Court is well briefed on that,

23        but it is going to take the Court some time to discuss that

24        matter with both of you.  Thank you.

25                    So I suggest that you take a break while I handle
```

1    these other cases that constitute plea agreements.

2              (WHEREUPON, a recess was had from 10:29 a.m. to

3    12:33 p.m.)

4              THE COURTROOM DEPUTY:  Criminal case 11-512,

5    United States of America vs. Frank Peake.

6              THE COURT:  Okay.  First, the Court has amended

7    the opinion and order on the Rule 29 to add certain facts

8    that I think were pertinent and are to be examined under the

9    standard of in the light most favorable to the government,

10   which is not my standard for sentencing, but is my standard

11   for Rule 29.  So please provide three copies to the defense

12   and two copies to the United States.

13             Second, I think that the duration of this matter

14   is not going to be five minutes.  In fact, I don't think it

15   is going to be one hour, so I think we ought to go take

16   lunch and come back.

17             If that alters anybody's plane -- does that alter

18   your plane?

19             MR. MARKUS:  Your Honor, we have a flight that

20   leaves at 6:00.

21             THE COURT:  Oh, no.  We will be out of here way

22   before 4:00.

23             MR. MARKUS:  I don't know how long sentencing is

24   going to take.  I have spoken to the prosecutor, and I think

25   we have a PowerPoint presentation and they have --

1          THE COURT:  I know.  I will accept the PowerPoint,

2     I looked at it, and I am not going to go back on my

3     representation to you that he would be allowed bail on

4     appeal.

5          MR. MARKUS:  And we have spoken about that as

6     well, and I think we have an agreement in light of the

7     Court's comments on that to allow bail pending appeal.

8     Maybe we can --

9          THE COURT:  I want you to understand that I think

10    it is a courtesy, because I understand that I have an

11    otherwise extremely decent person before me, all right,

12    other than this conduct.  And I know he's not a danger to

13    the community because he's not going to be in the field any

14    more.

15         But whether or not this has issues on appeal that

16    I warrant that are close, I don't necessarily feel that way

17    now that I have examined the evidence coolly and having the

18    benefit of the record and my notes and the two briefs.

19         But, anyway, I am not going to change my mind as

20    to the right that he could develop an argument that may

21    persuade the Court, that's another matter.  Whether I think

22    it is going to fly -- the standard is that I think it is

23    going to fly.  That's the standard.

24         But, anyway, the Court is not going to change its

25    mind.  That was the representation made, and that's it.  But

1   should he not prevail on appeal, that will be another

2   matter.

3            MR. MARKUS:  Of course, Your Honor.  Can I have a

4   moment to speak with Mr. Snyder about --

5            THE COURT:  Yes.

6            (Short pause while counsels conferred.)

7            MR. MARKUS:  Your Honor, I think there are two

8   components to the sentencing; one is the objections to the

9   pre-sentence investigation report, and then 3553 factors.

10           THE COURT:  Yes.

11           MR. MARKUS:  Perhaps we could just deal with the

12  objections to the pre-sentence investigation report and see

13  where we are, and if that goes quickly, maybe we could get

14  the sentencing done before lunch, and, if not, maybe we

15  could take a break?

16           THE COURT:  The problem is that these ladies and

17  gentlemen have been here since 9:00.  That's the problem,

18  all right.  And I have no problem.  I am going to have lunch

19  here with a sandwich.  I am not leaving.  It is my personnel

20  that is here, that I think they ought to take lunch.

21           Now, you are not going to miss your plane, all

22  right?

23           MR. MARKUS:  All right.  Thank you.

24           THE COURT:  And I think we can move quickly

25  through some matters.  But I have no control over this.

1    This is your control.

2              MR. MARKUS:  I know.  And I don't think that's

3    going to take you long, Your Honor.

4              THE COURT:  No, no.  Fine.  No problem.  I am

5    going to allow it because I saw some of this already in your

6    brief.

7              MR. MARKUS:  There's no hotel rooms in Puerto Rico

8    tonight, so if I miss the flight, Ms. Moss and I have to

9    stay with you tonight, Judge.

10             THE COURT:  Fine.  I will take you.  It will be

11   after the sentence.  I don't know if you may want to be

12   there.  You may not want to be there.  I don't know.  Where

13   are we going to put the lady?

14             MR. MARKUS:  I don't know, Judge.  I don't know.

15             THE COURT:  All right.  Let's go.  1:30 on the

16   dot.

17             (WHEREUPON, a recess was had from 12:38 p.m. to

18   1:49 p.m.)

19             THE COURTROOM DEPUTY:  Criminal 11-512, United

20   States of America vs. Frank Peake.  Case called for

21   sentencing hearing.

22             Appearing on behalf of the government, attorneys

23   Brent Snyder, Craig Lee, Heather Tewksbury.

24             Appearing on behalf of defendant, attorney Margot

25   Moss and attorney David Markus.

1          THE COURT:  I realize we haven't made the best of

2    interpretations relating to your names.  Please excuse us.

3    All right.

4          MR. SNYDER:  I think at times, Your Honor, I have

5    been far more guilty of that in interpreting names than

6    anybody here has.

7          THE COURT:  That's fine.  But the vernacular here

8    is not English, so please excuse us in the pronunciation.  I

9    think we can handle English from the books, but not

10   otherwise.

11         Who is going to speak first?

12         MR. SNYDER:  I assume since it's the United

13   States' sentencing, I would be happy to speak first,

14   Your Honor.

15         THE COURT:  Go right ahead.  Now, please presume

16   that I have read all the briefs, both of you.  Please do.

17   If you don't, I will give them to you underlined at the end,

18   all right.  So please do.

19         Go ahead.

20         MR. SNYDER:  Well, Your Honor, first, I will say

21   that I can probably speak for both of us in apologizing if

22   we overwhelmed Your Honor with paper.  We recognize that

23   some of the intricacies of antitrust sentencings aren't

24   always something that judges have confronted on a day-to-day

25   basis like some other types of sentencings.

1          Really, I just have a few basic points I want to

2     make that I think really probably cover both issues related

3     to the PSR and then also sentencing.

4          THE COURT:  You know what he is going to object to

5     in the PSR.

6          MR. SNYDER:  Yes, Your Honor.

7          THE COURT:  Why don't you address those points.

8          MR. SNYDER:  Okay.  Undeniably, this was an

9     egregious and harmful conspiracy, and I don't think it is

10    anything that I really need to belabor here today.  The

11    Court, having handled the entire MDL related to this

12    conspiracy, I think is very well aware of kind of the

13    breadth and scope of the conspiracy and all the types of

14    companies that were affected by the conspiracy.

15         The really salient issue that I think goes to both

16    the PSR and to the sentencing is that this was a massive

17    volume of commerce that was affected by the conduct that's

18    at issue here in this case.  And that volume of commerce is

19    the key sentencing criteria when you apply the guidelines

20    under 2R1.1.  And there's --

21         THE COURT:  I have to clarify that I have verified

22    that the guideline in 2007 is equal to the guideline in

23    2013.  And since there was conduct in 2007, there is a

24    guideline that says that I must use the guideline that was

25    applicable during the last part of the conspiracy.

1          In other words, should there be an overlapping

2     between two guidelines, the guideline says that the Court

3     may use and should use the guideline that covers the last

4     part of the conspiracy.  Go ahead.

5          MR. SNYDER:  And the United States agrees with

6     that interpretation, Your Honor, and would only note with

7     respect to that guideline, that was a guideline that was

8     enhanced, actually, in about 2004 to extend --

9          THE COURT:  So if it was handled in 2004, then

10    since you have requested that we use the year 2005 and not

11    2003, so that's the appropriate guideline.

12         MR. SNYDER:  That is correct, Your Honor.

13         THE COURT:  All right.

14         MR. SNYDER:  And the key sentencing criteria under

15    that guideline is the volume of affected commerce.  And in

16    this case, as in all antitrust cases, there is a presumption

17    that all sales of the price fixed product or service that

18    occurred during the defendant's participation were affected

19    by the conspiracy.  And that is a presumption that Mr. Peake

20    has been unable to rebut.

21         And I think I can focus on just a single example

22    that hopefully makes the point clear, and that is the bunker

23    fuel surcharge.  The bunker fuel surcharge was undeniably

24    fixed.  There was a lot of testimony and documentary

25    evidence about the bunker fuel surcharge during the course

1      of the trial.

2              And the bunker fuel surcharge would go up and down

3      numerous times during the course of each year that was

4      affected by the conspiracy.  And as a result -- and that

5      bunker fuel surcharge applied to every single container of

6      freight that was shipped between the United States and

7      Puerto Rico.

8              So looking at just that one single component of

9      the rate that was charged to customers, it shows the

10     conspiracy affected all freight that was shipped back and

11     forth.  And that was applied to contracts not yet in

12     existence when Mr. Peake joined the conspiracy, contracts

13     that were already in existence when he joined the

14     conspiracy.  Because even if the contract had run halfway

15     through its term, the bunker fuel surcharge was still being

16     fixed on a more periodic basis during the life of those

17     contracts.

18             So there's been testimony, and I think the Court

19     added it to its order this morning about all the components

20     of the rates were affected by the conspiracy, and Mr. Baci

21     testified at trial that the price increases in those

22     components during the course of the conspiracy was 90 plus

23     percent attributable to the conspiracy.

24             Now, as a result of the fact that this case

25     involves such large volumes of affected commerce, the

1    investigation has produced several of the longest sentences

2    ever imposed for antitrust defenses.  And that includes

3    Peter Baci, who was Mr. Peake's subordinate, who received

4    what at that time was the longest sentence for an antitrust

5    defense.  There has been since somebody else sentenced to

6    the same amount of time.

7              And Mr. Baci received that sentence even though he

8    almost immediately accepted responsibility and began to

9    substantially cooperate with the Government's investigation.

10             So based on that --

11             THE COURT:  I think I made this expression before,

12   and I did it in the last letter that I received from the

13   juror, from the foreperson, and that is that we cannot take

14   Baci naked.  We have to take Baci with the extra baggage

15   that he earned.  In other words, he earned 3 points, which

16   the defendant is not entitled to, and he earned the 5K1.1

17   substantial assistance.

18             Now, there's no guideline for a 5K.  That's a

19   discretional matter.  But a 5K, to use an example, is more

20   than a safety valve.  Because a safety valve is merely

21   stating the truth.  It is not cooperating.  And a safety

22   valve is 2 additional points.

23             So I think we should add 3 and 3 points, if we are

24   only going to use the guidelines.  But we're not.  We're

25   not.  Because I want to hear the whole spectrum, not just

1    the guidelines, all right.  But we cannot take Baci and say

2    Baci got 48, therefore, he shouldn't get more than 48.  The

3    problem is that Baci cooperated, and Baci also timely

4    accepted responsibility and did not expose the Government to

5    having to prove its case.

6         MR. SNYDER:  That's correct, Your Honor.  And the

7    same basic facts apply to each of the other people that had

8    been prosecuted in this investigation.

9         THE COURT:  For that I cite the case of Brother

10   Perez-Gimenez that was confirmed, and that is, I have faced

11   that matter here in federal court many times, when we have

12   conspirators that because a person pled guilty, they want to

13   have the same sentence as the person that accepted

14   responsibility, the conspirator that went to trial versus

15   the person that accepts responsibility or cooperates.  And

16   that's the case of US vs. Rodriguez Lozada, which was from

17   Judge Perez-Gimenez, which has been cited many times, which

18   is at 558 F.3d 29 at page 45:

19        "In addition, as the district court noted, Richard

20   and the other coconspirators pled guilty, pursuant to plea

21   agreements that addressed their roles under United States

22   Guideline 3B1.1.  Given the material difference between the

23   defendants who pled guilty pursuant to plea agreements and

24   Rivera, who did not, no disparity in sentencing occurred in

25   this case that would amount to an abuse of discretion."

1           And here there is the added baggage that these

2     gentlemen cooperated.  So now I wanted to make a comment.

3     Because this Court -- you just said that I participated in

4     the civil case.  And I want to make the comment of Isaac

5     Camacho vs. Autoridad De Telefonos, which is at 868 F.2d.

6     This is a case where I was a lawyer.  And Judge

7     Perez-Gimenez had acted in a criminal capacity, and then he

8     had a civil case, and they alleged that because the judge

9     participated in a civil or a criminal case, he cannot take

10    the case after.

11          And Isaac Camacho, which is at 868 F.2d, at page

12    482, going to page 490, it is an opinion authored by Judge

13    Selya.  If you look closely, you will find that I was one of

14    the lawyers representing the authority persons.  And the

15    issue here was that Judge Perez had handled the criminal

16    case in its entirety as far as providing and authorizing all

17    the Title IIIs.  All of them.  So he saw all that evidence

18    ex parte.  Not in court.  Ex parte.

19          And in comes the civil case where the *Macheteros*,

20    who were the gentlemen who were found guilty of putting the

21    bombs on the National Guard airplanes, and also who attacked

22    in Connecticut the stagecoach, the electronic stagecoach,

23    let's put it that way, and these gentlemen then attacked the

24    Title IIIs in the civil case, alleging that because in

25    Puerto Rico, we cannot make another constitution, of

1      wiretapping, that, therefore, since we were in Puerto Rico,

2      that we could not wiretap under Title III.

3              And they filed a case against the company that

4      authorized the wiretap, and, of course, as you can imagine,

5      that was not a very difficult case for the First Circuit on

6      the merits, because that's preempted.  And the state cannot

7      preempt a federal law.

8              But the main point of the case is on the recusal

9      of Judge Perez because he had seen the criminal, and then he

10     had seen the criminal ex parte.  All of them.  Even assuming

11     all of them.  The First Circuit Court stated that the

12     participation in both civil and criminal was not a reason to

13     recuse.

14             I also want to clarify the following.  The case of

15     the civil case that was assigned to the Court was not

16     because I asked for it.  This was a case that was assigned

17     to the Court by the multidistrict litigation.  I did not

18     request this case, the civil case.  Neither did I request

19     the criminal case.  The criminal case was assigned by the

20     chief to me because of procedural efficiency in handling

21     this case.  That's all.  And because of that, that case was

22     assigned by the chief.  I didn't ask for it either.

23             So I want to clarify that, because I want the

24     record to be clear on those two aspects because you

25     mentioned that this Court saw the civil case.  Yes, I saw

1    the civil case, but it was an assigned case from the

2    multidistrict litigation.  It wasn't assigned to the

3    district, it was assigned to me from the MDL litigation.

4              All right.  Go ahead.

5              MR. SNYDER:  Yes, Your Honor.  Thank you.

6              Based on the volume of commerce and the sentences

7    that Mr. Peake's coconspirators received, he's potentially

8    facing a very significant sentence, and in the

9    Government's -- and, obviously, the Government's

10   recommendation shows that the Government believes that he

11   deserves it.  But the Government also recognizes that this

12   Court has considerable discretion in deciding what

13   Mr. Peake's sentence should be.  And it is that that I

14   really want to address myself to for my remaining remarks

15   today.  As the probation officer concluded, in looking at

16   both the guidelines and equitable issues, there are no

17   factors, there are no guidelines or equitable factors that

18   warrant the Court's exercise of discretion to significantly

19   depart from the guidelines.

20             And I just quickly want to address a number of

21   potential things that the Court could be considering.  You

22   know, the first is that a departure isn't warranted because

23   of the fact that Mr. Peake's subordinate Peter Baci handled

24   the day-to-day operations and details of the conspiracy.

25   That's what bosses do.  They delegate, and they oversee

1    other people who did the real work of either legitimate work

2    or illegitimate work in the case of conspiracy.  That is

3    really the main point that I think needs to be considered in

4    connection with the leader/organizer enhancement under the

5    guidelines.

6            It is not a defense that Mr. Peake let Mr. Baci do

7    more of the dirty work.  That doesn't make him less

8    culpable, and it doesn't make him less worthy of punishment.

9    In fact, he benefited by a lot of that work that was done by

10   Mr. Baci because he was the person who was getting the

11   largest bonuses when Sea Star line made profits when their

12   profits went up.

13           THE COURT:  Brother counsel disagrees with you, so

14   let me hear the figures.

15           MR. SNYDER:  I'm sorry?

16           THE COURT:  Brother counsel on the other side

17   disagrees with you.  He says that, in fact, he received less

18   salary every year.  He says a 5 percent cut in his salary

19   every year.  That's what he says.

20           MR. SNYDER:  I think if you look at his total

21   compensation, in some years the bonuses -- there were some

22   years where bonuses were a little higher and some years they

23   were a little lower.  But Sea Star would only pay bonuses if

24   the company was making a profit.  And Sea Star in its entire

25   history only ever made a profit during the conspiracy.  In

1    addition to that, even if Mr. Peake's bonuses were a little

2    higher or a little lower in certain years, I believe the

3    evidentiary record shows that his were the highest being

4    paid in the company.

5              And so he was always benefiting -- when Sea Star

6    was profitable as a result of the conspiracy, and bonuses

7    were paid, he was always benefiting more than anybody else

8    at the company was, including Mr. Baci.

9              Mr. Peake knew, participated, oversaw and, most

10   importantly, could have stopped the conspiracy, but he

11   didn't.  And that's precisely why he should receive the

12   leader/organizer bump under the guidelines.

13             It would be unfair for Mr. Peake to obtain the

14   benefit and then let Mr. Baci take the fall.  You know, he

15   went to trial, which it was his right, but it would be

16   unfair for him now to say, "Well, Peter Baci did more of the

17   dirty work, and even though he cooperated, I should get a

18   more attractive sentence than he did."  That would

19   essentially be letting Mr. Baci take the fall for something

20   Mr. Peake at all times as Mr. Baci's boss could have put a

21   stop to.

22             This case is really no different than a drug

23   cartel case.  The cartel leader is not less culpable just

24   because it was somebody else that actually physically

25   smuggled the drugs.

1          THE COURT:  Or killed the persons.

2          MR. SNYDER:  Or killed the persons.

3          He's more responsible because he was the leader,

4    and he could have stopped the conduct.  And that's the same

5    thing that applies to Mr. Peake here.

6          Another more general argument that you have

7    already touched on is that a departure isn't warranted

8    merely because Mr. Peake's coconspirators got lower

9    sentences.

10          The case law is very clear on this, and the Court

11    already touched on this issue in the order that you issued

12    yesterday with respect to the juror letter.  As you noted,

13    the other individuals that have already pled guilty in this

14    case got lower sentences because they accepted

15    responsibility and they cooperated and Mr. Peake didn't.

16    Mr. Peake had all the same opportunities to plead and

17    cooperate at the outset, but he chose not to.  He doesn't

18    now get to take advantage of their decision to cooperate in

19    order to get a lower sentence.  He can't free ride on their

20    acceptance and cooperation.  That wouldn't be fair to them.

21    Had he made the same decision as they did at the outset, he

22    would have been treated similarly to them.  But he chose not

23    to.

24          The other argument I think that's clear from

25    Mr. Peake's briefing as well as his PowerPoint is that he

1    intends to point to sentences given to other antitrust

2    offenders in different investigations.

3           Well, the treatment of offenders in completely

4    different antitrust cases doesn't warrant a departure in

5    this case.  The cases hold that only similarly situated

6    defendants should be compared, and it needs to be an apples

7    to apples comparison --

8           THE COURT:  Let me ask you this:  When did the

9    guideline change?

10          MR. SNYDER:  I believe it was in 2004, Your Honor.

11          THE COURT:  2004.  So, therefore, examples prior

12   to 2004 do not help us.

13          MR. SNYDER:  That is correct, although I will note

14   for the record --

15          THE COURT:  That he has recent ones, yes, I know.

16          MR. SNYDER:  He has the more than recent ones.

17   But you are correct, Your Honor, the earlier examples are

18   not applicable because, one, many of them wouldn't have

19   involved convicted defendants, and, two, wouldn't involve,

20   you know, convictions post the new enhanced guidelines.

21          So the comparison really needs to be an apples to

22   apples comparison, not apples to oranges comparison.  By

23   that I mean, in a drug cartel case, a kilo in San Juan is a

24   kilo of cocaine in San Francisco.

25          But an LCD conspiracy -- and that would make that

1    an apples to apple comparison.  But an LCD conspiracy in

2    Taiwan is not the same as an auto parts conspiracy in Japan,

3    which isn't the same as a vitamins conspiracy in Europe,

4    which isn't the same as a coastal freight conspiracy in the

5    United States and here in Puerto Rico.  They are not apples

6    to apples comparisons.  And there's reasons for that.

7           They are different industries, different numbers

8    of participants, very important, different extradition

9    issues that require us to offer sentences that will cause

10   people to voluntarily submit to the jurisdiction of the

11   United States if they are in a country that we can't

12   extradite from, which was the case with the LCD defendants.

13          Different needs for cooperation, which can vary

14   throughout different investigations.  In this investigation,

15   we had those Gmails in our possession before any of these

16   defendants ever knew that they were under investigation.

17          That created a very different need or much less of

18   a need for cooperation than in a foreign investigation where

19   we don't have access to documents, people, or any sort of

20   covert surveillance opportunities.  And that distinguishes a

21   lot of the cases that Mr. Markus will shortly stand up here

22   and rely on.

23          Those differences lead to different sentences in

24   those investigations and make them inapt comparisons to this

25   investigation.  They also don't warrant departure here,

1    especially because they would result in Mr. Peake getting

2    lesser sentences than his own coconspirators, who accepted

3    responsibility immediately and cooperated beginning in 2008.

4            For instance, in the AUO case, the most senior

5    level executives who were convicted received 36-month

6    sentences.  And a more -- less culpable, a more mid-level

7    executive who was convicted at trial received 24 months.

8    But what Mr. Markus' entire point doesn't address is how

9    those sentences compared to all of the pleading and

10   cooperating coconspirators.  Those coconspirators all

11   received sentences that were substantially less than the

12   people who were convicted at trial.

13           So the mid-level executive who received 24 months

14   still received a sentence that was almost double the CEO of

15   one of the major participating corporations who pled guilty,

16   went to prison, and accepted responsibility.  Undeniably,

17   the CEO of one of the participating companies, who paid a

18   multi-hundred million dollar fine, was more culpable than a

19   mid-level executive at AUO.  But yet that mid-level

20   executive at AUO didn't accept responsibility, didn't

21   cooperate, and received a sentence that was almost double

22   that of the pleading and cooperating CEO.

23           Finally, Mr. Peake's personal characteristics

24   don't warrant a departure in this case.  Mr. Peake claims to

25   be a man of integrity, a good family man, and respected in

1       this community.  But almost all white collar offenders can

2       say the same thing.  That doesn't warrant leniency.  If

3       anything, that makes them even less worthy of sympathy or

4       leniency.  They have all the advantages:  Power, wealth,

5       respect, and public trust, yet they choose to abuse those

6       things.  They act out of greed, not need.  They misuse their

7       power and influence for personal benefit.  That doesn't

8       merit leniency.  A man of integrity would not have done to

9       Puerto Rico for years that Mr. Peake did and allowed to be

10      done.

11              So as the probation officer concluded, there's

12      simply no grounds that warrant a departure in this case.

13      Having said that, the Government recognizes that an 87-month

14      sentence, which is the guideline sentence, is severe.  But

15      so is the crime.  However, the Government does understand

16      that the Court may conclude that an 87-month sentence is too

17      severe for this case.

18              But even if so, the Government believes that a

19      sentence is necessary in this case that is longer than

20      Mr. Peake's coconspirators received, because any other

21      result gives him the benefit of the acceptance of

22      responsibility and cooperation that they earned and he

23      didn't.  And that would create a disservice, and it would be

24      a disincentive to cooperation for other people if they know

25      they can hold out, go to trial, and then free ride on the

1    cooperation of people who plead before them.

2            THE COURT:  That is a big problem.

3            MR. SNYDER:  This case is not about imposing the

4    longest sentence of all time.  It isn't.  That's not why the

5    Government is standing here and requesting this sentence.

6    It is about treating Frank Peake consistent with how his

7    coconspirators were treated.  Who, by virtue of the volume

8    of commerce, the severity of the conduct in this case,

9    received some of the longest sentences that have ever been

10   imposed, even though they cooperated quickly, and they pled

11   guilty quickly, and substantially cooperated.  True

12   unfairness and disservice would be to treat Frank Peake

13   better than his coconspirators by giving him the benefit of

14   their acceptance of responsibility and substantial

15   cooperation that they earned and he didn't.

16           THE COURT:  Before you leave, I would like to go

17   through the numbers on the points that are attributed under

18   leadership.  First, I have no doubt that he led or organized

19   at least one participant.  He doesn't have to lead all of

20   them, one participant is enough, and he lead at least two,

21   which is Chisholm and Baci.  But that doesn't do the trick

22   by itself.  We need others.

23           And I wanted to know of these factors that I am

24   going to read to you, under US vs. Appolon, 695 F.3d 44,

25   2012, at page 70, factors that are relevant in determining

1      the supervisory nature of a defendant's role.  The

2      supervisory nature.

3              One, the exercise of decision making authority.  I

4      imagine that that is relating to the conspiracy.  I think

5      that criteria has been met; that is, that Baci definitely

6      followed, when he had to intervene, Baci could not turn it

7      back.

8              MR. SNYDER:  That's correct.

9              THE COURT:  Baci could not turn it back.  And,

10     further, there were times when he was acting on himself

11     precisely because there was no agreement.

12             The second one is the nature of the participation

13     in the commission of the offense.  I think that's also met.

14     What's your opinion as to that?

15             MR. SNYDER:  We would agree, Your Honor.  He

16     played a leadership role.  His role was not to be the

17     hands-on, day-to-day person, but when issues would arise

18     that needed to be solved or guidance needed to be given, or

19     the conspiracy needed to be put back on track with Horizon,

20     that's when Mr. Peake would get involved and work to get

21     things on track.

22             THE COURT:  Third is the recruitment of

23     accomplices.  I don't think he recruited anybody.

24             MR. SNYDER:  We agree with that, Your Honor.

25             THE COURT:  And the fourth -- these are not

1    numerous clausus factors, these are numerous apertus

2    factors.  In other words, this is not the end of the

3    potential factors.

4          But the next one is the claim right to a larger

5    share of the fruits of the crime.  What is your position

6    relating to that?

7          MR. SNYDER:  That with respect to the bonuses that

8    he received from Sea Star, he received -- those bonuses were

9    the result of profits, the ill-gotten gains of the

10   conspiracy, and that as the president of the company, he did

11   receive larger bonuses than other people in his company did.

12         THE COURT:  A fifth element provided -- the fifth

13   criteria, not the element.  The fifth criteria was the

14   degree of participation in planning or organizing the

15   offense.

16         MR. SNYDER:  His role was that of a leader.

17   Undoubtedly, he played less of a role on a day-to-day basis

18   than Mr. Baci or Mr. Glova did.  The same thing would also

19   be true, however, of Mr. Serra, who did receive a four

20   leader organizer bump in connection with his plea.

21         THE COURT:  The sixth -- I am going to ask the

22   defendant, also, what his position is.  The sixth --

23         MR. MARKUS:  I will have an answer for you.

24         THE COURT:  The nature and scope of the illegal

25   activity.

```
 1              MR. SNYDER:  It was extensive, Your Honor.

 2              THE COURT:  I think I categorized it as extensive

 3     and persuasive in the sense that it covered, pursuant to

 4     some testimony, it covered up to 85 percent.

 5              MR. SNYDER:  Correct.  This was not a one overt

 6     act conspiracy that Mr. Peake just had awareness of as the

 7     boss of the company.  This was obviously a conspiracy that

 8     went on for a lengthy period of time, and although Mr. Peake

 9     was not there in those first months that it was organized,

10     he came in shortly thereafter, and the evidence at trial

11     established that he very quickly thereafter become involved

12     and continued to be involved throughout the remaining number

13     of years that the conspiracy remained in effect.

14              THE COURT:  And the seventh criteria is the degree

15     of control and authority exercised of others.

16              MR. SNYDER:  He was the president of the company.

17              THE COURT:  He at least had control over two

18     persons, and I recall that he was able to persuade at least

19     another as to applying the same bunker fuel to the longer

20     routes.

21              So that you may know where the Court got this,

22     this is commentary note number 4 to United States Guideline

23     3B1.1.

24              The other matter that I wanted to discuss with you

25     a little bit more thoroughly than you covered was how did
```

1    you get to the $500 million figure, which runs all the way

2    up to $1 billion.  There's no change.  It receives the same

3    points whether it is 500 or whether it is $999,000 million.

4              MR. SNYDER:  That's correct.

5              THE COURT:  It receives the same 12 points.  And

6    we examined the guidelines, and it is constant since on or

7    about 2005 or 2004.  So -- because he doesn't agree with

8    you, and this may be critical, because there are 12 points

9    attributed to this.

10             MR. SNYDER:  Right.  Although --

11             THE COURT:  By "he," I mean Mr. Markus.

12             MR. SNYDER:  Correct.  Even as to that, this

13   particular issue -- and first let me address your question.

14             The way we got to $500 million was, first, to

15   start out by asking Sea Star and getting evidence from Sea

16   Star line as to what their Puerto Rico sales revenues were

17   from July of 2003, where there is evidence that Mr. Peake's

18   actual participation began, and we run those numbers, we ask

19   them to run those numbers through mid April 2008, when the

20   conspiracy was ended.

21             THE COURT:  The conspiracy was ended the day of

22   the raid.

23             MR. SNYDER:  The day of the raids.

24             THE COURT:  Although he was arrested in 2011.

25             MR. SNYDER:  Correct.  But that is the broader

 1    period of time, the open $900 million numbers.

 2              Then we also asked them to provide us with the

 3    revenue that was from the time period from essentially the

 4    actual charge in the case, which was, you know, mid-2005,

 5    until the end of the conspiracy, and we asked them to run it

 6    from essentially the date when we have, you know, the first

 7    incriminating e-mail that Mr. Peake's name was on that was

 8    introduced into evidence.

 9              THE COURT:  And that came out around 900 --

10              MR. SNYDER:  The shorter period came out at 565.

11              THE COURT:  565, and the last 900 something.

12              MR. SNYDER:  Right.  So under either approach it

13    results in the same guideline enhancement.  So in that sense

14    it is really more of a technical matter of application of

15    the guidelines.  I think under the guidelines, 1B1.3, he is

16    responsible for all relevant conduct, whether he was charged

17    with it or not, and that includes the broader period.  It

18    doesn't result in any difference in his sentence.  I will

19    say, it was probably more of an academic point.

20              With respect to, then, the issue of why within

21    either time period we argued for all of the revenues, that

22    they should all be attributed to him, it is because of

23    testimony at trial that all of the components of the rates

24    were affected, that the price increases in those rates were

25    90 plus percent contributable to the conspiracy, and then

1    even if there are arguments about contracts, when certain

2    contracts started or ended as to whether those should be

3    included, there was other types of collusion that began

4    immediately when Mr. Peake came on board that would have

5    affected those contracts, the bunker fuel surcharge and

6    things like that, that fluctuate numerous times during the

7    course of the year that was all being fixed.

8              And then every time shipments were made during the

9    course of a month, those fixed bunker fuel surcharges were

10   being applied to the containers.  There were other similar

11   examples.  But when all of those rates are the subject of

12   collusion, and some of the collusion is on an annual basis,

13   some of it is, you know, can be on a monthly or even a

14   weekly basis depending on how often these bunker fuel

15   surcharges are fluctuating.  There was constant collusion

16   during the course of the year about rate issues.  The

17   presumption is they are all affected, and we, the United

18   States, you know, strongly asserts that that presumption

19   can't be rebutted in this case.

20             And so it is for that reason, the presumption that

21   all the rates were affected, there's no -- the guidelines

22   make it very clear, we have no obligation to show that the

23   conspiracy was successful or that it had an effect, or

24   anything like that.  But in this case, we have testimony

25   from the coconspirators that it was effective, and that it

1    was effective throughout the time period that Mr. Peake

2    participated in the conspiracy, and that it would have

3    affected all of that revenue.

4            With respect to then where I understand Mr. Peake

5    is, he, as I understand from his last objection to the PSR,

6    he contends that the volume of affected commerce is about

7    $383 million.  So he would argue he shouldn't receive the

8    enhancement applicable to the $500 million to $1 billion, he

9    should receive the enhancement applicable to the $250

10   million to $500 million.  Essentially, that amounts to a 2

11   level difference.

12           So I would assert the Government strongly believes

13   that its position is correct and consistent with how the

14   volume of commerce guidelines are applied in antitrust

15   cases.  But even if Mr. Peake's arguments are accepted, it

16   amounts to a 2 level difference in the guidelines, which

17   still puts his sentence probably somewhere in the 70-month

18   range.  So we're not talking about a meaningful difference

19   in the overall guideline sentence applicable to Mr. Peake

20   here.

21           THE COURT:  Well, I wouldn't want to do one day.

22   And 70 months is not the same as 87, if we are using

23   strictly guidelines, here.

24           MR. SNYDER:  I do understand that, Your Honor.

25   But in terms of what the Government's sentencing position

1     is, which is that Mr. Peake should receive a sentence

2     substantially above the level of his coconspirators, it

3     doesn't change that analysis, is what I mean.

4          THE COURT:  There's one other factor which I

5     considered that you should also address, which is that his

6     participation lasted less time than the time of the other

7     coconspirators.

8          MR. SNYDER:  First, that that is actually

9     inaccurate.  Mr. Glova was the last person to join the

10    conspiracy.  He didn't start in the conspiracy until January

11    2006, and the undisputed evidence from trial is Mr. Peake

12    being in the conspiracy in July of 2003.  So there's a

13    considerable difference between when Mr. Glova began

14    participating and when --

15         THE COURT:  But I meant also that as far as the

16    gentleman that received the 48 months, who is Baci, right?

17    Baci was there much more than he was.

18         MR. SNYDER:  He was there about a year earlier, a

19    year and a couple months earlier.  The conspiracy began in

20    late April of 2003, Mr. Peake joined in July of 2007.

21         MS. MOSS:  2002, Your Honor.

22         MR. SNYDER:  I'm sorry.  2002.  And Mr. Peake

23    joined in July of 2003.  And the difference is accounted for

24    in the volume of affected commerce.

25         Mr. Baci was there, he was there longer.  As a

1    result, more volume of commerce was affected by his

2    participation in the conspiracy, and that was included in

3    his guideline.  And his guideline was actually above the

4    billion dollar mark, which actually gave him additional

5    levels in his guideline sentence.  The same applies to

6    Mr. Serra, and the same applies to Mr. Gill.  They were all

7    there longer, they affected more commerce.  As a result,

8    their guidelines were higher, and the fact that their

9    sentences ended up being lower is entirely attributable to

10   their acceptance of responsibility and their cooperation.

11          Had Mr. Peake made the decision to do the same

12   thing that they did at the same time, he likely would have

13   ended up with a lower sentence than they did because he

14   would have received all the same benefits that they did.

15   But he chose not to do that.  And so for him to now turn

16   around and argue --

17          THE COURT:  That he wants the same.

18          MR. SNYDER:  That he wants the same, or less, that

19   would disincentivize their decision to cooperate and not put

20   the Government to its burden of proof.

21          THE COURT:  All right.  Thank you.

22          MR. MARKUS:  I promise, Judge, the sky will not

23   fall if you give a reasonable sentence in this case.  I

24   promise the Government and I promise the Court, nothing bad

25   is going to happen.  There won't be a slew of antitrust

1     trials if Your Honor gives Mr. Peake a sentence below the

2     guidelines.  I promise you, Your Honor.  I promise you.

3                THE COURT:  I know that.

4                MR. MARKUS:  This case --

5                THE COURT:  I know that.

6                MR. MARKUS:  There's a lot I would like to say,

7     and I really had a tough time sitting there for the past

8     half hour not jumping up because Mr. Peake does not deserve

9     a sentence higher than Peter Baci, and there's a lot of

10    reasons.

11               Let me start with the two objections that we have.

12    And let me be clear that our position is not that the volume

13    of the commerce is 380-something million.  Our position is

14    that until the Government proves what the volume of commerce

15    is, as required under the First Circuit, the volume of

16    commerce is zero.  They have the requirement to prove three

17    things under First Circuit law, Your Honor:  Which

18    particular deals were involved in this conspiracy; of those

19    deals, which were the deals Frank Peake was involved in;

20    and, third, and importantly, which of those deals affected

21    prices unreasonably.  In other words, were the prices above

22    what the market would have beared.  And what the testimony

23    at trial was is that both from Peter Baci, Gabriel Serra, is

24    that the prices in that way were not unreasonable.  The

25    customers were not treated unfairly.  And we cite a lot of

1    that testimony in our papers.

2          They haven't called an economist, like they would

3    have to in a civil case.  They haven't done any of the proof

4    that they would have to show that there are unreasonable

5    prices, and that Puerto Ricans suffered something above the

6    market here.

7          In fact, Your Honor, if you remember, they filed a

8    motion before trial saying we could not use as a defense

9    that the prices were reasonable in this case.  And

10   Your Honor granted that motion.  We could not argue to the

11   jury, "Hey, there may have been an agreement, but it didn't

12   affect anybody."  Your Honor granted that motion.  All that

13   they had to prove at trial was that this was an agreement.

14   But sentencing is very different.  Sentencing, as Mr. Snyder

15   pointed out, is what were the unreasonable market conditions

16   after the conspiracy.  How much was commerce affected by the

17   conspiracy.  So they do have the burden to prove to the

18   Court, unlike they had at trial, to show how the prices were

19   unreasonable.

20         If, in fact, the prices were reasonable, if they

21   are not above the market, then the volume of commerce is

22   zero, and they have utterly failed in their burden here,

23   Your Honor, both because we have given you testimony from

24   Baci and Serra saying that the prices were reasonable.

25   Also, there's testimony that when Navieras went out of

 1    business, the prices before then were under market, that was

 2    what Gabriel Serra and Peter Baci testified to, that when

 3    Navieras was in business, there was overtonnage, there was

 4    overcapacity, and, therefore, prices were unreasonably low.

 5    And so there's a cause and effect here that the prosecutors

 6    won't be able to show.  And I think Mr. Snyder said it best

 7    when he said bunker fuel surcharge is a good example.

 8         Absolutely it is a good example to show why prices

 9    were not unreasonable.  The evidence at trial was that

10    bunker fuel surcharge was a cost recovery item only, and

11    that it was a reasonable cost recovery item.  They were not

12    making a profit on that bunker fuel surcharge.  Both Baci

13    and Serra testified before the grand jury about that, they

14    testified at trial about that, the FBI 302s reflect it.

15    Even if the Government proved that there was an agreement as

16    to the timing of bunker fuel surcharge, what they did not

17    prove was that it was an unreasonable surcharge.  The

18    testimony was uncontradicted that it was a cost recovery

19    item.

20         So our position is that until they prove

21    unreasonable prices with some sort of economist or other

22    evidence, the volume of commerce is zero.  If the Court is

23    going to accept their position that all sales count and that

24    the burden is on the defense to somehow come forward with

25    evidence, we have come forward with a number of items that

1    should be discounted and those are in our papers and

2    Ms. Moss will address those particular items, and that does

3    get the amount to under 500 million.

4              I will turn it over to Ms. Moss in a second.  The

5    only other objection that we have, Your Honor, is to the

6    role --

7              THE COURT:  Yes.  Why don't we go by the numbers

8    with you, pursuant to -- I want to see what your reaction

9    is.

10             MR. MARKUS:  Sure.  So factor number -- you want

11   to go through the numbers on role?

12             THE COURT:  On role, because I think that you --

13   do you accept that he, in fact, did supervise Baci and/or

14   Chisholm?

15             MR. MARKUS:  No, Your Honor.

16             THE COURT:  You don't?

17             MR. MARKUS:  He supervised them at work, but he

18   was not their leader in the conspiracy.  In fact, not only

19   Baci there before him, Baci was the architect with Serra as

20   to the conspiracy.  They signed a contract.

21             THE COURT:  I agree with you on that.  I agree

22   that they were the architects.  But we have to lead with his

23   participation.

24             MR. MARKUS:  Right.  So Baci received a 3 level

25   enhancement as to role.  Certainly, Peake should get less

1    than that.  And I know Your Honor doesn't want to give a lot

2    of weight to the juror comment --

3              THE COURT:  I can't because you know there is an

4    instruction there that I provided that was instruction

5    number 28, jury should not consider punishment.  You want to

6    know why that is?  Because it is absolutely prohibited.

7              MR. MARKUS:  And it sounds like the jury did

8    consider punishment.  It sounds to me, and I would move for

9    a new trial on this, Your Honor, it sounds to me like the

10   jury thought Mr. Peake was going to get a low sentence and

11   that's why they convicted him.  That's what the letter

12   says --

13             THE COURT:  If you read those two letters, they

14   thought he shouldn't receive the higher sentence.

15             MR. MARKUS:  That he should get a low sentence.

16   The reason they convicted was that they thought he was going

17   to get a low sentence.

18             THE COURT:  That means that they are concerned

19   that he would receive a higher sentence.

20             MR. MARKUS:  That's exactly right.  So I think

21   they disregarded your instruction there.

22             THE COURT:  Punishment provided by law for the

23   offense charged in the indictment is a matter of exclusivity

24   within the province of the Judge.

25             MR. MARKUS:  Right.

```
 1              THE COURT:  And should never be considered by you
 2       in any way in arriving at an impartial verdict.
 3              MR. MARKUS:  Right.
 4              THE COURT:  As to guilt or innocence.
 5              MR. MARKUS:  It sounds to me like they considered
 6       it.  But my point is something different, Your Honor.
 7              My point is that the jurors, forget about what
 8       they think about punishment, which I think the Court can and
 9       should consider, and we will talk about that in a minute.
10       They also had an opinion on role in the offense.  They
11       listened to the case for three weeks, and they had opinions
12       as to who was more culpable.  Not -- I am putting aside the
13       punishment comment.  They said Frank Peake had a less role
14       than Peter Baci, Gabriel Serra, and the others.
15              They came out and didn't write just one letter,
16       they wrote two letters.  I haven't been doing this as long
17       as the Court, but in 17 years I have never seen a juror
18       write two letters to the Court about role in the offense.
19       And what the juror said was that Frank Peake was an
20       occasional problem solver and had less role and less
21       involvement than Peter Baci.
22              In fact, what the testimony was, was that Baci
23       conferred with Mr. Peake maybe a maximum of every three
24       months.  Peake wasn't around at the creation of the
25       conspiracy, Your Honor, he had no involvement in the
```

1    planning or day-to-day operations of the conspiracy.  He

2    didn't recruit other participants.  His role at the company,

3    he was dealing with many, many, many other things.  Even if

4    you accept everything the Government says, the conspiracy

5    related to less than 5 percent of his activities.  Serra

6    said it.  When we asked Serra about this at trial, he said

7    less than 5 percent of his activities related to the

8    conspiracy.

9            We have a lot in our papers concerning role on

10   this point, Your Honor, both in our objections at pages 18

11   and 19 in our sentencing memo.

12           THE COURT:  But I tend to agree with your brother

13   counsel in that he says that Peake and Serra participated

14   many times in resolving the disputes between the general

15   managers of sales.  He cites volume 2, page 57 to 59, volume

16   5, page 17 to 21, and 24 to 26, volume 7, 56 to 59, and 85

17   through 86.  And the dispute with Sea Star about the 50/50,

18   the dispute that he had to solve between the 50/50 sharing

19   cargo relating to the movement of fast ships between Florida

20   and Puerto Rico, Exhibits 73 and 182.

21           So he has him participating, and he created some

22   others.  I think he created at least five events.  At least

23   five, which are addressed, I think, quite correctly, at

24   pages 6 and 7 of Docket 215.  And those are with specific

25   references to the record, and that is unrebutted evidence.

1           MR. MARKUS:  I think it is rebutted, Your Honor.

2    If you look at pages 7, 8, 9, 10, and 11 of our pleading, we

3    go through Baci's testimony where he explains he ran the

4    conspiracy.

5           THE COURT:  I have no doubt that he was the

6    soldier down there.

7           MR. MARKUS:  No, no.  Not the soldier, Your Honor,

8    he started it.  He was --

9           THE COURT:  I know.  But of course he started it.

10   Mr. Peake did not arrive until over a year after the

11   conspiracy began.  Obviously, he is not the architect.

12   Obviously.

13          MR. MARKUS:  Right.  And so if Baci was the

14   architect and was running the thing, certainly -- and the

15   jury felt this way, too.  He is more culpable.  Yes.  If you

16   believe the Government, Frank Peake was an occasional

17   problem solver.  That doesn't make you a 4 level leader.

18          So he may have been the boss at the company, but

19   he wasn't the big boss of the conspiracy, Your Honor.  Even

20   Serra was in a much different position than Frank.  Serra

21   also was at that initial meeting creating the conspiracy,

22   forming the outline of the conspiracy, telling -- figuring

23   out with Baci how they are going to communicate with

24   throwaway phones and e-mail addresses and those sorts of

25   things.  Serra, Baci, and Gill were in much different

1    positions than Frank Peake, who came in much later, didn't

2    recruit anybody, didn't run the day to day, and as the jury

3    said, was an occasional problem solver.  I am not talking

4    about relying on the jury for punishment here.  I am talking

5    about relying on the jury for fact finding.  That's what we

6    do.

7              And so they found and asked the Court to find that

8    Mr. Peake was not as culpable as Mr. Baci was.  And so

9    that's our argument on role, Your Honor.

10             THE COURT:  What is the difference between what

11   Baci -- under the guidelines, what is the difference if Baci

12   goes to the highest, and the defendant goes to the 12 range,

13   what is the difference?  Two points?  He goes to the -- he

14   goes to the next one.  Baci went to the next category.

15             THE PROBATION OFFICER:  14?

16             THE COURT:  14.

17             MR. SNYDER:  I am not understanding.

18             MR. MARKUS:  I don't understand Your Honor's

19   question.

20             THE COURT:  Well, you just mentioned that because

21   Baci was longer, his responsibility under the amount was

22   higher.

23             MR. MARKUS:  He received 14 levels under --

24             THE COURT:  So there's a difference of 2 points.

25             MR. MARKUS:  Correct.  That's not role.  That goes

1      to the volume of commerce.

2              THE COURT:  It goes to the volume.  Yes.  Yes.

3      That's what I was talking about.  To the volume.

4              I don't think I am going to be persuaded about the

5      role because I think he does match most of the criteria, and

6      there can be more than one leader.  Who is the most honcho,

7      that's later to be decided when we hear all the evidence,

8      when I hear all the arguments, but I want to separate and to

9      make the distinctions that I ought to make.

10             Just like I added three points for acceptance of

11     responsibility and technically 3 points for substantial

12     assistance, I think I have to deduct from him in order to

13     put him equal to Baci, I have to deduct 2 points on the

14     volume of business.

15             Go ahead.

16             MR. MARKUS:  Well, then if I understand Your

17     Honor's ruled on role, then we will move on to volume of

18     commerce.  I mean --

19             THE COURT:  I have ruled on role, and I think I

20     have to put him at a different level than Baci.  But that

21     doesn't mean that 12 is not correct.  That means that Baci

22     was at 14.  All right.  That's all there is.  Go ahead.

23     Keep on going.

24             MR. MARKUS:  I'm not sure how you want me to

25     proceed on --

```
 1              THE COURT:  You proceed to your picture.

 2              MR. MARKUS:  On the volume --

 3              THE COURT:  I may ask questions, but you proceed

 4    to your picture.

 5              MR. MARKUS:  On the volume of commerce issue,

 6    again, our position is that it should be zero, unless the

 7    Government proves up volume of commerce at a sentencing

 8    hearing.

 9              THE COURT:  But I think that they cited two cases

10    in their brief that are strong cases to the contrary.

11              MR. MARKUS:  Well, they are not First Circuit,

12    Your Honor, and they are not binding on this Court.  And

13    there's no First Circuit case that --

14              THE COURT:  There is no First Circuit case on the

15    matter.  Of course there is no First Circuit case on the

16    matter.  But they cited two cases relating to that matter,

17    which the Court thought were quite convincing.  It is the

18    Giordano and Andreas case.

19              MR. MARKUS:  But, Judge --

20              THE COURT:  Those two cases.

21              MR. MARKUS:  Those two cases factually are very

22    different.  Those cases didn't have the testimony that we

23    have here that was the prices were reasonable.  I mean, we

24    have Serra and Baci both saying that the prices were not

25    unreasonable.  We also have the Navieras issue going out of
```

1    business where the prices were unreasonably low before that.

2    So I think --

3              THE COURT:  But I don't think it is a defense in

4    antitrust that you can agree on the prices and then you can

5    say fine.  The point is they are not competitive.  Not if

6    they're reasonable.  Because who knows what's reasonable.

7              MR. MARKUS:  That's why the Government has to

8    prove it, Your Honor.  They want to sentence this man to 12

9    additional points saying that Puerto Ricans were harmed by

10   over $500 million.  That's not true.

11             THE COURT:  They want that because the market of

12   Puerto Rico in several types of businesses was affected.

13             MR. MARKUS:  It wasn't.

14             THE COURT:  Well --

15             MR. MARKUS:  They have to show that, Your Honor,

16   somehow.  In a civil --

17             THE COURT:  I think it is you who has to show it.

18             MR. MARKUS:  I think we did have with Baci's and

19   Serra's testimony saying the prices were not unreasonable

20   and Navieras going out of business.

21             Just take a step back and look at the big picture

22   for a second, Your Honor.  In your civil cases, before you

23   can get damages, you have to show damage with an economist,

24   with some evidence.

25             What the Government is telling you here is don't

1    worry about all that civil stuff.  Don't worry about having

2    to show anything.  We just presume it, and we want to give

3    the guy 87 months in prison on that presumption.  That's

4    insane.  I mean, this is a man's liberty, and as you said,

5    you wouldn't want to do one day.  They need to come forward

6    with some proof.

7             THE COURT:  The Sixth Circuit and the Seventh

8    Circuit -- by the way, the Seventh Circuit is a circuit that

9    we normally follow, together with the Fifth, not necessarily

10   the Sixth.  But here's what it says:  The presumption must

11   be that all sales during the period of the conspiracy have

12   been affected by the illegal agreement.  That's the issue.

13   The illegal agreement.

14             MS. MOSS:  Are affected.

15             THE COURT:  I think we have a change of characters

16   here now.

17             MS. MOSS:  All sales affected, Judge.  Not just

18   all sales.  All sales affected by the conspiracy.

19             I want to start out -- I am going to talk about

20   volume of commerce, and I'm going to be talking about

21   numbers, which I realize is not a juicy or sexy topic, but

22   it is crucial here, Judge.  And when the Government stands

23   up and says that there's no meaningful difference if you

24   choose 10 points or 12 points or 8 points, it is incredibly

25   offensive to me, Your Honor.  It angers me.  It shows a

1    complete lack of understanding of the sentencing process and

2    what effect this has on this individual before you,

3    Your Honor.

4           It has no meaningful difference?  It makes all the

5    difference here, Judge.  And what Your Honor just read about

6    sales affected, again, Your Honor pointed to the cases

7    Andreas and Giordano.  And what those cases say is that it

8    is not all sales, but it is all sales that were affected by

9    the conspiracy.  And, again, our position is that they have

10   to prove that they were affected by the conspiracy.

11          Now, if Your Honor disagrees or you are placing

12   the burden on us, we still believe that we can show you --

13   and we know that their numbers are wrong.  Now, I want to

14   start out --

15          THE COURT:  We are not now talking about beyond a

16   reasonable doubt.  We are now talking a preponderance of the

17   evidence.

18          MS. MOSS:  Correct.

19          THE COURT:  Which is a civil criteria.  All right.

20   Go ahead.

21          MS. MOSS:  A lower criteria.

22          THE COURT:  A lower criteria, but still civil.  It

23   is civil.

24          MS. MOSS:  The Government stood up here and talked

25   about Peter Baci's numbers, and the volume of commerce

1   applicable to Peter Baci.  I need to begin by stating,

2   Judge, we have submitted an affidavit from Peter Baci, and I

3   provided it to the Court ahead of time.  Do you have that,

4   Your Honor?

5           THE COURT:  Yes.

6           MS. MOSS:  And in this affidavit, Peter Baci even

7   disagrees with the volume of commerce numbers.  However,

8   because Peter Baci wanted to believe --

9           THE COURT:  He accepted his.

10          MS. MOSS:  Because he was precluded.  Because he

11  wanted to plead, he was precluded from arguing the volume of

12  commerce numbers.  He was forced to accept them, Judge, and

13  I see that you are laughing --

14          THE COURT:  I am smiling.

15          MS. MOSS:  I see that you are smiling.

16          THE COURT:  I am smiling because you have to look

17  at the fact that he accepted.

18          MS. MOSS:  He accepted them.

19          THE COURT:  You can say whatever you would like,

20  but he did under oath accept the plea agreement.

21          MS. MOSS:  And he is saying under oath that he

22  disagrees with them, Judge.

23          THE COURT:  So what do you do once a person takes

24  a deposition and then later he wants to take it off with a

25  sworn statement?

1          MS. MOSS:  Judge, I think you -- the Government's

2     relying on Peter Baci.  I think you have to rely on Peter

3     Baci for us as well, Judge.  He gave an affidavit where he

4     said the numbers are wrong.  And he goes step by step as to

5     why the numbers are wrong, and I am going to go through that

6     with you now.

7          THE COURT:  Go ahead.

8          MS. MOSS:  Are you going to listen?

9          THE COURT:  I am.

10          MS. MOSS:  Judge, I am going to start off with

11     saying, again, this makes a huge difference.  Whether

12     Your Honor finds over 500 million, which is 12 points, or

13     under 500 million, which is 10 points or even less than

14     that, makes a huge difference.  That's a year and a half to

15     three years in this man's life.

16          Now, I think that the starting point for the Court

17     is that we have to look at the indictment.  And the

18     indictment charged Mr. Peake with participating in this

19     conspiracy from late 2005 to April 2008.  So that's the

20     starting point.

21          Now, the Government can get up here all they want

22     and talk about responsibility for relevant conduct.  But

23     that doesn't matter unless they prove it.  They have to show

24     some proof towards that, which they did not do here.

25          And, Your Honor, during the course of this trial,

1    Your Honor gave instructions to the jury, and I am going to

2    read directly from my objections.

3              THE COURT:  Yes.

4              MS. MOSS:  Where you say:  "I want you to keep

5    clear" -- I am on page 11, Your Honor.

6              THE COURT:  Yes.  Thank you.

7              MS. MOSS:  "That even though it is alleged that

8    the conspiracy began in 2002 by these other people, there is

9    no evidence that he joined this conspiracy.  The Court

10   cannot allow evidence before 2005 because it is charged as

11   to him as 2005."

12             And Your Honor goes on to say, that:  "So he is

13   only responsible, subject to your credibility and your

14   weight, and keeping in mind that he is presumed innocent,

15   that it is up to the United States to prove beyond a

16   reasonable doubt his participation between 2005 and 2008."

17             And Your Honor saw from the evidence in this case,

18   every piece of evidence admitted against Frank Peake,

19   whether by e-mail, or report, or meeting, or itinerary, or

20   plane ticket, was 2005 or later.  So that's the starting

21   point.

22             And even the reliance of the Government on this

23   sheet of paper provided by Sea Star as to this $565 million

24   figure, even that, Your Honor, I say is flawed.  Because,

25   again, what he is charged with is late 2005, and that's what

1    the evidence showed.  I am just going to use the ELMO for a

2    second.

3            When you look at late 2005, already the numbers

4    are below 500 million.  And I am going to tell you, these

5    are not exact numbers, these are approximate numbers.  But

6    whether they are approximate or exact, it is clearly under

7    500 million.  So from that starting point, from considering

8    what he was charged with, the time period he was charged

9    with, we are already below 500 million.

10           The next step, Your Honor, and this is just going

11   step by step through my objections.  The PSR, again, we have

12   to focus on sales that were affected by the conspiracy.  Not

13   all sales.

14           And there are a myriad of sales that were not

15   affected.  And included in that were sales from the

16   transportation of freight that was never ever even discussed

17   as part of this conspiracy, discussed as part of the

18   conspiracy.  And what do I mean by that?  There was an

19   abundance of testimony by Peter Baci and by others that

20   Horizon and Sea Star had different kinds of ships.  Are you

21   following?

22           THE COURT:  I am following.

23           MR. MARKUS:  Okay.

24           MS. MOSS:  Okay.  Horizon ships could only carry

25   containers.  So what you put in a container, the boxes that

 1    you put in a container, that's all that they could ship.

 2              Sea Star ships were completely different.  They

 3    could carry containers, they had huge tanks that they could

 4    fill with liquid, they could carry livestock, they could

 5    carry cars, they could carry huge pieces of construction

 6    equipment.  They were able to carry a lot of different types

 7    of freight that Horizon couldn't.  So there was no collusion

 8    about those types of freight.  And, again, I referenced in

 9    my objections, our objections, these different types of

10    freight, which include bulk fructose.  Amounts to, again,

11    during the time of the conspiracy, $10.8 million.  Cars,

12    $6.6 million.  NIC, which means "not in container," those

13    livestock or cattle or chickens or whatever they may have,

14    $11.7 million.  And other special equipment, such as the big

15    construction equipment, 3.1 million.

16              And, Judge, I am not --

17              THE COURT:  That's what I thought the conspiracy

18    was covering, all of that.

19              MS. MOSS:  No, it wasn't.

20              And, in fact, if you look at the testimony by

21    Peter Baci, he specifically says those things were excluded

22    from the 50/50 agreement.  Because they couldn't collude

23    about cars, about fructose, liquid, about things not in

24    containers like cows.  They couldn't collude about those

25    things.  So they were not part of the conspiracy.  And that

1    was the proof at trial.  That was the testimony at trial.

2           So when you add those numbers up, and, again, we

3    start off with the period of late 2005 through 2008, 462

4    million, subtract now the revenue for this freight that they

5    did not collude on, and the testimony which they did not

6    collude on it, 32.5 million.  We are down to 429.5 million.

7           The next step.  And, again, Judge, I am following

8    straight with my objections.

9           There were some contracts in this case that were

10   negotiated well before Mr. Peake ever came on, and well

11   before a conspiracy ever started.  Starting in 2002, early

12   2002, there was a contract with the United States Postal

13   Service for I believe it was $4.3 million.  This was

14   negotiated before this conspiracy began.  So, obviously,

15   that contract was not affected by the violation, and,

16   therefore, the sales and the revenue from that contract

17   cannot be included in the volume of commerce.

18           And, again, that number -- and if you refer to

19   Peter Baci's affidavit, he also speaks about this.  If you

20   subtracted that number, now we get down to even less, 425

21   million.

22           And, Judge, I just want to say that I am putting

23   out a lot of numbers.

24           THE COURT:  I am understanding.  Keep going.

25           MS. MOSS:  But the numbers are not numbers that I

1     am making up.  These are numbers that are provided by Sea

2     Star or provided and researched by Peter Baci who was one of

3     the key witnesses in this case.

4          The next step.  Peter Baci has stated under oath,

5     he provided an affidavit, that he never discussed with his

6     competitors, with Horizon, a number of customers, and he

7     went through the painstaking effort of writing it down,

8     handwriting each one of these customers down.  And if

9     Your Honor takes a look at it, this is in Exhibit 1-A that I

10    provided to the Court, this is probably 30 pages of

11    customers.  And I believe we totaled them up to 2,634

12    customers that were never part of the conspiracy.  Never

13    discussed.  What Your Honor heard in the trial is a lot

14    about what were called the Hall of Fame reports.

15          THE COURT:  The Hall of Famers.  The large-volumed

16    clients.

17          MS. MOSS:  Right.  The top 100 clients, who

18    actually only made up 20 percent of the clientele of Sea

19    Star and Horizon.  So there's 80 percent of these customers

20    that were never discussed as part of this conspiracy.  And,

21    again, referring to the numbers that Peter Baci researched

22    that were provided by Sea Star, these customers for this

23    time period of 2005 to 2008 equals to $39 million.

24          THE COURT:  But there were also the reefers, and

25    the agreement as to reefers was complete.  And those were

1    not only as to Hall of Famers, because a Hall of Famer may

2    not necessarily come in with -- there may be Hall of Famers

3    that were not in the big leagues in the Hall of Fame, but

4    they were substantial clients under the reefer agreements.

5              MS. MOSS:  Not according to Peter Baci, not

6    according to the testimony, not according to the e-mails.

7    What the e-mails showed is that Peter Baci and Greg Glova

8    were going back and forth bid rigging on very specific

9    customers.  And those customers were part of the conspiracy.

10   These customers that I am talking about now were not.  And

11   so again, I say Your Honor, you have to subtract another $39

12   million.  And so we are getting here even further and

13   further and further below the $500 million mark.  And these

14   are estimated numbers, the numbers are probably much, much

15   higher.

16             So that's the next step.  So we have now given you

17   four separate reasons, four separate examples of sales that

18   have to be excluded because they were not affected by the

19   conspiracy.

20             Now, the Government got up here and talked about

21   bunker fuel surcharge.  As Mr. Markus said, this was a cost

22   recovery tool.  And the argument they made I think is

23   incredibly flawed.  Because what the testimony was as to

24   bunker fuel surcharge, and I have it here if Your Honor

25   wants to see it, is that Peter Baci testified that, of

1      course, yes, the bunker fuel surcharge went up and down

2      because the cost of fuel went up and down.  But the bunker

3      fuel surcharge had no effect on the contract whatsoever.

4      And if you assume that there was --

5              THE COURT:  I remember seeing an e-mail where the

6      fact that somebody undercut in bunker fuel created an

7      agreement in another place.

8              MS. MOSS:  Well, Your Honor, what I think you are

9      referring to, honestly, is somebody who undercut on

10     intermodal fuel, intermodal transportation costs, but not

11     bunker fuel.  But in any case, I will say that there were

12     exceptions to bunker fuel surcharge, but very few

13     exceptions.  And throughout the time period, they tried to

14     eliminate as many exceptions as possible.

15             But I go back to, Judge, again, even if there was

16     no conspiracy at all, that bunker fuel surcharge still would

17     have been in place, it would have been in place at exactly

18     the same amount of price as it was instituted in this case,

19     and it would apply to the same exact customers because Peter

20     Baci testified -- I will go ahead and I will put it up on

21     the screen, Judge.

22             Because this comes directly from the trial.  He

23     said that Sea Star had a specific formula for determining

24     what's the bunker fuel surcharge.  And it was very

25     technical, it went back to 1998 when Sea Star started, and

1    what the price of fuel was at that time, and how they

2    measured the change and utilization in the fuel, but it was

3    a very specific formula, and they followed that formula each

4    and every time.  That is how they set the price.

5         Now, there may have been collusion about timing,

6    but not about the price.  The price would have been the same

7    regardless of any conspiracy.  And because of that, Judge,

8    it doesn't apply to every piece of freight.  In fact, it

9    applies to no piece of freight.

10        And I don't have the numbers because we don't have

11   access to those numbers, we don't have access to the same

12   materials and documents that the Government does.  But that

13   number has to be in the millions of dollars.  So now, Judge,

14   I think I have offered you four things, and I am going to

15   get to the last thing now.

16        And this was the subject of our last amended

17   objections that we filed.  And this is the TSA revenue.  And

18   I am sure Your Honor remembers the TSA, the transportation

19   service agreements, that Horizon and Sea Star had with each

20   other.

21        So Sea Star carried freight of their own

22   customers, but they also carried freight for Horizon, for

23   Horizon customers on their own ships.  And the Government

24   went to great length to show to the jury that these TSAs

25   between Horizon and Sea Star were completely legitimate,

1    completely lawful and legal, and had absolutely nothing to

2    do with the conspiracy.  And they asked each witness that

3    question, and they all agreed.  Nothing to do with the

4    conspiracy.  And I will just put that up very briefly.

5           Glova:  When you communicated with Sea Star about

6    the TSA, were those appropriate and legitimate?  They were

7    appropriate and legitimate.

8           Baci:  It should be excluded from the volume

9    commerce.

10          Serra:  Nothing illegal about the discussions of

11   the TSA.

12          Your Honor, I have submitted again as part of the

13   sentencing today, Exhibit 2, which is a chart provided by

14   Sea Star that gives you the numbers for the TSA for the time

15   period, again, that Mr. Peake was charged.  And that number

16   is 2.7 million.

17          So, Your Honor, I end with calculating the volume

18   of commerce.  And this is a very, very conservative

19   estimate.  We start off with the time period that he's

20   charged with, 462 million.  We subtract all the revenue for

21   the cows and the liquid and all of that, 32.5 million.  The

22   contracts that were entered before conspiracy was even

23   started, a minimum of 4.3 million.  Revenue from the

24   customers that were never discussed, at least 39 million.

25   Revenue from the bunker fuel surcharge, a number that I

1    don't have access to, but, again, was probably millions of

2    dollars.  And revenues from the Horizon, Sea Star,

3    transportation service agreement, $2.7 million.

4            We are down to $383.5 million, well below $500

5    million.  Even if you were to take out one of these steps,

6    we are still well below $500 million.  Your Honor, I would

7    assert that we are even below $250 million.  Unfortunately,

8    we don't have access to those numbers, and the Government

9    has failed to prove them up.  I think it is quite clear,

10   Judge.

11           THE COURT:  What is the month that we can agree on

12   that he began in -- it said late 2005.  What is late 2005?

13           MS. MOSS:  We were not provided that, Judge.

14           THE COURT:  What is the evidence that the United

15   States has?

16           MR. SNYDER:  July, Your Honor.  That's why we

17   provided the numbers we did.

18           THE COURT:  You say it is July.

19           MR. SNYDER:  That's what we said, yes.  It is

20   based on the evidence in the record, Your Honor, which said

21   July.

22           THE COURT:  Okay.

23           MS. MOSS:  It is not based on the indictment,

24   Judge.  It is also not based on your instructions to the

25   jury.

1          MR. SNYDER:  To be clear, we, because of

2     sentencing guideline 1B1.3, you include all relevant

3     conduct.  So, again, that pushes our date back to July of

4     2003, which is where all the evidence at trial said that

5     Mr. Peake began participating in the conspiracy.

6          MS. MOSS:  It is not what the evidence showed,

7     Judge.  In fact, if you go back and look at the transcripts,

8     the evidence does not show that.  They do not state that.

9     And, again, even though in some instances the Government may

10    include all relevant conduct, again, the case law is quite

11    clear, from the First Circuit and every other circuit, it is

12    relevant conduct that they actually prove.  And they have

13    not done that.

14         MR. SNYDER:  Your Honor, in terms of the

15    evidentiary record on the late 2005 --

16         THE COURT:  Do we have anything on the record that

17    I can refer to?

18         MR. SNYDER:  Exhibit 37 is an incriminating e-mail

19    exchange that Mr. Peake was involved in, and it dates to

20    June 2005, June 7, 2005.  So we ran numbers from the

21    beginning of the next month.

22         MS. MOSS:  Judge, I just want to point out that

23    the e-mail they are referring to, the infamous BS e-mail,

24    Judge, where they are again referring to past action by Sea

25    Star and by Horizon, those "who shot John" reports, not

1   conspiracy related.

2           MR. SNYDER:  The purpose of exchanging those

3   e-mails was conspiracy related because they were complaining

4   to each other about things they had done contrary to the

5   conspiracy.

6           MS. MOSS:  We disagree with that, Your Honor.

7           THE COURT:  All right.  But still, even that, even

8   if I take that, wouldn't we be really closer to less than

9   500,000?

10           MS. MOSS:  Absolutely.  500 million.  Yes.

11  Without a doubt.

12           THE COURT:  What's your position relating to that?

13           MR. SNYDER:  Do you want the short answer or long

14  answer?  Because --

15           THE COURT:  I want an appropriate answer pursuant

16  to the record.

17           MR. SNYDER:  Your Honor, the Government's position

18  is that that $565 million from July 2005 to the end of the

19  conspiracy is a conservative number.  And that's even

20  without going back further in time.  And in our objections

21  to the -- in responding to their objections to the

22  pre-sentence report, on all of these points she just made,

23  we provide a written response.  For instance, not in

24  container goods are still subject to the bunker fuel

25  surcharge.  And they also were subject to the conspiracy

1    with Crowley, who did carry noncontainerized goods.

2          I can take you through it.  The bunker fuel

3    surcharge.  I can show you a document that shows they were,

4    in fact, profiting on the bunker fuel surcharge that Peter

5    Baci drafted, and it was sent by Mr. Peake to Gabe Serra.

6    So there are responses to all of these things.  And during

7    the time period charged in this case, $565 million, the

8    Government believes is the accurate number.

9          The case law is not just strong, it is

10   indisputable.  There are no cases that hold any of the

11   propositions that she had just stood up here to argue to

12   you.  The case law is very clear.  You cited some of the

13   cases.  There was always Hayter Oil, SKW.  All of these

14   cases say that once you are convicted of participation in

15   the conspiracy, all sales are presumed to be affected.  All

16   sales.

17         THE COURT:  But she just proved that those sales

18   were out.

19         MR. SNYDER:  And I can sit here, if you would

20   like, I can go back through every one of the categories and

21   tell you why she is wrong.  I just -- let's take

22   noncontainerized goods as just one example.

23         THE COURT:  Okay.

24         MR. SNYDER:  She says they weren't part of the

25   50/50 because Horizon didn't carry them.  That's her

1    argument.  Well, they still were subject to a bunker fuel

2    surcharge, which was fixed.  So the rate charged for those

3    noncontainerized goods was still affected by the conspiracy.

4          Additionally, Crowley was part of the conspiracy.

5    Crowley carried used cars.  Mr. Baci in interviews, we

6    didn't get into this at trial, but there are interviews and

7    I believe grand jury testimony by Mr. Baci where he says:

8    "We were fixing the prices of used car shipments, which are

9    not in containerized goods with Crowley."  So those were

10   affected by the conspiracy.

11         And I can take you through every one of these

12   items --

13         THE COURT:  For example, were the automobiles

14   subject to the surcharge?

15         MR. SNYDER:  I believe there was a bunker fuel

16   surcharge related to the automobiles, yes.  If it was moving

17   this cargo, it was subject to a bunker fuel surcharge.

18         But, the rate, the actual used car shipment rate

19   was also being fixed, and that was being fixed between Sea

20   Star and Crowley.  So it doesn't matter whether Horizon was

21   involved in that piece because they didn't carry that type

22   of cargo.  The rate of that cargo was still being fixed with

23   Crowley, and there's evidence of that, as well as the bunker

24   fuel surcharge that applied to it was being fixed with

25   Horizon.

1          And to address the bunker fuel surcharge, if Sea

2     Star was so confident that they had this formula and they

3     were going to follow it, there was no need for them to fix

4     the rate with Horizon.  There was no need to talk about it.

5     The reason they were talking about it is because it was an

6     element of competition.  If Sea Star went up $30, $40 per

7     container on its bunker fuel surcharge and Horizon didn't,

8     they stood to lose, and both Glova and Baci testified to

9     that at trial.

10          Additionally, Trial Exhibit 125, which I can put

11     on the ELMO, right here, Mr. Baci is basically saying that

12     in 2002 and 2003 at the very beginning of the conspiracy,

13     they had their bunker fuel surcharge revenue, which was

14     lower than the actual cost of bunker.  The first year of the

15     conspiracy, by 2003, most of that deficit was wiped out.  By

16     2004 and 2005, they are earning millions of dollars per year

17     as profit off of bunker fuel.  This is Exhibit 125.  This

18     was an e-mail that was sent or a document that was sent by

19     Mr. Peake to Mr. Serra.  This was not cost recovery, this

20     was collusion, and it affected every single item of cargo

21     that was shipped on one of these ships during the whole time

22     of the conspiracy.

23          That's the end of the story on the bunker fuel

24     surcharge, and, really, about volume of commerce generally.

25     The case law is very clear, that all sales are presumed

1     affected by the conspiracy, and the word is "affect."  The

2     word "reasonableness" --

3                    THE COURT:  That was the word they used.

4                    MR. SNYDER:  But they are equating that to

5     unreasonable.  They have to be unreasonable prices.

6                    MS. MOSS:  That's a different argument, Judge.

7                    MR. SNYDER:  The word "unreasonable" is no where

8     in the sentencing guideline.  No where.  The word is

9     "affect."

10                   THE COURT:  It's no where in those two cases

11    either?

12                   MR. SNYDER:  Correct.  It is "affected."  And

13    "affect" is defined very, very broadly.

14                   The Government doesn't have to show it is

15    unreasonable.  The case law is clear, to get a conviction,

16    the agreement is the crime.  And the cases have recognized

17    that it would be inconsistent or it would be ironic if after

18    saying the person is convicted, even without proof of

19    effect, because all prices are deemed to be unreasonable, if

20    the Government then had to turn around in sentencing and

21    prove that the prices were unreasonable.

22                   And I guess the last point with respect to the

23    sentencing guidelines is that the reason the Government

24    doesn't have to prove effect is because the guideline

25    presumes a 20 percent effect.  When you calculate a

1      corporate fine, you take the volume of the entire affected

2      commerce, and there's a 20 percent multiplier in there, and

3      under the guidelines, that is presumed to be the effect of

4      the conspiracy.  And the reason they have that is they

5      recognize that effects can be direct and indirect, and they

6      are not always easy to prove.  And so there is an element of

7      effect that's built into the guideline itself.

8              So if you have any other questions, I am happy to

9      respond.

10             THE COURT:  Fine.

11             Anything further?  I am waiting for the --

12             MS. MOSS:  I do have something further, Your

13     Honor.

14             THE COURT:  Go ahead.

15             MS. MOSS:  I am actually glad the Government put

16     this up here because this does give us some numbers, Judge.

17     When I was saying before I didn't have the numbers as to the

18     bunker fuel surcharge, now we have some numbers.  This $400

19     million.  And it doesn't matter whether it was a cost

20     recovery tool or they actually made revenue from it,

21     Your Honor, because -- and I think that the Government is

22     completely misunderstanding the whole bunker fuel surcharge

23     purpose, and I want to make sure that Your Honor doesn't.

24     Because, again, there was no collusion about the amount of

25     the bunker fuel surcharge.  So it doesn't matter that is

 1    applied to every piece of freight, which it didn't.  We know

 2    it didn't.

 3              What I have said, and what we have said in our

 4    pleadings, again, and I just -- you know, I know I am being

 5    repetitive, Judge, but this is really important, and I

 6    really think you need to understand this.  That, again,

 7    whether there was a conspiracy or not, that bunker fuel

 8    surcharge was going to apply to every piece of freight that

 9    was transported, and it was going to apply at the price that

10    they instituted it, because Peter Baci used a formula that

11    was based on the cost of fuel that had nothing to do with

12    the conspiracy.  So it was going to apply regardless of this

13    conspiracy.  And that's why it has to be excluded, because

14    it wasn't affected by the violation, affected by the

15    conspiracy.

16              And I don't want the Government to confuse you

17    about this use of the words "reasonable," "unreasonable."

18    What the case law says, and we have cited all the same cases

19    that the Government has cited, and they do say that the

20    Government has to not only show all sales that were affected

21    by the violation, but that were above market price.

22              Judge, and with that, I will sit down.

23              THE COURT:  So the word that I am looking for in

24    Andreas and Giordano that is not here, is what?

25              MR. SNYDER:  "Reasonableness," "unreasonableness."

1          MS. MOSS:  Judge, what Andreas says, I will put it

2     up on the ELMO.  The plain language --

3          THE COURT:  It says affected by the violation, but

4     you also said another word.  I'll look at the transcript.

5          Anything from the defense?  I thought you were

6     going to make a presentation.

7          MR. MARKUS:  Yes, Your Honor.  This goes to the

8     3553 factors, Your Honor.

9          THE COURT:  I know.  Character of the person.

10         MR. MARKUS:  Yes.

11         THE COURT:  Fine.

12         MR. MARKUS:  So, Your Honor, after we figure out

13    what the guidelines are, which is one of the 3553 factors --

14         THE COURT:  It is one of them.

15         MR. MARKUS:  Right.  Not one that's entitled to

16    any specific weight or anything like this.

17         THE COURT:  It's a reasonable place to begin.

18    That's all it is.

19         MR. MARKUS:  Sometimes, Your Honor, in this case

20    it is not, and we will go through the reasons why it is not.

21         One of the main reasons it is not, Your Honor, is

22    because it would lead to the highest sentence ever in the

23    history of the United States for an antitrust case.  Not

24    just in this case, but in any case ever, Your Honor.  And

25    Frank Peake doesn't deserve that sentence for the reasons we

1    will go through now.

2              Just briefly, though, to overview, the highest

3    sentence in the history of the United States ever for an

4    antitrust case is 48 months.  As we will discuss in a

5    moment, these same prosecutors recently told the judge

6    sitting in the same position as you, that she should

7    sentence the worst antitrust defendants ever to 10 years.

8    And that Judge rejected these prosecutors' arguments and

9    give a three-year sentence, and the sky did not fall,

10   Your Honor.  They are still prosecuting antitrust cases and

11   people are still pleading guilty.

12             In this case, he is less culpable than Baci and

13   Serra.  And we will discuss why that is, but you have noted

14   some of the reasons, Your Honor.  And so it is not enough to

15   say the extra baggage of Baci on acceptance and cooperation

16   mean that that's the starting point.  You also have to look

17   at the extra baggage that Baci has with obstructing justice,

18   meaning he got 2 extra points and should get a higher

19   sentence than Frank Peake.  Meaning the extra baggage of the

20   higher volume of commerce, meaning he gets a higher sentence

21   than Peake.  Meaning the extra baggage that the jury

22   listened to three weeks of evidence and said he is less

23   culpable than the others.

24             So we know the 3553 factors, Your Honor, the

25   nature and circumstances of the offense and the history and

1    characteristics of the defendant, the need to avoid

2    unwarranted sentencing disparities, the need for the

3    sentence imposed to reflect the seriousness of the offense,

4    promote respect for the law, and to provide just punishment,

5    and the need to afford adequate deterrence.  Each one of

6    these factors point in our favor.

7              And so we will start with his background, and I

8    know Ms. Moss is going to talk about his background, and

9    then I will get into some of the other factors.  So I will

10   leave it to her on this factor.

11             MS. MOSS:  Judge, I don't think I need to say very

12   much about Mr. Peake's background because Your Honor already

13   stated this morning that you know that he is, I think in

14   your words, you said he was an extremely decent person.

15   And, of course, 3553(a) requires the Court --

16             THE COURT:  I said except for this conduct.  That

17   is right.  I did say that.

18             MS. MOSS:  And that's important because,

19   Your Honor, the 3553(a) factors require the Court to look at

20   the history and characteristics of the defendant.  Because

21   it is not just important to look at a small isolated piece

22   of time in this man's life, but to look at the man as a

23   whole, to look at the totality of this individual before

24   you, and the whole of his life.

25             And what the whole of his life will show is that

1    he is a good, decent, honorable man who has devoted himself

2    to other people, Judge, and that is the predominant theme.

3    That is what I stood up before the Court, and before the

4    jury during my opening statement, and I said to them, and I

5    said, "Frank Peake has been described by person after person

6    after person as being the best man I have ever met.  Being

7    one of the finest men you will ever meet."  And that wasn't

8    just posturing for the jury, Judge.  That is what people

9    have sincerely and honestly said about him.

10           And, you know, he's done very well in his career,

11   Judge, and I think it is important for you to know that he's

12   not somebody that comes from wealth, he is not somebody that

13   comes from advantages, he is not somebody that was born with

14   a silver spoon in his mouth.  This is someone who came from

15   a blue collar background, with blue collar values, whose

16   father was a police officer for 30 years, whose mother was

17   mostly a stay-at-home mom.  He had parents who didn't

18   graduate from high school.

19           But Mr. Peake worked very hard and educated

20   himself and did very well in his career to become the

21   president of Sea Star at a very young age, at 40 years old,

22   42 years old.  But even though he was so accomplished,

23   Judge, I think at his core, what he remains is a good

24   person.

25           And what Mr. Markus had on the screen before,

1    pictures of Mr. Peake with his family, because what

2    Mr. Peake is is, you know, in addition to being the

3    president of Sea Star for the short period of time, he's

4    also a brother.  And I hope Your Honor had the opportunity

5    and the honor to read the letters written by his brother,

6    Chris, who's shown here, his sister Debra, his in-laws, and

7    his children who are pictured here, who Mr. Peake is their

8    rock.  He is the one that they turn to, and the one that

9    they rely on.

10          And dozens upon dozens of people have written

11   letters for him, to talk about what a good man this is.  And

12   I know Your Honor talked about the 140 pages of pleadings,

13   but this was even more pages written about the goodness of

14   Frank Peake.

15          Your Honor talked about -- or the Government

16   talked about how these coconspirators have earned credits or

17   earned reductions because of things like cooperation.

18   Mr. Peake has earned credits and deductions because of his

19   decency and because of his contributions.

20          And, Judge, I am referring to the letters, and we

21   have them up on the slide here.

22          THE COURT:  Yes.  I saw those letters, and I've

23   jumped over that already because I am ready.

24          MS. MOSS:  But, Judge, it is really important,

25   because this is one of the main factors of 3553(a).  That's

1    why I am spending time on this.  And, Judge, it is important

2    to know who some of these letters were provided by.

3             THE COURT:  Okay.  The problem is is that you had

4    already flashed that, and you went to another subject.

5             MS. MOSS:  Okay, Judge.  Well, I hope you take the

6    time to read these because I think these quotes are

7    significant.  For someone to write that you are the finest

8    man that they have ever met, I mean, I wish people could

9    write these things about me, Judge.  But these are things

10   that people have written about Frank Peake.  "Frank Peake is

11   the guy you would like your sister or your daughter to

12   marry."  I mean, how many men are you going to say that

13   about, Judge.

14             And these are letters that were written by

15   military officers, owners of companies, heads of companies.

16   And I see Your Honor is moving on.

17             THE COURT:  I am moving on to the next one.  The

18   next page.

19             MR. MARKUS:  Why don't we move onto the next one.

20             THE COURT:  I am on the next page.

21             MS. MOSS:  Frank Peake's background.

22             THE COURT:  No.  No.  The one before that.  That's

23   the one I am at now.

24             MS. MOSS:  And what this addresses, Your Honor, is

25   Frank Peake as the head of Sea Star, Frank Peake as an

1   employee of Sea Star.  And this is going to become

2   especially important later when Mr. Markus is talking about

3   the findings of other judges around the country.

4   Particularly in the First Circuit in the Prosperi case,

5   about people who were acting for the good of their

6   companies.  And people who were trying to make better for

7   their companies and the loyalty of the companies, not for

8   themselves.

9          And what those quotes show is that Frank Peake was

10  more than devoted to this company and to his employees.  And

11  they all say that they worked very hard during this time

12  because they wanted to do better for Frank Peake.  Because

13  Frank Peake was committed to improving the company, to

14  working hard to providing the best service in the Puerto

15  Rico trade.  That's who Frank Peake is.

16         And, Judge, again, I hope you had the opportunity

17  to read all the letters and to read what we have written in

18  our sentencing memorandum, and I will rely on those

19  pleadings, and I hope that you will see when you are

20  deciding his fate, who this man is in his entirety.  He is a

21  good man.  He's a die hard Yankee fan, Judge.

22         MR. SNYDER:  Objection, Your Honor.  That's

23  pandering.  He's a Philly fan.  We all know that.

24         THE COURT:  He really is a Red Sox fan.

25         MS. MOSS:  No.  Absolutely not.

1          THE COURT:  Or a Mariner fan.

2          MS. MOSS:  Judge, I think a lot, especially with

3    the passing of Nelson Mandela, who talked about contributing

4    to your community, about people with good hearts and good

5    heads.  Your Honor may find for a period of time maybe his

6    head was not in the right place, but his heart has always

7    been in the right place.

8          And he is a good person.  We have written in the

9    memorandum about the number of community organizations that

10   he has contributed to, and there's probably a list of 20 in

11   there, including YMCA, Boys and Girls Club of America,

12   Covenant House, things like that, that this man has devoted

13   himself to other people.

14         And I think Your Honor must take that into

15   consideration and understand that -- and I see you are

16   moving on, Judge.

17         THE COURT:  I am already at the next page, which

18   is the comparison.

19         MR. MARKUS:  Here we go, because I don't want you

20   to have to get the guest room ready, Your Honor.

21         So here we go.  The comparison to the conspirators

22   in this case.  These were the conspirators that the

23   Government has discussed in this case.  Baci, Serra, Gill,

24   Glova.  One person they haven't discussed was Shapiro, who,

25   of course, was one of the other architects of the conspiracy

1    who wasn't charged and got zero months.

2          If they want to compare apples to apples, let's

3    discuss apples to apples because the conspiracy period for

4    Frank Peake is less, that's one reason he should get less

5    than Baci and Serra.  The volume of commerce was less than

6    Frank Peake, that's a reason he should get less than Baci

7    and Serra.  Frank Peake didn't obstruct justice like Peter

8    Baci did.  Frank Peake didn't start this conspiracy like

9    Baci, Serra, Gill, and Shapiro did.  And the jurors, Your

10   Honor, the jurors thought he was less culpable.

11         Those are all reasons why if you want to -- you

12   can't just say Baci pled guilty and got cooperation,

13   therefore, Frank Peake should get more.  No.  There's a lot

14   of other factors that go into it, and we will discuss some

15   of those.

16         Here are some that we can talk about with Baci

17   that don't apply to Frank Peake, and we have discussed some

18   of these.  He was present at the start.  Yes, for Baci; no,

19   for Peake.  And we go down the list here.  Responsible for

20   pricing and bunker fuel surcharge.  Used the throwaway

21   phones.  Used secret e-mail.  Managed the conspiracy on a

22   daily basis.  Communicated daily with his competitors.

23   Coordinated bids and contracts.  Created the conspiracy

24   documents.  And attempted to destroy evidence.

25         Your Honor, remember that when the raids happened,

1    what was Baci doing?  On the phone telling people to get rid

2    of the e-mails.  So, yes, there are a lot of aggravating

3    factors for Baci that don't apply to Mr. Peake.

4            Same with Serra.  A lot of aggravating factors

5    regarding Serra.  He was present at the start of the

6    conspiracy.  He signed the conspiracy contract.  He was the

7    one who did the 50/50 contract with Shapiro.  He was the one

8    who attended meetings in Dallas and Charlotte.  No Frank

9    Peake.  He was responsible for pricing.  He instructed

10   employees to keep the conspiracy secret.  He recruited

11   others into the conspiracy and he lied to the FBI.  None of

12   these true for Frank.

13           Your Honor, here's the jury's opinion.  I know the

14   Court issued that order yesterday, but I have to tell you, I

15   wish I would have had the chance to address the Court before

16   that order came out because I disagree just about as

17   strongly with that order as I disagreed in this case.

18           THE COURT:  So we agree to disagree.

19           MR. MARKUS:  We agree to disagree, Your Honor, but

20   I would like to be heard on it.  Because I think this is an

21   important --

22           THE COURT:  Go ahead.

23           MR. MARKUS:  I said this before, a juror taking

24   the time to write two letters to the Court obviously feels

25   strongly about the case.  You know, one of the factors that

1    the 3553 in the cases talk about is sort of a voice to the

2    community, giving a voice to the community.  Well, here's a

3    person in Puerto Rico who actually listened to the evidence,

4    and who has strong feelings about the punishment, but not

5    just the punishment, Your Honor, not just the punishment,

6    but the relative role in the offense.  And the juror has

7    written two letters and given comments.  I assume it was the

8    same juror.  It may have been a different juror.

9            THE COURT:  No, no.  I think this is the -- I

10   don't know.  It was a foreperson and one was not.

11           MR. MARKUS:  Another juror --

12           THE COURT:  It is the same man.  Same man.  It is

13   the same person, foreperson.

14           MR. MARKUS:  Well, what they say is:  "While Peake

15   was a participant, he seemed to be more of an occasional

16   problem solver than a vital part of the conspiracy on a

17   day-to-day basis.  He didn't stop it because all the

18   companies involved in the trade were doing it.  I don't

19   believe he deserves the same punishment."

20           And I think, Your Honor, those comments can be

21   taken into account by the Court, not just on punishment

22   issues but on role in the offense and 3553 as a voice of the

23   community.

24           What about the sentences issued by Judge Corrigan,

25   because we heard a lot --

1          THE COURT:  Judge who?

2          MR. MARKUS:  Judge Corrigan in the middle

3    district.  He is the judge on Baci and Serra, Your Honor.

4    And, you know, the Government in this case did not allow him

5    to consider the other 3553 factors in the case.  And so what

6    he said at the sentencing was:  "The Court usually can

7    consider such things as history and characteristics of the

8    person, whether or not the person is likely to repeat the

9    crime or not, specific deterrence as to the person.  But I

10   won't be considering any of that today.  The only thing I

11   will be considering today is the nature and value of the

12   cooperation that each person provided to the Government."

13          So Your Honor isn't bound by those things that

14   Judge Corrigan was bound by, and Judge Corrigan was upset by

15   it, Your Honor.  He told the Department of Justice that he

16   felt snookered in giving the highest sentence ever.  He was

17   unhappy about giving that 48-month sentence because the

18   Department of Justice, it wasn't these prosecutors, it was

19   another prosecutor that has since left the office, told

20   Judge Corrigan that these sentences -- it turned off on me.

21          THE COURT:  We are trying to put it back on for

22   you.  There it is.

23          MR. MARKUS:  So what he said was that he asked a

24   direct question about whether or not these sentences were in

25   line with other antitrust cases, and he was told that they

1    were.

2            You know, Your Honor, and now what we're hearing

3    is, well, since this judge issued that sentence, this is

4    sort of the new normal.  But this judge wasn't told the

5    truth about what the average antitrust sentence was.  And he

6    felt that the Department of Justice should have done that.

7    He says that he was told by the Department of Justice that

8    he was giving Mr. Baci the longest jail term ever imposed

9    for a single antitrust violation.  He wasn't told about

10   this.

11           And so what does the First Circuit say?  The First

12   Circuit says that there has -- the aim in sentencing is a

13   national uniformity focusing upon the common standard and

14   looking at how most cases of the same kind were treated.

15   That's what the First Circuit has consistently said about

16   sentencing.

17           So what do we see about average sentences in

18   antitrust cases?  They are nowhere near the monster sentence

19   that they are asking for here.  They are asking for a

20   sentence -- in 2004, the average sentence was 15 months for

21   someone in criminal history Category 1 like Mr. Peake.  The

22   median sentence was 12 months.  They are asking -- that's

23   one year.  They are asking for over seven years, Your Honor.

24   Seven times higher than the average sentence.  It is not

25   right.  You don't get seven times the sentence because you

1    go to trial, and even, by the way, for people who do go to

2    trial, Your Honor.

3           The AUO case, on the next slide.  This was a

4    recent case in San Francisco where the volume of commerce

5    was $2.3 billion with a "B."  These prosecutors told the

6    judge it was the worst antitrust case in the history of

7    antitrust sentences.  They didn't just ask for seven years

8    in that case, they asked for ten years, the maximum

9    sentence.  They told the judge in San Francisco, "Give the

10   guy ten years."

11          So they said they want to compare apples to

12   apples.  They asked for more than they are asking for Frank

13   Peake.  And you know what the judge said?  "No way.  That's

14   unreasonable.  You guys are trying to make a new normal here

15   where the antitrust sentences are off the charts, and it is

16   not going to fly."

17          So what happened?  They asked for ten years.  The

18   most serious price fixing cartel ever prosecuted by the

19   United States.  That's what they told the judge.  And what

20   did Judge Illston say?  She said no.  She gave 36 months to

21   the top executives.  And she said:  "The defendants thought

22   they were doing the right thing vis-a-vis their industries

23   and their companies.  They weren't, but that's what they

24   thought at the time.  I don't mean to suggest they didn't

25   know it was illegal.  I think they did know it was illegal,

1    but there were a lot of business pressures that they were

2    responding to, and that's what they did.  These were poor

3    choices, it was bad judgment.  There was relatively little

4    personal motivation."

5              And then she compares and contrasts to mail fraud

6    and other fraud cases where they are smaller dollar amounts,

7    but --

8              THE COURT:  Can we really say that there was

9    relatively little personal motivation when the bonuses were

10   going up?

11             MR. MARKUS:  Same in this case, Your Honor.

12             THE COURT:  Am I being snookered?  No, right?

13             MR. MARKUS:  No, Your Honor.

14             THE COURT:  Fine.

15             MR. MARKUS:  No.  In fact, that's the whole point

16   here, is that Mr. Peake's salary wasn't changed by this

17   case.  In fact, Your Honor pointed out at trial, the bonuses

18   were relatively modest compared to what the company was

19   making.  These weren't big bonuses.  And, in fact, the

20   bonuses were less because he took part of the profits and

21   reinvested them.

22             Your Honor, in 2007, his bonus was less than

23   $90,000.  Every year his bonus went down, 2006 to 2007 to

24   2008, his bonuses went down, from 145 to 90 to 45,000.  His

25   salary remained constant at about 230,000.

1          THE COURT:  Yes.  But during the years that there

2     was no conspiracy, or very little conspiracy, he didn't have

3     those types of bonus.

4          MR. SNYDER:  He wasn't there, Your Honor.  He

5     wasn't at the company before the conspiracy.  He didn't

6     start the conspiracy.  He wasn't there before the

7     conspiracy.  They offered him --

8          THE COURT:  He was there in 2003, right?

9          MR. MARKUS:  Yes.  The conspiracy started in 2002,

10    and he was offered --

11         THE COURT:  Do we have the bonuses?

12         MR. MARKUS:  We have them from 2005, 2006, 2007 --

13         MR. SNYDER:  We may have them from an earlier

14    time, but I think we were limited in the years we could put

15    in.  I can't remember the answer to that.  He certainly

16    would have gotten them in 2004, 2005.  I don't remember

17    2003, if the company was profitable.

18         MR. MARKUS:  Your Honor, just one point about it

19    is the bonuses were much less than it could have been

20    because Frank Peake reinvested the profits into the port of

21    Puerto Rico.  So those took away from the profitability of

22    the company, and his bonuses were less than they otherwise

23    could have been.  By the way, no difference than the AUO

24    case where the executives there were making money.  The

25    point is that they weren't stealing money and putting it in

1    their pockets.

2         So how do Judge Illston's comments compare here?

3    They compare with exact accuracy.  He was trying to do the

4    right thing versus his industry and his company, that's what

5    we have heard about in the letters that Ms. Moss talked

6    about.  A lot of business pressures, we heard that the

7    companies were all losing money and going to go under before

8    this happened.  He invested 72 million in capital

9    improvements for Sea Star and the port.  And he didn't

10   receive kickbacks, launder money, embezzle, any of those

11   things that we see typically as hallmarks of the fraud case.

12        By the way, Peter Baci says the same thing.

13   Here's Peter Baci, Your Honor.

14        (WHEREUPON, a video was played, with audio as

15   follows:)

16        VOICE 1:  The competitive nature and the

17   profitability of not only Sea Star, but all the other

18   companies involved in the shipping from Puerto Rico to

19   Jacksonville.

20        VOICE 2:  Well, in 1998 when Sea Star came into

21   the marketplace, the market can best be described as being

22   overtonnaged, where rather supply of container capacity far

23   exceeded the requirements to ship goods back and forth to

24   Puerto Rico.  So it drove a pricing decline.  Ships were

25   running around at about maybe 60 percent of their capacity,

1    it was too much capacity, and the prices were dropping every

2    day.

3          We estimated that the year 2000 or 2001, that the

4    five carriers in that trade lost a collective hundred

5    million dollars on revenues that might have been 800 million

6    dollars.  So it was a bloodbath.  Everybody was losing

7    money, nobody was making enough money to reinvest in the

8    business.  It was just -- it was a disaster.

9          (Video ended.)

10          MR. MARKUS:  We hear from Peter Baci as well about

11    the state of the industry and why those volume of commerce

12    numbers that the prosecutor is pounding on really overstate

13    the culpability in the case.

14          There are other cases, of course.  I know

15    Your Honor pointed out earlier in this proceeding that New

16    York in the Second Circuit are cases that Your Honor looks

17    to sometimes as persuasive.  Here's another bid rigging case

18    where the guidelines, because there was mail fraud involved,

19    had guidelines close to 20 years, because they were the

20    product of greed and arrogance, according to the

21    prosecution.  In fact, the defendants even received

22    kickbacks, and the defendant's businesses were affected by

23    these crimes.

24          And so what happened in this case?  Judge Wood

25    issued sentences way below the guidelines, and people still

1    plead guilty, people aren't rushing to go to trial because

2    of it, trials have decreased every year.  And you see the

3    sentences there.  18 months, 27 months, 16 months, way under

4    the guidelines.

5            It is okay to sentence under the guidelines,

6    Your Honor.  There's no presumption that a guideline

7    sentence is appropriate.

8            Other antitrust cases.  Here's the automotive

9    case.  This case, Eric Holder said in late September that it

10   is the largest investigation the antitrust division has ever

11   pursued, over $5 billion in commerce.

12           You can see some of the other factors there on

13   that case.  And some of the sentences, 12 months, 14 months,

14   for some of the top executives.

15           Now, those cases are a little different because

16   those two individuals didn't go to trial.  So we have to

17   look at similarly situated defendants in other cartels.  Why

18   should we look in other cartels even though Mr. Snyder says

19   we shouldn't?  The person formally in his position said we

20   should.  Scott Hammond said that we should look to similarly

21   situated defendants in other cartels to be proportionate.

22           Why should we be proportionate?  Because that's

23   what the guidelines say we should strive to be.  Give

24   proportionate sentences.  It is one of the main goals of

25   3553.  And, by the way, Your Honor, one of the reasons you

1    should consider the juror's note, the juror in his letter is

2    talking about proportionality.  The juror heard the evidence

3    about Baci and Serra.  The juror absolutely -- and I take

4    exception to Your Honor's order.  The juror did know about

5    acceptance of responsibility.  The juror did know about

6    cooperation.  There was extensive testimony that they got

7    credit for those things.

8              THE COURT:  They may have forgotten it when they

9    wrote the letter.

10             MR. MARKUS:  Judge, the jury listened to the

11   evidence, and they came to a conclusion about who was the

12   most culpable and who deserved the most punishment and

13   didn't --

14             THE COURT:  But that's not the role.  The role is

15   over here.

16             MR. MARKUS:  Absolutely.  It is something the

17   Court is to consider under the proportionality under 3553,

18   Your Honor.

19             And so if we want to be proportionate, and we want

20   to look at the most egregious cases after trial, here's

21   examples of the AUO case with the same prosecutors where

22   they asked for ten years, getting three years and two years

23   of the New York case.  There have been 72 defendants

24   sentenced between 2006 and 2011, Your Honor.  72 antitrust

25   defendants.  60 of those defendants have gotten under the

1      guidelines.  That is what judges around the country have

2      been doing in these antitrust cases.  They have not listened

3      to these requests for ten years, for seven years.  These

4      requests that the prosecutors are trying to do, by the way,

5      to discourage trials.  There aren't going to be many left.

6      That's what our country was founded on, Your Honor.

7              What about the First Circuit?  What does the First

8      Circuit say about big variances, Your Honor?  The First

9      Circuit says you absolutely have the discretion to do it.

10     And in a similar case just last year in United States vs.

11     Prosperi, the district Judge Stearns went down from 87

12     months to probation.  18 months of probation, and talked

13     about how the loss amount overstated the culpability, talked

14     about the motivation was for seeing the company succeed just

15     like Peter Baci talked about.

16             Your Honor, even if the guidelines, and we

17     disagree with the prosecutors about this, but even if the

18     guidelines don't take into account the reasonableness of the

19     sentence, the Court can still take that into account.  And

20     you know what I haven't heard from the prosecutors today?

21     Anything to rebut what Baci and Serra said about the prices

22     being unreasonably low before the conspiracy started and

23     that customers weren't cheated from the conspiracy.  And

24     that is something the Court can consider under 3553.  The

25     guidelines overstate culpability here.

1          And the First Circuit, Your Honor, affirms

2     variances like the one we are asking for.  Because Frank

3     Peake is just like the defendants in Prosperi.  Just like

4     the defendants in Prosperi, Your Honor.

5          I am going to skip over the next slide here

6     because I know I am sort of using up too much of my time.  I

7     am getting close to the end, Your Honor.

8          This is Eric Holder, our Attorney General, who

9     says that too many Americans go to too many prisons for far

10    too long and for no good law enforcement reason.  I can read

11    it to you, but here he is himself saying it.

12          (WHEREUPON, the video was played, with audio, to

13    wit:)

14          VOICE:  It's clear as we come together today that

15    too many Americans go to too many prisons for far too long,

16    and for no truly good law enforcement reason.  It is clear

17    that at a very basic level, the 20th century criminal

18    justice solutions are not adequate to overcome our 21st

19    century challenges.  And, again, it is well past time to

20    implement commonsense changes that will foster safer

21    communities from coast to coast.  Today, and together, we

22    must declare that we will no longer settle for such an

23    unjust and unsustainable status quo.  To do so would be to

24    betray our history, our shared commitment to justice, and

25    the founding principles of our nation.  And this is our

1    solemn obligation as stewards of the law and servants of

2    those whom it protects and empowers, to open a frank and

3    constructive dialogue about the need to reform a broken

4    system, to fight for the sweeping systemic changes that we

5    need, and to uphold dearest values, as the ABA always has,

6    by calling on our peers and colleagues, not merely to serve

7    their clients, nor to win their cases, but to ensure that in

8    every case, in every circumstance, and in every community,

9    justice is done.

10            (Video ended.)

11            MR. MARKUS:  Your Honor, so even though --

12            THE COURT:  You know, you are one step ahead of

13    the Puerto Rican lawyers because they only give me the

14    transcript of that.

15            MR. MARKUS:  I am trying, Judge.  I am trying.  I

16    think it is powerful to hear the man say --

17            THE COURT:  I have heard that many times.  You are

18    way ahead of them.

19            MR. MARKUS:  He just said it this summer, and it

20    has been a constant theme.

21            THE COURT:  I know.  I have seen the transcript of

22    exactly that.

23            MR. MARKUS:  And I think we even heard Mr. Snyder,

24    sort of snuck out of him when he said that the guideline was

25    severe in this case.  And, you know, he said, you know, even

1      if you go under the guideline, it should be more than Baci.

2              I mean, I think we heard even from that, that a

3      guideline sentence in this case is just not appropriate.  So

4      the question is how much lower should we go.  And we have a

5      big disagreement with the Government about how much lower it

6      should go.  They say it shouldn't go that much lower because

7      the conspiracy could not have succeeded without Frank Peake.

8      And I am just going to address a couple of the arguments

9      that they say.

10             It did exist without Mr. Peake, Your Honor.  It

11     existed when Baci and Serra started it in 2002 without Frank

12     Peake.  It operated without him, it had the parameters

13     without him.  It was going.  It was humming right along

14     without Frank Peake.  Baci ran the conspiracy, even under

15     the Government's theory, without Frank Peake around.  And

16     even according to Baci, he only spoke to Peake every three

17     months, at most.

18             They also say that the sentence should be higher

19     than Baci's because Frank Peake could have stopped the

20     conspiracy anytime.  But that's true of any defendant that

21     appears before you, right?  Any defendant can call up the

22     authorities and stop it or do whatever.  That's not the

23     point.  The point is what is the relative culpability.  All

24     these other 3553 factors.  And, again, I point to the jury

25     and the other things we have said about here.  But forget

1    about that.  The facts are that the conspiracy was humming

2    along without Frank Peake.

3              In both their opening statement and their closing

4    statement, they never said that Frank Peake was the

5    mastermind of this conspiracy.  They didn't use that word.

6    I know Your Honor put that in the order.  The Government

7    doesn't even say that, Judge.  The Government said he was an

8    occasional problem solver.  That's what the Government said,

9    that's what the jury said.  And if you believe the

10   Government that he was an occasional problem solver, that's

11   why he should get less than Peter Baci.

12             THE COURT:  He is not the mastermind when he's not

13   there.  But he was the problem solver.

14             MR. MARKUS:  That's different than being the

15   mastermind, though, Your Honor.  Peter Baci decided what

16   customers to use, what rates to increase, set out the plan,

17   did all these things.  Peter Baci had a higher volume of

18   commerce.  Peter Baci obstructed justice.  Peter Baci

19   deserves a higher sentence than Frank Peake.  Yes, Mr. Peake

20   went to trial.  So that factor doesn't apply to Baci, but

21   Baci has all these other bad factors.

22             And so some of these we go through in this slide,

23   and we have talked about them.  The obstruction issues, the

24   higher volume of commerce issues, the architects of the

25   conspiracy.  Those things apply to Baci and Serra.  They do

1    not apply to Mr. Peake.

2            I know the prosecutors want you to disregard the

3    jury sentencing recommendation.  I know the Court has issued

4    the order.  I point out that there is case law saying that

5    you have the discretion to consider it.  I remind the Court

6    the jurors are randomly selected from the Puerto Rican

7    community.  We've made a big issue about how they were the

8    victims in --

9            THE COURT:  You know, I really don't understand

10   then.  The Court has the discretion to consider.  Oh, yes,

11   the discretion.  But not to follow it.  It is not their job.

12           MR. MARKUS:  No one is saying it is their job,

13   Judge.  No one's saying that they have the binding authority

14   on the Court.  But the reason that --

15           THE COURT:  This is not a death penalty case.

16   There the jurors decide.

17           MR. MARKUS:  Sometimes.  Sometimes.

18           THE COURT:  No, I think they always decide.

19           MR. MARKUS:  In federal court.

20           THE COURT:  But in state law, maybe, but here, in

21   federal court, it is the jury that decides death issues, not

22   the judge.

23           MR. MARKUS:  But, Your Honor, one point that we

24   raised before trial was that the case shouldn't be in Puerto

25   Rico because there was an issue with the jury being victims

1    of the crime.  And you said, "You know what?  I have faith,"

2    the Court said, "that the jury can put that aside and listen

3    objectively."

4           And here's the jury giving their opinions after

5    hearing this.  And the prosecutors just want to sweep that

6    aside.  I think the Court can, doesn't have to say, "Okay,

7    well, just because the juror does it, I am going to do it."

8    No, but you can consider it and give it some weight in

9    coming to your determination.  These are jurors who listened

10   to the evidence, were victims according to the Government.

11   The Court said, no, they can listen and be fair.  Here's

12   prosecutors telling them that their school lunch price

13   increased, and here they come back, and a juror

14   conscientiously tells the Court, strongly, two times,

15   Mr. Peake should get less than the real bad guys in the

16   case.

17          THE COURT:  So they didn't do a bad job in

18   weighing the evidence.

19          MR. MARKUS:  We disagree with the conclusion that

20   they came out on guilt.

21          THE COURT:  But you like the --

22          MR. MARKUS:  Well, listen.  If you are going to

23   take -- the Government can't have it both ways.  And the

24   Court --

25          THE COURT:  You can't have it both ways either.

1          MR. MARKUS:  Well, we are stuck with the verdict.

2     We are going to appeal it because we disagree.  We are stuck

3     with the verdict, but we are saying, if the Court is going

4     to accept the verdict, let's listen to what the jurors have

5     to say about it.  Let's listen to what the jurors have to

6     say about it, because it goes to the 3553 factors.

7          So what is a reasonable sentence for Mr. Peake?

8     We contend that his involvement for the reasons that we have

9     stated is much less than the other players.  I know I have

10    beaten this horse dead, but the juror recognized his lesser

11    involvement.  Ms. Moss talked about how he is respected, a

12    good man, and I don't think that's at all been undercut by

13    any witness from the Government.  The Government hasn't even

14    called one victim to testify here at sentencing, Your Honor.

15    None of them have submitted letters to the Court or anything

16    like this.

17         THE COURT:  The United States is totally satisfied

18    that the victims have had their day and are still having

19    their day in the civil case, where they have been

20    remunerated.

21         MR. MARKUS:  Okay.

22         THE COURT:  That's what the argument is.  That's

23    what the other side of the coin is.

24         MR. MARKUS:  Right.  This is Mr. Peake's day,

25    Your Honor, and so, you know, our position is that you have

1      to look at his background, his characteristics, and, you

2      know, he should not be sentenced to the highest sentence

3      ever in antitrust history by almost double.  I don't think

4      Your Honor wants that on his record, I don't think Mr. Peake

5      deserves that on his.

6              What's a sufficient but not greater than sentence

7      that's necessary in this case, Your Honor?  I am asking for

8      a nonjail time sentence.  Just like the Prosperi judge did,

9      that was affirmed by the First Circuit.  I believe that

10     community service with house arrest and the $20,000 fine

11     would serve the community, would serve all of the 3553

12     factors in this case.  He should get a lower sentence than

13     Baci and Serra.  Putting him in jail for a couple of years

14     isn't going to do anybody any good.  It is not going to

15     decrease trials like the prosecutor is saying.  It is not

16     going to do any of these sorts of things.  In fact, studies

17     have shown that sentencing has almost no effect on

18     deterrence, especially a federal sentence like this.

19              THE COURT:  You know, these cases are kind of

20     difficult to prosecute if you don't have cooperators.  So a

21     sentence below the cooperators' is a difficult sentence.  It

22     is a very difficult sentence because you know very well that

23     without these witnesses, it is very difficult to try these

24     types of cases.

25              MR. MARKUS:  The Government told you themselves --

1           THE COURT:  Because there is no agreement,

2     although in this case there was one, but not as to him.

3           MR. MARKUS:  Prosecutors told you they didn't need

4     the cooperators.  They had the e-mails long before the

5     cooperators were around.  So I disagree with the Court.

6     They told you a couple minutes ago that the cooperators

7     didn't help them all that much and they didn't need them in

8     this particular case.

9           So I disagree with the Court.  And I disagree that

10    if Your Honor gives Mr. Peake a lower sentence, that people

11    are going to say, "Let's go to trial."  There are factors

12    here.  He didn't get obstruction of justice.  He didn't get

13    the same volume of commerce numbers.  He wasn't the

14    architect of the conspiracy.  They can't just compare half

15    of the apple.  If they want to compare apples to apples,

16    they have to look at all of those factors, Your Honor.  The

17    jury, the voice of the Puerto Rican community told us what

18    was appropriate in this case.

19          They are not binding, but that is something that

20    is very powerful.  I don't know if the Court has ever had a

21    juror, a foreperson of a jury send two letters to the Court.

22          THE COURT:  No, I haven't.

23          MR. MARKUS:  So I think that's a unique

24    circumstance about proportionality that can be considered.

25    Is it an easy thing to do, Your Honor?  No.  What I am

1    asking you to do is not an easy thing to do, but it is the

2    right thing to do.

3              I am asking the Court to do the right thing for

4    Mr. Peake.  You are in that chair because it is not always

5    easy to do what you have to do, Your Honor.  It is not easy

6    to sentence.  It is not easy, especially in a case like

7    this.  But the right thing to do in this case is to give

8    Mr. Peake under Baci and Serra.  The jury knew it, the

9    factors all point to it under 3553, and I am asking the

10   Court to do the right thing here.

11             Thank you.

12             THE COURT:  United States?

13             MR. SNYDER:  Your Honor, there's a lot I could say

14   in response, but I will try to limit myself to three quick

15   points.

16             First, Frank Peake does deserve a sentence that's

17   higher than his subordinate who accepted responsibility five

18   years ago.  And it just so happens that it will happen to be

19   the longest sentence.  But that's not why we are here.

20             Let me first address the LCD sentences, the AUO

21   sentences.  In LCD -- well, let me do a timeline for you.

22   April 2008, FBI searches Sea Star, Horizon, Crowley.  That

23   fall, five individuals plead guilty and receive the

24   sentences that Your Honor is familiar with, including Peter

25   Baci of 48 months, Gabe Serra, 34 months.

 1          Fast forward now to 2012.  AUO executives are

 2     convicted, the United States asks for longer sentences.

 3     They asked for statutory max sentences to the two

 4     senior-most executives.  Having been one of the prosecutors

 5     on that case, they were asked for at the direction of first

 6     the deputy assistant Attorney General, who is referenced in

 7     Mr. Peake's PowerPoint.  And the Government sought those

 8     sentences because they believed they were justified in that

 9     case, and they were actually below guideline sentences

10     because ten years -- the guidelines were about ten years,

11     and ten years is the statutory max.  That case, the judge

12     didn't agree that that was an appropriate sentence and

13     sentenced them to 36 months.

14          Fast forward several more months.  Mr. Peake is

15     convicted and now is facing sentencing.  How perverse would

16     the result be if Mr. Baci, Mr. Serra, Mr. Gill, all got the

17     sentences they got, but Mr. Peake by waiting, by not

18     cooperating, not accepting responsibility, letting years of

19     the investigation go by as the Government's investigating

20     Puerto Rico and investigating other jurisdictions that were

21     under investigation, other trade lines that were under

22     investigation, goes through trial and now can say, "Hey,

23     because another judge in another case sentenced people who

24     were arguably worse than me, to less, therefore, I can get

25     to rely on those sentences."  What does that say?  How does

1    that incentivize cooperation?  How does that incentivize

2    somebody to take responsibility.  How is that fair to

3    Mr. Baci, Mr. Serra, Mr. Gill, who all recognize what they

4    did, and pled guilty.

5            It wouldn't be.  It would be the absolute

6    opposite.  It would disincentivize cooperation, and that is

7    something that the cases uniformly say you should take into

8    account in considering whether a higher sentence for

9    somebody who doesn't plead guilty is a sentencing disparity.

10   Those cases hold that it isn't.  And that's why AUO is an

11   outlier on a number of different grounds.

12           It just was a different investigation.  Those

13   executives received two and a half times -- those 36-month

14   sentences represented two and a half times the sentence

15   received by the highest level cooperator at 14 months.

16           As we noted in our papers, if Mr. Peake were to

17   receive a sentence two and a half times larger than

18   Mr. Baci, he would be right at 120 months, the statutory

19   max.  Of course, we are not asking for that.

20           But to say that Mr. Peake should get the benefit

21   of now being able to point to sentences handed down after

22   his coconspirators pled guilty and accepted responsibility,

23   it would be an absolute incentive not to cooperate or accept

24   responsibility.

25           Mr. Markus said we haven't said the rates were

1    unreasonable.  One, the case law doesn't require it.  And,

2    two, I think we can let the MDL speak for itself.  The MDL

3    was full of people suing because they believed the rates

4    that they had been charged were unreasonable.

5             So I think it seems that the Government -- it

6    seems a little too obvious to even have to state.  The

7    Government believes the rates were unreasonable.  The proof

8    is in the MDL pudding, and litigation that continues to go

9    on and on and on of victims who were victimized by this

10   conspiracy and are seeking recovery.

11            Finally, with respect to the juror letter.  I will

12   leave it with this:  Where are the other 11 letters?  Where

13   are all these other jurors that we keep hearing about, who,

14   by God, they wouldn't have convicted but for if they had

15   known?  You haven't seen any of those letters.  You have

16   letters from one juror who clearly hesitated to even cast a

17   guilty verdict to begin with, and is very clear on the face

18   of his letter, and under rule 608(b), this is precisely the

19   reason we are not permitted to consider the internal

20   workings of the jury deliberation room in deciding whether a

21   new trial is appropriate or certainly in considering the

22   proprietary of the sentence where, of course, the jurors

23   have no understanding of the guidelines and the different

24   factors that Your Honor is supposed to consider in deciding

25   a reasonable sentence.

1          That's all I have, Your Honor.  Thank you.

2          THE COURT:  The Court recesses.

3          (WHEREUPON, a recess was had from 4:16 p.m. to

4     4:59 p.m.)

5          THE COURT:  Okay.  Is there any reason why the

6     Court should not at this time pronounce sentence?

7          MR. MARKUS:  No.

8          THE COURT:  The defendant will move with both

9     counsel to the front, please.

10          On January 29, 2013, defendant Frank Peake was

11     found guilty of Count 1 of the indictment in criminal case

12     number 11-512, which charges a violation of Title 15, USC,

13     Section 1, a Class C felony, conspiracy to suppress and

14     eliminate competition by agreeing to fix rates and

15     surcharges for Puerto Rico freight services.

16          The November 1, 2013 edition of the United States

17     sentencing guidelines, which is the same as the guideline of

18     November of 2007, has been used to apply the guideline

19     adjustments pursuant to the provisions of guideline

20     1B1.11(a).  Based on the provisions of guideline 2R1.1(a), a

21     base offense level of 12 has been determined, as Mr. Peake

22     was found guilty of price fixing.  Because Mr. Peake agreed

23     to submit noncompetitive bids, an additional level is

24     warranted pursuant to guideline section 2R1.1(b)(1).  Since

25     the volume of commerce attributed to Mr. Peake was more than

1    500 million, a 12 level increase is authorized pursuant to

2    guideline section 2R1.1(b)(2)(F).

3          It is the Court's opinion that notwithstanding the

4    exempt status of certain cargo pointed out by the defense,

5    the Court is of the opinion that all this cargo was

6    contaminated by the bunker fuel incorporation antitrust

7    agreement into the rate.

8          Because Mr. Peake was a chief executive officer of

9    Sea Star, who had the authority over other employees

10   participating in the conspiracy, he acted as a leader,

11   negotiator, and ultimate decision maker in the criminal

12   activity that involved five or more participants, 4 levels

13   are added pursuant to guideline 3B1.1(a).

14         The slides produced in the defense presentation,

15   which is going to move the Court to provide a variance, also

16   showed that there was more than four persons in the

17   conspiracy.  I refer to page 7, where at least five persons

18   are alleged to have participated in the conspiracy, and with

19   Mr. Peake it would be six.

20         Based on a total offense level of 29 and a

21   criminal history category of 1, the guideline imprisonment

22   range for this offense is from 87 to 108 months, a fine of

23   $20,000 to $1 million, plus a supervised release term of at

24   least one year, and not more than three years.

25         The Court has reviewed the advisory guideline

1   calculations, and finds that the pre-sentence investigation

2   report has adequately applied the guideline computations,

3   and that it satisfactorily reflects the component of this

4   offense by considering its nature and circumstances.   The

5   Court has also considered the other sentencing factors set

6   forth in Title 21 USC.

7           Mr. Frank Peake is a 51-year-old man with a

8   bachelors degree in accounting and a masters degree in

9   business administration.   He has a history of formal

10   employment in the shipping industry, specifically, Mr. Peake

11   worked as a manager, a vice president, and president of Sea

12   Land Corporation, Sea CSX Line, Sea Star, and American

13   Shipping Group.

14           During all that time there's absolutely no

15   evidence that there was any violation of -- other than his

16   time in this conspiracy, to any maritime law or any other

17   business related law or any personal criminal violation.

18           Mr. Peake has no history of substance abuse, but

19   admits to consumption of alcohol in excess, which the Court

20   will provide him the 500 hours of intensive alcohol

21   treatment, which may warrant that his sentence be reduced

22   one year should he comply.   But that determination is not

23   under the control of the Court.

24           In regards to the offense, however, Mr. Peake

25   played a critical role in the success of the conspiracy.   He

1     approved his subordinates' illegal conduct and directly

2     participated in many key price-fixing meetings and

3     communications, and they are all well expressed at pages 6

4     and 7 of the United States sentencing memorandum.  I have

5     counted at least 5 critical events, which I have placed

6     under the Rule 29 opinion, and now incorporate under my

7     sentencing conclusions in this case.

8          The Court also amends its opinion by stating that

9     he is the mastermind, that the word "mastermind" is wrongly

10    placed.  He is not "the mastermind," but he is a critical

11    person in the successful operation of the scheme since July

12    2005 to the date the conspiracy ended in April.

13         He did receive training in antitrust relations and

14    could have put a stop to the conspiracy at any time.

15    Instead, he allowed it to continue and took the lead in

16    several aspects because he was benefiting indirectly by the

17    bonus compensation which he was receiving.

18         The Court has also considered the negative impact

19    the conspiracy had on business in Puerto Rico.  The

20    conspiracy succeeded in raising all components of the prices

21    because the vast majority of the transportation industry was

22    affected.  85 percent, pursuant to testimony of Mr. Baci.

23    The customers, therefore, found that shipping rates

24    increased significantly every year, but they had no other

25    alternative.

1           The Court recognizes that when Mr. Peake entered

2      into the conspiracy, there was a severe pressure on him to

3      have the company and the industry succeed as the industry

4      and the companies were having serious economic difficulties.

5      However, the saving of the maritime industry affected all

6      the transportation costs of the industry, up to, as I stated

7      before, 85 percent.

8           Although there were no kickbacks nor

9      under-the-table payments, Mr. Peake did receive considerable

10     bonuses, which increased his salary significantly during his

11     participation in the conspiracy.

12          Before finishing this part of the opinion,

13     however, the Court must analyze a potential disparity in

14     sentence between the defendant and Mr. Baci.  The Court

15     knows that Mr. Baci was sentenced to 48 months, which would

16     mean a sentence at level 22.  But his volume of commerce is

17     2 points higher than the volume of Mr. Peake, as Mr. Baci

18     received apparently a 14 point assessment under the volume

19     of business as he was in the conspiracy for a longer period.

20     Further, Mr. Baci had 2 points placed on him due to

21     obstruction of justice.

22          However, the Court, upon reading the pre-sentence

23     report, finds that Mr. Peake was not entirely truthful, as

24     in his first interviews with the FBI he denied any

25     participation whatsoever in his initial interviews.  He

1    eventually provided a veiled acceptance of having some

2    participation.  Therefore, the Court understands that there

3    is only a difference of 1 point in this last mentioned

4    respect between Mr. Baci and Mr. Peake.

5           Now, however, if the Court places now Mr. Peake at

6    level 19 to equate him with Mr. Baci, the Court must also

7    then proceed to add to Mr. Peake, in order to put him at the

8    same level of Baci, we have to add to him 6 points; 3 points

9    for acceptance of responsibility, and at least 3 points for

10   the assistance in prosecution which was granted to Mr. Baci.

11          However, Mr. Peake warrants, in the opinion of the

12   Court, consideration for his personal characteristics

13   outside the business pressure, which contributed to his

14   participation in the conspiracy.

15          Therefore, the Court ends at a level 24, and,

16   therefore, grants a 1 level mitigation.  This means that his

17   potential sentence is between 51 and 63.  But the Court must

18   also make a differential between Baci and Peake because of

19   the fact that, obviously, Peake was over Baci, and Peake

20   particularly had the ability to solve problems when Baci and

21   his equal codefendant in other companies did not have an

22   agreement.

23          Therefore, it is the finding of this Court that

24   Mr. Peake is to be sentenced to 60 months.  It is also the

25   judgment of the Court that Mr. Frank Peake is to be fined

1    $25,000 to be paid forthwith.  Upon release from confinement

2    Mr. Peake shall be placed on supervised release for a term

3    of three years, to be served under the following terms and

4    conditions:

5            He shall observe the standard conditions of

6    supervised release recommended by the United States

7    Sentencing Commission and adopted by this Court.

8            He shall not commit another federal, state, or

9    local crime.

10           He shall not possess firearms, destructive

11   devices, or other dangerous weapons.

12           He shall not possess controlled substances

13   unlawfully.

14           He shall not use liquor excessively, and shall

15   submit to alcohol tests within 15 days of release from

16   imprisonment.  After his release, Mr. Peake shall submit to

17   random alcohol testing, not less than three samples during

18   the supervised period, but not to exceed 104 samples per

19   year, in accordance with the drug aftercare program policy

20   of the United States Probation Office, which includes

21   alcohol, and has been approved by this Court.

22           If substance abuse or drugs is detected in any

23   sample, Mr. Peake shall participate in an inpatient or

24   outpatient substance abuse treatment program for evaluation

25   or treatment as arranged by the United States Probation

1     Office based on his ability to pay or ability of payment by

2     third parties as approved by the Court.

3           He shall participate in vocational training or job

4     placement program as recommended by the United States

5     probation officer.  He shall provide the probation officer

6     access to any financial information.

7           Upon request, he shall cooperate in the collection

8     of a DNA sample as directed by the probation officer,

9     pursuant to the revised DNA collection requirements and

10    Title 18, US Code, Section 3563(a)(9).

11          The defendant shall perform 250 hours of community

12    service as monitored by the United States probation officer

13    in a nonprofit organization.

14          A special monetary assessment in the amount of

15    $100 is imposed as required by law.

16          Has that been paid, Mr. Markus?

17          MR. MARKUS:  The $100, not yet, Your Honor.

18          THE COURT:  Okay.  The Court grants him ten days

19    to pay that.

20          MR. MARKUS:  Thank you.

21          THE COURT:  I think he has ability to pay.

22          The defendant is ordered under 3553, 18 USC

23    3553(a)(2)(D), he is ordered to receive from the Bureau of

24    Prisons while under custody the 500 hours for alcohol abuse.

25    Under this program, sir, you are entitled to up to one year

1    reduction in sentence if you pass the alcohol test, which is

2    given separately than the drug testing.  This is separate

3    within the same program.  The Court understands that the

4    Court is warranted to issue this order under paragraph 75

5    and 77 of the pre-sentence report.

6            After sentencing reminder:  You have a right to

7    appeal this sentence since you have been found guilty after

8    a plea of not guilty under federal rule of criminal

9    procedure 32(a)(2).

10           Notice of appeal shall be filed in the district of

11   Puerto Rico within 14 days from today when the judgment of

12   the Court will be entered.

13           Under rule 4(b), you have a right to apply for

14   leave to appeal in forma pauperis if you are unable to pay

15   the cost of an appeal under federal rule 32(a)(2).

16           If you are represented by court-appointed counsel,

17   he or she will continue.  But you are not.  You are

18   represented by counsel of your choice.

19           You will be given credit toward your sentence for

20   any day spent in federal custody.

21           Did he spend any time under federal custody?

22           MR. MARKUS:  One day, Judge.

23           THE COURT:  That's not too much of a credit, but a

24   credit of one day is ordered.

25           In connection with the offense for which the

1    sentence has been imposed, the Court allows you to remain

2    under the same bail conditions.  However, the Court orders

3    that the drug testing -- the alcohol testing is to be made

4    in the district that you are residing in.

5             The Court does not want further DUIs on your part,

6    and if you do and the matter is repeated, you could have

7    your bail revoked.

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  All right.  That ends the matter,

10   gentlemen.

11            MR. MARKUS:  Your Honor, if --

12            THE COURT:  What the Court has done is equate him

13   to Baci, in a way equate him to Baci, because the Court

14   understands that, yes, Baci was the day-to-day officer, but

15   on the other hand, this gentleman was the gentleman that

16   could resolve all the problems that were occurring between

17   Baci and his codefendants of the same level of Baci.  And,

18   hence, the Court understands that he participated in at

19   least five events, which are correctly and very well

20   narrated by the United States at pages 6 and 7 of their

21   sentencing memorandum.

22            Yes, Mr. Markus?

23            MR. MARKUS:  Yes, Your Honor.  Obviously, I

24   preserve and re-raise all our previous objections and

25   arguments.

1          I would like to ask for a recommendation that if

2     after the appeal the conviction and sentence is affirmed,

3     that Mr. Peake be able to do his sentence at Fort Dix, which

4     is close to his home.

5          THE COURT:  Well, you are coming back here.  I

6     think you are coming back.  But fine.

7          MR. MARKUS:  There's been a judgment.

8          THE COURT:  You have to come back for the

9     judgment.  And then I will recommend the place where he

10     goes.  All right.  That's what I will do.

11          MR. MARKUS:  I think if Your Honor issues a JNC

12     today, so that we can appeal from it, we would just ask

13     that --

14          THE COURT:  Fine.  Fine.  Yes.  I will do it.

15     Yes.  I don't want to delay the appeal.  You are right.

16          The Court authorizes that he serve his sentence at

17     Fort Dix, New Jersey.

18          MR. MARKUS:  Yes, Your Honor.

19          THE COURT:  Okay.  That's where it is.  Fort Dix,

20     New Jersey.  Although I want to advise you that the best

21     custodial place to serve white collar crime where there's no

22     violence, where you may have been induced to crime due to

23     some circumstances is not in Fort Dix, but it is in Florida.

24          MR. MARKUS:  There's --

25          THE COURT:  But the time has not arrived yet.  I

```
 1    have issued the order to the preference you have requested.

 2              MR. MARKUS:  Yes, Your Honor.

 3              THE COURT:  Study it, because there is a place in

 4    Florida where persons serving white collar crimes in Puerto

 5    Rico have been sent.  There are no bars.  There's a door

 6    that shuts down for everybody, but there are no bars,

 7    there's a yellow line where they can't pass, and they have

 8    total liberty during the entire day.

 9              MR. MARKUS:  Thank you, Your Honor.

10              The only other request I would make is if in the

11    event the conviction and sentence are affirmed, Mr. Peake

12    have 45 days or something like this to surrender or come

13    back to the Court so that he doesn't have to -- there's no

14    issue about him having to report that very day or not.

15              THE COURT:  No.  No.

16              What the Court will do is we will allow him 45

17    days to surrender.

18              MR. MARKUS:  Thank you, Your Honor.

19              THE COURT:  That's also part of the sentence.

20              Good luck, Mr. Peake.

21              THE DEFENDANT:  Thank you, Your Honor.

22              THE COURTROOM DEPUTY:  Surrender where?

23              THE COURT:  He will surrender, if he surrenders,

24    he surrenders to Fort Dix, New Jersey, when the Bureau

25    states the date.  And the Court will state the date, if it
```

1    is ahead of 45 days.

2                  Mr. Snyder, anything from you?

3                  MR. SNYDER:  No, Your Honor.

4                  THE COURT:  Perhaps you think I have been too

5    lenient.

6                  MR. SNYDER:  Your Honor, I believe the sentence is

7    entirely appropriate for the case.

8                  THE COURT:  All right.  Well, somehow I get the

9    impression that you both don't like the sentence.

10                 The Court enters into the record the presentation

11   by counsel in slides, which was presented to the Court and

12   which the Court used only to establish that there were more

13   than four persons in the conspiracy.

14                 Any objection thereto?  Mr. Markus?

15                 MR. MARKUS:  To making that part of the record?

16   No.

17                 THE COURT:  Very well.  Mr. Markus, I don't know

18   how much time you have to catch your plane, but get out of

19   here.

20                 MR. MARKUS:  I think we are going to try to catch

21   the later flight, Judge.

22                 THE COURT:  Okay.

23                 THE COURTROOM DEPUTY:  Judge, the allocution?

24                 THE COURT:  Oh, hold it.  I don't want to make

25   this sentence illegal.

1        Sir, you are entitled to make an allocution.  He

2    did not make an allocution.

3            MR. MARKUS:  Judge, may I have a moment?

4            THE COURT:  Yes.

5            (Short pause while the defendant and his counsel

6    conferred.)

7            THE DEFENDANT:  No, thank you, Your Honor.

8            THE COURT:  Sir, you are entitled to make an

9    allocution.  The allocution may sway the Court to sentence

10   you lower or higher.  It doesn't provide any guarantees, but

11   you are entitled by law, and the sentence will be illegal if

12   you are not entitled to make an allocution.  But you are

13   entitled to waive it.  And you are waiving it; is that

14   right?

15           MR. MARKUS:  Well, Judge, to be fair, I think the

16   Court has determined what his sentence is.  I mean, if

17   Your Honor is telling me that you truly have an open mind

18   about going lower --

19           THE COURT:  Yes, I could have an open mind.  But

20   there's no guarantee.  There's no guarantee.

21           MR. MARKUS:  I know there's no guarantee, but --

22           THE COURT:  There is no guarantee either way.

23   Either way.

24           MR. MARKUS:  Well --

25           THE COURT:  I am granting you that opportunity.

1          MR. MARKUS:  Let me have a moment, Your Honor.

2          (Short pause while the defendant and his counsel

3     conferred.)

4          MR. MARKUS:  Mr. Peake was planning on addressing

5     the Court before the announcement of sentence, and he would

6     still like to address the Court.

7          THE COURT:  Very well.  Okay.

8          MR. MARKUS:  And I would ask the Court to keep an

9     open mind about going a little lower, based on his

10    statement.

11         THE DEFENDANT:  Your Honor, first of all, thank

12    you for giving me this opportunity.  Can I use the ELMO?

13         THE COURT:  You may.

14         THE DEFENDANT:  What I wanted to do, Your Honor, I

15    wanted to take this opportunity to introduce you to my

16    children.

17         THE COURT:  Let me say this, that your children, I

18    saw them.  They were illustrated precisely in the slide

19    presentation.

20         THE DEFENDANT:  That's why I put it back up there.

21         THE COURT:  Okay.

22         THE DEFENDANT:  I just wanted to talk to you a

23    little bit about them.

24         THE COURT:  Go ahead.

25         THE DEFENDANT:  Because they really wanted to be

1    here today.  I was the one that told them no, and that, you

2    know, they are in school, and they are working and doing a

3    lot of things.  But my oldest, Nicole, she said, can you at

4    least tell the Judge about us.  And so I said, yes, I will

5    tell the Judge about you.

6              All three of my kids, that's Frankie, Megan, and

7    Nicole, they are all teenagers.  Nicole is 19, Frankie is

8    17, and Megan is 14.  And I am sure Your Honor remembers

9    back to when your girls were teenagers.

10             THE COURT:  I have three girls.  They were all

11   teenagers.

12             THE DEFENDANT:  What a challenging time that was.

13   And in spite of those challenges, there is nothing on this

14   earth that I love more than these three children, and I am

15   sure Your Honor felt the same way about his girls.

16             The last two years have been difficult for me, but

17   I think even more so for these three kids.  I have since the

18   day they were born, I have been their rock.  I have read to

19   them every night when they were young.  I have become

20   teacher and soccer coach and, you know, been to all their

21   games, and been to all their recitals, and have been with

22   them and become the one that they turned to the most when

23   there are issues in their lives, and particularly now in the

24   teenage years, there are lots of them.  And they are all

25   approaching the college age and things of that nature.

1          The only reason I bring this up, Your Honor, is

2     because while I understand that I perhaps need to be

3     punished for my activities, I think the unfortunate

4     consequence, and trust me, I don't short the blame on this,

5     Your Honor, but the unfortunate consequence is these three

6     kids that you see, and the challenges that they will face

7     potentially without me for an extended period of time,

8     particularly given the fact that their mother has been

9     hospitalized now twice for nervous breakdowns in the past

10    year.  So, clearly, my biggest concern is not for myself.

11    My biggest concern is for these three beautiful kids.

12          THE COURT:  Well, as to that, I think your case is

13    going to take two and a half years in federal court in

14    Boston.  This case, the record is enormous, and appeals are

15    lasting in Boston between 18 to 24 months.  So you will

16    still have them for the next 24 months, from 18 to 24

17    months, all right.

18          Remember, the statement of the Court lasts until,

19    as of now, lasts until the First Circuit decides.  That was

20    what I said.  And I remind you that it did not include the

21    Supreme Court.  But that's not written in stone or in iron.

22    Continue.

23          THE DEFENDANT:  Your Honor, again, because they

24    couldn't be here to be with me today, I did want to at least

25    give them their moment in the spotlight because they deserve

1    it, and they are challenging, they are teenagers, but all

2    three of them are just great kids.

3              THE COURT:  Is that the allocution?

4              THE DEFENDANT:  That's it, Your Honor.

5              THE COURT:  Okay.  The Court is sincere with you

6    and advises you that the Court has taken that into

7    consideration already under two grounds.  First, under the

8    ground that -- under the reasoning that I saw the

9    presentation being made, and, second, that I knew you were

10   not going to jail, and you will still have around 24 months,

11   which may be increased depending on what you state to the

12   Court about those three children.  And it is important what

13   the mother is doing.  This is like a downward departure for

14   family reasons.

15             THE DEFENDANT:  She's getting some psychological

16   assistance.

17             THE COURT:  Fine.  All right.  So this is

18   something that the Court may revisit.  I know you are not an

19   ardent criminal.  You are not running around with machine

20   guns, but I do feel that the case of the United States was

21   strong.  After evaluating it carefully, I think it was

22   strong.

23             By the way, Mr. Markus, I examined those two

24   cases, and none of those two cases have the words

25   "reasonable price."  None of them.  None of them.  Those two

1    cases that I mentioned to you, that is the two cases the

2    Court mentioned to you -- there were really three.  I found

3    that there were really three cases.  They were the cases of

4    Giordano, and Andreas, and Hayter Oil Company, and none of

5    the three had the words "reasonable pricing."

6                MR. MARKUS:  But they do say "above market price."

7                THE COURT:  They talk about market price, but not

8    "reasonable."

9                MR. MARKUS:  Well, Your Honor --

10               THE COURT:  Gentlemen, have a good flight home.

11   Mr. Markus, you are a big fighter and so is Mr. Snyder.

12               MR. MARKUS:  Your Honor, I just want to say one

13   thing based on the allocution, which is, Your Honor

14   calculated the guidelines, I know, obviously, we disagree

15   with them, but the guidelines that you calculated with

16   taking into account everything came out to 51 to 63 months.

17   I think listening to the man and seeing him, we would just

18   ask Your Honor to give the low end of 51 months.  At that

19   point, it is still more than Baci, but it would make a

20   difference to Mr. Peake, Your Honor.

21               THE COURT:  I know it would be, we discussed it,

22   we discussed it thoroughly, but we thought that there had to

23   be a distinction with Mr. Baci because Mr. Baci went through

24   the procedure of timely accepting responsibility and going

25   through the pressure, that's like a pressure cooker of

1    sitting here and providing testimony against his good

2    friend.

3              THE DEFENDANT:  He is not --

4              MR. MARKUS:  Okay.

5              THE COURT:  Well, fine.  Maybe he is no longer

6    your good friend.  But you worked together, and I saw his

7    face.  It wasn't easy for him to testify, for none of those

8    cooperators that came to testify, none of them were having

9    fun testifying here.  There was one that even approached you

10   to give you his hand, and I don't blame you for not giving

11   your hand to him.  But, you know, he went through a lot of

12   pressure to testify.  Maybe he exaggerated, I don't know.

13   He certainly went through -- he certainly suffered an

14   eloquent and diligent and hard cross-examination, all of

15   them, by two very competent lawyers.

16             So it is not easy to come in and testify against

17   persons that you have worked with and that they may have

18   admired you, yet they were as guilty as you as far as the

19   conviction is concerned.

20             Well, I don't think I will be seeing you again,

21   sir, because everything from here on can be performed in

22   writing, and I wish you good luck.  You are still a young

23   man and you are going to come out a young man, and I wish

24   you good luck, sir.

25             THE DEFENDANT:  Thank you, Your Honor.

1           (WHEREUPON, at 5:35 p.m., the proceedings were

2     concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    UNITED STATES DISTRICT COURT )
                                  )  ss.
2    OF PUERTO RICO               )

3

4

5                       REPORTER'S CERTIFICATE

6

7

8           I, ANNETTE M. MONTALVO, do hereby certify that the

9    above and foregoing, consisting of the preceding 121 pages,

10   constitutes a true and accurate transcript of my

11   stenographic notes and is a full, true and complete

12   transcript of the proceedings to the best of my ability.

13           Dated this 10th day of January, 2014.

14

15                              S/Annette M. Montalvo
                                Annette M. Montalvo, CSR, RDR
16                              Official Court Reporter
                                José V. Toledo U.S. Courthouse
17                              300 Recinto Sur Street
                                San Juan, PR   00901
18                              847-370-7335

19

20

21

22

23

24

25
```