IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO


UNITED STATES OF AMERICA,        )

                     Plaintiff,    )   Case No. 11-512

       vs.                      )

FRANK PEAKE,                     )

               Defendant.    )
_____


TRANSCRIPT OF FURTHER JURY TRIAL
BEFORE THE HONORABLE DANIEL R. DOMINGUEZ
FRIDAY, JANUARY 25, 2013
SAN JUAN, PUERTO RICO


APPEARANCES:

FOR THE PLAINTIFF:        BRENT SNYDER
                          CRAIG Y. LEE
                          MICHAEL WHITLOCK
                          HEATHER TEWKSBURY
                          ASSISTANT U.S. ATTORNEYS


FOR THE DEFENDANT:        DAVID OSCAR MARKUS, ESQ.
                          A. MARGOT MOSS, ESQ.




Proceedings recorded by mechanical stenography, transcript

produced by computer.

1          THE COURT:  Please call the case.

2          THE CLERK:  Criminal case 11-512.  United States

3     of America vs. Frank Peake.

4          THE COURT:  Okay.  Before we move on, the Court

5     must make its *Petrozziello* finding prior to the -- at

6     the close of the case, but prior to the final

7     argument.

8          So the Court makes the following *Petrozziello*

9     determination pursuant to the case of *United States*

10    *vs. Petrozziello*, 548 Fed.2d., 20, 1st Circuit, 1977;

11    *United States vs. Campa*, 679 Fed.2d., 106, at

12    Page 111, 1st Circuit, 1982; *United States vs.*

13    *Martorano*, 557, Fed.2d., 11, 1st Circuit, 1977; and

14    pursuant to the procedures set forth under *United*

15    *States vs. Ciampaglia*, 628 Fed.2d., 632, 638.  See

16    also *United States vs. Mitchell*, 596 Fed.3rd. 18 at

17    Page 23, 1st Circuit, 2010.

18         The Court determines that the United States has

19    proven by a preponderance of the evidence that a

20    conspiracy, as indicated in count one of the

21    Indictment, existed; that declarants, co-conspirators,

22    Peter Baci and Gregory Glova and Gabriel Serra were

23    members of the conspiracy; that the declarations of

24    co-conspirator Frank Peake as to the statements that

25    were made by Peter Baci, Gregory Glova and Gabriel

1    Serra, were made during the course while they were

2    members of and in furtherance of the conspiracy.  And,

3    hence, those declarations are authorized and

4    admissible pursuant to Federal Rule of Evidence

5    801(D)(2)(E).

6         All right.  The defense wishes to renew its Rule

7    29 now.

8         MR. MARKUS:  Yes, Your Honor.  We renew our Rule

9    29 on all elements of count one.  And I don't know if

10   Your Honor would like me to just also go through the

11   objections that we have to the jury instructions now.

12        THE COURT:  No.  Those are preserved, respected.

13   And at the end of the Court providing the

14   instructions, I will provide you space for you to

15   place all the objections that you mentioned in the

16   conference yesterday.

17        MR. MARKUS:  Thank you, Your Honor.

18        THE COURT:  Including the fact that the Court did

19   not allow a theory of the defense which you requested,

20   and others; missing witness that you mentioned.  So

21   the Court is not going to stop the record for you on

22   that.

23        MR. MARKUS:  Thank you, Judge.

24        THE COURT:  In fact, I encourage you to do it at

25   the end of the instructions.

1          MR. MARKUS:  Thank you.

2          THE COURT:  All right.  Now, can we bring in the

3     jury?

4          MR. MARKUS:  Yes, Your Honor.

5          THE COURT:  Okay.  I will be advising the jury

6     that you both have equal time, that you have chosen

7     one hour and 45 minutes.

8          MR. SNYDER:  Your Honor, I do believe it's going

9     to be fairly less than that.

10         THE COURT:  An hour-and-a-half?

11         MR. SNYDER:  Probably a little less than an hour-

12     and-a-half even.

13         THE COURT:  Okay.

14         MR. SNYDER:  An hour.

15         THE COURT:  An hour-and-a-half.  That, however,

16     you may finish before, and you will not turn into

17     pumpkins if you finish before, nor will there be

18     attorneys looking for Cinderella shoes, as one of you

19     may exit quickly.

20         But the idea is that it's equal time, all right?

21     Okay?  And that the United States may reserve rebuttal

22     time within this hour-and-a-half, which may be

23     shorter.

24         MR. MARKUS:  The only other issue is I gave Omar

25     the chart that we had planned to use.

1          THE COURT:  Okay.  I saw your chart, but your

2     chart is incomplete because you left out that it

3     doesn't have to be 100 percent; right?

4          MR. MARKUS:  Well, Judge, the Government can argue

5     and that's in the instructions.  What's in the chart

6     is an accurate statement of the law.  And as long as

7     it is accurate, we can make argument, I believe, and

8     the Government has been pretty free --

9          THE COURT:  I will allow you to do that, but I

10    will state to the jury that my instruction may

11    supersede that.

12         MR. MARKUS:  Thank you, Your Honor.

13         THE COURT:  Will supercede that.

14         MR. MARKUS:  Yes, sir.

15         THE COURT:  So I will authorize that.

16         Put that on your side of the scale.

17         MR. MARKUS:  Thank you.

18         THE COURT:  You that are keeping a score board on

19    this, which I don't keep.

20         MR. MARKUS:  Coming up to the ninth.

21         THE COURT:  All right.  Bring in the jury, please,

22    Mr. Bruno.  Where is he?

23         Bruno is doing the duty of their lunch?

24         THE CLERK:  Yes, Judge.

25         THE COURT:  Now, there is this rule.  The rule is

1    no closer to there.  You see the podium?  You see the
2    tip of the podium?
3         MR. LEE:  Yes.
4         THE COURT:  You see where he's standing?  That's
5    as close as you can get to the jury.
6         Straight line.  No sitting on the bench.  No
7    Hollywood.  All right?  No sitting on the bench,
8    joking around with the jury.  There's a straight line
9    going from there up to here.
10        MR. LEE:  So I am okay here.
11        THE COURT:  It's fine there.  But it goes one
12   further step.  That's it.
13        MR. LEE:  No problem.
14        (Whereupon, the jury enters the courtroom)
15        THE COURT:  So we have come to the last part of
16   the case, the final arguments of the parties.
17   Arguments are not evidence. They are going to both
18   interpret the evidence for you.  If you understand
19   that they're interpreting it wrongly or a little bit
20   one-sidedly, either side, that's up to you to decide.
21   They are here to orient you as to the facts they
22   understand they proved.
23        Each side has equal time.  They have chosen an
24   hour-and-a-half, but we're going to divide it.  The
25   United States is entitled, because they have the

1    burden of proof of proving beyond a reasonable doubt

2    this case, they are entitled to rebuttal.  They can

3    reserve.  So time is equal as to both of them, an

4    hour-and-a-half.  But they may finish before.  Don't

5    take it against them if they finish before.  In other

6    words, if they finish before that means that they

7    organized their thoughts and they presented it in a

8    more concise fashion.  Don't take it against either

9    side if they take less time.  All right?

10        So taking that into account, in my watch it is

11   10:14.  You are entitled to an hour-and-a-half.

12        MR. LEE:  Yes, Your Honor.

13        THE COURT:  But if you use up all the hour-and-a-

14   half, there will be no time for rebuttal.  All right?

15        So here we go.  Thank you.  We're very happy

16   you're here.

17        MR. LEE:  Thank you, Your Honor.  I'm happy to be

18   here.  May it please the Court.

19        THE COURT:  Yes, sir.

20        MR. LEE:  Good morning, ladies and gentlemen.

21   Frank Peake committed a crime.  Instead of competing,

22   he cheated his customers, and the customers paid the

23   price.

24        Instead of competing, he conspired with his

25   friends, and Sea Star's profits grew.  Instead of

competing, he chose to break the law, a law designed
to protect competition.

Price-fixing is a crime that takes place behind
closed office doors.  It takes place over e-mails and
over phone calls.  It takes place in hotel rooms.  A
crime where the customers think they are negotiating
hard with the companies and getting the best deal.

Meanwhile, the companies have already decided who
is going to win the business.  A crime where its
victims don't even realize that they are being ripped
off.  Where they think the companies are competing,
they're really colluding.  Where the customers pay the
higher prices charged by the companies because they
have no choice.

But Frank Peake, he had a choice.  When he became
president of Sea Star, he had a choice of how he
wanted to run the business.  He could have run it the
right way or the wrong way.  And when he learned that
Sea Star had an agreement, an illegal agreement with
the only other company that provided fast ship service
to Puerto Rico, he had a choice, and he made a choice.
He could have chosen to put a stop to the illegal
agreement, an agreement that divided the market in
half, an agreement that raised rates, an agreement
that coordinated the timing and the amounts of the

1    fuel surcharges.

2        He was the president of the company, the

3    president.  And he had a choice.  He made a choice.

4    He chose to join the conspiracy.  He chose to approve

5    the actions of his direct employee, Peter Baci; to

6    approve Peter Baci's communications he had with

7    Horizon; to approve of Peter Baci his day-to-day

8    involvement in splitting the market share in half,

9    half for Sea Star and half for Horizon.  But Frank

10   Peake did more than just approve.  He chose to

11   participate.  He stepped in when he needed to fix

12   problems, problems that Baci was having with Greg

13   Glova, problems about the conspiracy.  And to fix

14   those problems, he chose to work with his old friend,

15   his old friend from Horizon, Gabriel Serra.

16       Frank Peake, he chose to join the conspiracy.

17   Frank Peake already had every advantage.  His company

18   was one of only four companies that served the Puerto

19   Rico trade market.  And his company was just one of

20   two that offered the fast ship service.

21       But limited competition wasn't enough.  He wanted

22   to eliminate all competition, and with the help of

23   Peter Baci and his friends at Horizon, he did.

24       Judge Dominguez will instruct you that there are

25   three things you need to find in order to return a

1    guilty verdict.  And these things or elements are what

2    the United States needs to prove.  Think about them as

3    questions, questions you should ask yourself while

4    evaluating the evidence, questions you should discuss

5    with your fellow jurors once it comes time to

6    deliberate.

7         And the first element or question is whether there

8    was a price-fixing conspiracy at all.

9         And the second is whether defendant Frank Peake

10   knowingly and intentionally joined this conspiracy.

11        And the third element is whether the conspiracy

12   had an effect on interstate commerce.

13        As to the first element, there is no doubt there

14   was a conspiracy to fix prices in the Puerto Rico

15   trade lane.  As Judge Dominguez will instruct you,

16   fixing prices means agreeing with competitors about

17   prices, rates, price levels or surcharges.  Fixing

18   prices means deciding which company will submit the

19   higher rate to determine who will win the contract.

20   And fixing prices is agreeing, agreeing to amounts and

21   when to apply those surcharges.

22        The agreement to fix price is the crime.  And this

23   first element, it's not even in dispute in this case.

24   During her opening, Ms. Moss said that -- told you

25   about this conspiracy to fix prices between Sea Star

1    and Horizon.  And you saw for yourself the

2    overwhelming evidence of the conspiracy, from the

3    witnesses, from all the documents; that they fixed

4    prices for nearly every contract and that they worked

5    together to raise prices every single year.

6         You also need to find that the conspiracy existed

7    at some point within the period of the statute of

8    limitations.  And one way that can be proved is if

9    some member of the conspiracy, any member, it doesn't

10   have to be Frank Peake, but any member performed some

11   act in furtherance of the purposes and objectives of

12   the conspiracy after September 17th, 2006, and before

13   November 17th, 2011.

14        And there are plenty of acts in furtherance of the

15   conspiracy between that time period.  For instance,

16   Greg Glova, he told you about the illegal agreement

17   and how it affected nearly all of his two hundred plus

18   accounts.  And he told you that he coordinated with

19   Peter Baci for nearly every one of those accounts,

20   starting when he first joined -- when he first took

21   his position and joined the conspiracy at the end of

22   2005, all the way up until April of 2008, when the

23   F.B.I. had their search warrants.

24        And this statute of limitations, as well as this

25   first element, they're not a question at all, based on

1    all the evidence you've seen in this case.

2        And, in the same way, the third element, it's not

3    going to be an issue either.  All this question asks

4    you to find is whether goods transported on Sea Star

5    and Horizon ships traveled between the states and

6    Puerto Rico.  And you heard plenty of evidence that

7    they did.  That was the exact service provided by

8    Horizon and Sea Star.

9        Remember the two witnesses, Mr. Gabriel Lafitte

10    from Burger King, and Ron Reynolds from U.S.D.A.?

11    They testified about the need to transport goods from

12    the states to Puerto Rico on Sea Star and Horizon

13    ships.

14        So that just leaves one element, just one question

15    for you to decide in order to find Frank Peake guilty:

16    Did the defendant knowingly and intentionally become a

17    member of the conspiracy?  And as Judge Dominguez will

18    instruct you, "knowingly" means not by accident or by

19    mistake.  And that's the real issue in this case.

20    That's the only issue in this case.

21        We don't have to show that Frank Peake started the

22    conspiracy.  It doesn't matter one bit that the

23    defendant joined the conspiracy after it was already

24    in motion.  Judge Dominguez will also instruct you

25    that even if the defendant was not part of the

agreement at the very start, he can be found guilty of
conspiracy if the Government proves that he knowingly
joined the conspiracy later.  You can get on the train
at the first stop or you can get on at the last stop.
All that matters is you got on.

As an example, look at Greg Glova.  He wasn't
there at the beginning.  In fact, he was the last
person to join the conspiracy.  He joined after Frank
Peake.  But he was just as much part of the conspiracy
as the people who were there in the beginning.

We don't have to show that Frank Peake knew about
every gmail that was sent between Baci and Glova, or
show that Frank Peake talked with Serra about every
single contract.  All you need to find is that Frank
Peake knowingly and intentionally joined the
conspiracy.  Not that he was an originator, not that
he was the mastermind, and not even that he was the
day-to-day person.

We know he joined the conspiracy by looking at the
evidence.  Do you remember the witnesses?  People who
had firsthand knowledge because they talked to Frank
Peake directly about the conspiracy.  Witnesses who
testified because they're who Frank Peake chose to
conspire with.  People who admitted to their crimes,
have taken responsibility and who have gone to prison.

1        And every single one of them said that nothing they

2        said at this trial can make their prison term even one

3        day shorter, because they already did their time.

4            You saw them take the stand and testify about

5        Frank Peake's involvement.  You saw how they took no

6        joy in being here.  You saw how they sat there and

7        they didn't relish testifying against Frank Peake.

8            You saw how they weren't out to get anybody.  You

9        saw how hard it was for Gabriel Serra to testify

10       against his friend.  But they did testify.  And

11       everything any witness said about Frank Peake's

12       involvement in the conspiracy was corroborated by the

13       other witnesses or by a document.

14           And remember when the witnesses told you that they

15       realized that what they were doing was wrong, so they

16       tried to hide it.  For Greg Glova and Peter Baci, they

17       used code names.  They used secret gmail accounts.

18       And for Gabriel Serra, he stayed hands off and he only

19       stepped in when he needed to.  And Frank Peake, he

20       tried to cover his tracks too.  You heard how he did

21       it.  You heard from Peter Baci how Frank Peake got

22       angry when he copied him on a gmail to Greg Glova; not

23       upset that Peter Baci was communicating with a

24       competitor, but angry that he was creating this

25       electronic trail that could be traced right back to

1   him, traced back to show that Frank Peake was involved

2   in the conspiracy.  And Peter Baci testified to that.

3   He said there was one point this time where I copied

4   Mr. Peake on a gmail communication that I had with

5   Horizon Lines, and Mr. Peake came to me and asked me

6   not to do it again.

7       And you heard Peter Baci testify that Frank Peake

8   told him to do something else, to avoid this

9   electronic trail.  He was asked the question:  Would

10  you ever give him hard copies of e-mails?

11      Answer:  Yes.  It was something that I thought was

12  important.  I would print it out and put it on his

13  chair or desk and leave.

14      Why did Frank Peake ask Mr. Baci to do this?  He

15  did this so he could cover himself.  Cover himself in

16  case there ever was an investigation.  He wanted to

17  make sure that if that day came, he could say, "It

18  wasn't me, it was all Baci's doing.  You don't see me

19  on any of these gmails."

20      Frank Peake, he thought he could fool everyone.

21  But as much as he wanted to keep his hands from

22  getting dirty, he still left fingerprints.

23      And in cases like this, cases involving financial

24  crimes, the e-mails you saw at trial, that's like the

25  fingerprint evidence.  And Frank Peake's fingerprints

are all over this case.  These e-mails support
everything that the witnesses said on the stand;
documents written when these things were happening,
long before an investigation and long before trial.
Written by the defendant's own hand.  E-mails that
Frank Peake sent to Gabriel Serra, with no other
reasonable interpretation other than they were
discussing aspects of the conspiracy.

     As you will remember, you saw a lot of these
e-mails, a lot of these e-mails at trial; e-mails with
Frank Peake's name all over them; e-mails that were
sent and received to further the conspiracy.

     We won't have time to go through them all today,
and I'm guessing, you wouldn't want me to show you all
of them again either.  But I will show you some,
enough to give you comfort that when you go back into
the jury room you can find Frank Peake guilty.

     If you can pull up Exhibit 34.  Here is just one
example of the many e-mails we saw at trial.  On
March 22nd, 2008, Frank Peake sent an e-mail to Gabe
Serra, complaining under the subject line "Ouch,"
about four accounts that Sea Star expected to win but
ended up losing.

     Peake blamed Horizon for not following through on
agreements and submitting lower prices than they were

1        supposed to.

2            And Serra replies, he gives explanations as to why

3        Sea Star lost those accounts, but he also refers to

4        poor communication, poor communication between Glova

5        and Baci.  And what did Peake write in response?

6        "Agree that things aren't working as well as they

7        were.  Pete has similar complaints."

8            Is this competition?  Is this how you speak to the

9        competitor, complaining about losing accounts and

10       asking for explanations by blaming it on poor

11       communication between your lower level employees?

12           What could this mean other than that Frank Peake

13       knew about the conversations between Glova and Baci?

14           What could this mean other than Frank Peake knew

15       about this conspiracy?

16           What could this mean other than Frank Peake was

17       involved in the conspiracy?

18           How did Frank Peake join the conspiracy?  We'll

19       talk about three different ways.

20           First, through his role as a problem fixer in the

21       conspiracy.

22           Second, through his participation at the Orlando

23       meeting; a meeting that was, without a doubt, a

24       meeting to discuss the conspiracy.

25           And, third, through his agreements to coordinate

the timing and amounts of the bunker fuel surcharge.

Frank Peake, he was a problem fixer. And in order to understand what I mean by problem fixer, consider everyone's role in the conspiracy.

First, you have Greg Glova. At Horizon, he was the day-to-day person for communicating with Sea Star. Glova had meetings, he had phone calls, and of course, he had e-mails with Peter Baci on a near daily basis.

An then Peter Baci, just like Glova, he was a day-to-day person, too, only he was at Sea Star. And most of the communications, most of the e-mails were between the two of them because they handled the details.

Greg Glova and Peter Baci, they did the daily dirty work to make sure that Horizon and Sea Star were able to split the market and charge higher prices.

An for the most part, the two of them did a good job, a good job making sure the conspiracy ran smoothly. They stayed out of each other's way and they kept to the 50/50 agreement. They also raised the rates every chance they could. But it wasn't always smooth sailing. Sometimes someone would slip up. Sometimes there was a miscommunication. And sometimes there were problems. Sometimes these problems were ones they couldn't handle on their own.

1      It's not the case that there were problems all the

2      time or problems with even most of the accounts, but

3      when problems did come up, what's important is not how

4      many or even that there were problems, but how those

5      problems were fixed.

6      When these problems came up between Greg Glova and

7      Peter Baci, who came to the rescue?  Glova and Baci

8      both testified that they elevated these issues to

9      their bosses.  Glova turned to Serra and Baci turned

10     to Peake.  Why?  Because that was how the conspiracy

11     worked, that was the chain of command.  The bosses

12     were the problem fixers in the conspiracy.  That was

13     their role.  And Greg Glova testified about the

14     bosses' role.

15     He was asked, "When Mr. Peake and Mr. Serra would

16     get involved, how would they help resolve things?"

17     "ANSWER: When it got elevated to Frank Peake and

18     Gabriel Serra, they would discuss it and come to some

19     kind of agreement together, when it would be elevated

20     and they would notify Mr. Baci and myself on what they

21     came to an agreement on and what they decided to do."

22     And Peter Baci, he testified to the same thing.

23     "We never had a price war.  But occasionally we would

24     have a fire fight and would disagree on what was going

25     on between a particular customer, and a fire fight

1    would break out and we would try to put it behind us

2    as quickly as possible."

3        "QUESTION:  How would you try to put it behind

4    you?"

5        "ANSWER:  If it became a dispute, I would go to

6    Frank and ask him to become involved in it."

7        And Mr. Serra, he testified about his own role in

8    the conspiracy and how it was just like Frank Peake's.

9        "QUESTION:  Did he, being Mr. Glova, also elevate

10   problems that he had with Mr. Baci to you?"

11       "ANSWER:  Yes, he did."

12       "QUESTION:  When Mr. Glova elevated those problems

13   to you, what would you do?"

14       "ANSWER:  In most cases, I would discuss them or

15   communicate them with Frank."

16       And then there's Gabe Serra.  Serra was in charge

17   of the Puerto Rico trade for Horizon.  He had a lot of

18   responsibilities.  He didn't care or have time to care

19   about every little detail of how the conspiracy ran on

20   a day-to-day basis.  All he cared was that it was

21   getting done.  And Serra testified that when there was

22   a problem, it got elevated from Mr. Glova to him, and

23   he stepped in, and he reached out, he reached out to

24   his friend, Frank Peake.

25       And we all heard how this worked.  Remember the

1   phone call that we played where Glova elevated the

2   issue about Plaza Provisions, and Serra said, on the

3   phone, not to worry because he talked to Franky about

4   it.  Serra and Peake already knew each other for

5   years.  They were friends.  They were friends when

6   they worked together at Horizon and friends when they

7   started working at different companies.

8       An there's nothing wrong with being friends.  But,

9   because of this friendship, it was easy, easy for them

10  to talk, to talk about problems between Baci and

11  Glova, to talk about problems about the conspiracy.

12  And, like Serra, Frank Peake was also in charge of the

13  Puerto Rico trade.  He was the president of Sea Star.

14      Think about that.  The president of the company.

15  It doesn't make sense that the president would be

16  involved in all aspects of customers, all aspects of

17  pricing, all aspects of sales.  In the same way, Frank

18  Peake wasn't involved in the day-to-day of the

19  conspiracy.  But that doesn't mean he wasn't part of

20  the conspiracy.

21      You heard from three witnesses, three witness who

22  admitted to the conspiracy, admitted to their roles in

23  it.  And these three witnesses all told that you Frank

24  Peake was right there in the conspiracy with them.

25  And these witnesses, along with all the documents you

saw, all told you that Frank Peake had a role.  Not
the day-to-day role, but the role to step in when
necessary.  Frank Peake, along with his friend, Gabe
Serra, were the problem fixers.

And here is another example of how the elevation
of problems worked in the chain of command.  On
June 2nd, 2006, Glova complains to Peter Baci about
losing loads for the GSA account.  And you heard that
the GSA account was a group of customers that included
General Electric or GE.

And a few days later, Glova sends another e-mail
to Baci and complains about losing business from the
Linden account.  Days go by and he doesn't hear
anything.  So what does Glova do?  He elevates it.  On
June 11th, Glova lets Serra know about the problem he
was having with Baci, about GSA and Linden.  And on
the very next day, Serra and Peake have a six-minute
call.  Later Glova sends another e-mail to Serra
reminding him of the GSA problem.

And Serra responds to Glova saying that he made a
call and was checking on it.  He said this because he
had made the call to Frank Peake, and that same day
Frank Peake sends an e-mail to Baci to remind him to
talk about two accounts.  Which two accounts?  GE and
Linden.  The same two accounts that were elevated from

1    Glova to Serra.

2        Then on June 13th Peake calls Serra twice, once

3    for a minute and then right after that an eight-minute

4    call.  What do you think they talked about?

5        This shows the constant communication not only

6    between Baci and Glova, but also the chain of command,

7    how Glova and Baci kept their bosses informed of their

8    problems and issues between Serra and Peake, and how

9    they were resolved.

10        The defense told you that this case was about

11    insiders and outsiders.  They told you that:  Frank

12    Peake, he didn't have a secret gmail account.  Frank

13    Peake, he didn't have a code name.  Frank Peake, he

14    used his corporate e-mail account to communicate with

15    Horizon.  But none of that makes him an outsider.

16        Do you remember someone else who didn't have a

17    secret e-mail account?  Someone else who didn't have a

18    code name?  Someone else who used his company's e-mail

19    to talk to competitors?  That someone was Gabe Serra.

20        Was he an outsider?  He told you about his

21    participation in the conspiracy.  He told you that his

22    role and Peake's role were different than Baci and

23    Glova's.  Serra and Peake, they didn't need to

24    communicate as much, they stepped in when necessary.

25    Yet Serra still told you that what he was doing was

1    wrong.  He still told you that he was responsible.  He

2    may not have discussed the conspiracy in every

3    conversation with Frank Peake, or even most of those

4    conversations, but it was enough.  Enough for him to

5    know it was wrong.

6        If Frank Peake wasn't in the conspiracy, then what

7    was Serra doing in the conspiracy?  Without Peake, who

8    did Serra work with to take care of the fire fights

9    between Glova and Baci?  But with Peake, when Serra

10   needed someone to talk to, someone at Sea Star, about

11   problems with the conspiracy, he reached out to his

12   friend, his counter part in the conspiracy, the other

13   boss, Frank Peake.

14       Serra and Peake worked together for years.  They

15   knew each other for years and they were close friends.

16   And together Peake and Serra made sure that those

17   little fire fights, those little fire fights between

18   Glova and Baci didn't turn into a war, a price war.

19       Does it make sense that Frank Peake was an

20   outsider?  You heard all the testimony.  Just like

21   Glova, just like Baci, just like Serra, Frank Peake

22   was on the inside.

23       And the second way that we know that Frank Peake

24   joined the conspiracy was through the Orlando meeting.

25   To show that Frank Peake was an insider you don't need

to look any further than the Orlando meeting, a

meeting attended only by four people:  Baci, Glova,

Serra and Peake.  A meeting of insiders.  A meeting to

discuss the conspiracy.

How do we know?  That's what every witness

testified about.  But also let's look at what was

happening before and after the meeting.

The meeting took place on October 23rd and

October 24th, 2006.  We know this not only through the

testimony, but through all the expense reports that

put the four people there.  And here is Glova's

receipt that shows that Frank Peake made the lunch

reservation.  And let's look at what was happening a

few days before.  On October 10th, Glova e-mails Serra

about the meeting and they talk about what's going to

be discussed at the meeting.  And then Serra and Glova

continues to swap e-mails about problem accounts.

And before the meeting, Glova gives Serra a list

of complaints he had with Baci over several customers,

his gripe list, complaints where he felt that Baci was

not following through on agreements.  Agreements about

who should win the contract.  Agreements on what

prices to charge the customers.  Agreements that

competitors aren't allowed to make.

What is Glova doing here?  He's elevating,

1    elevating problems to Gabe Serra.  Problems that he

2    wanted Serra to talk about with Peake at the Orlando

3    meeting.  Problems that needed fixing.

4        So on October 20th, 2006, just three days before

5    the Orlando meeting, Serra sent Peake a list, an

6    e-mail listing eight accounts that Glova told him were

7    problems, problems that needed to be discussed at the

8    meeting.  And look at which two accounts are on this

9    list:  GSA or GE, and Linden, the same two we just

10   finished talking about.

11       And what does Peake do five minutes later?  He

12   responds with a list of six accounts that he wants to

13   discuss at the meeting.  And this exchange between

14   Serra and Peake, this exchange of "Who Shot John" list

15   is exactly the type of communications that Glova and

16   Baci testified about, the ammunition that they would

17   give Serra and Peake to address the fire fights.

18       And Serra, when he took the stand, he told you

19   what this list was all about.

20       "QUESTION:  What did you have with this

21   information of the list of accounts that Greg Glova

22   shared with you?"

23       "ANSWER:  I believe I summarized to the ones I

24   thought were critical and sent them to Frank."

25       "QUESTION:  And why did you send that information

1    to Frank Peake?"

2       "ANSWER:  In our discussion we agreed that there

3    were a few accounts which we were concerned with,

4    their actions, and vice versa, they were concerned

5    with some of our actions on some other accounts."

6       THE COURT:  A half an hour has elapsed.

7       MR. LEE:  Thank you, Your Honor.

8       THE COURT:  Okay.

9       MR. LEE:  "QUESTION:  What, if anything, did this

10   e-mail have to do with the Orlando meeting?"

11      "ANSWER:  We were preparing for that meeting."

12      "QUESTION:  To discuss these accounts?"

13      "ANSWER:  Yes."

14      And that was one of the reasons for their Orlando

15   meeting.  All three witnesses testified that they

16   planned to discuss some problems that Glova and Baci

17   were having.  And these lists?  These were like the

18   action items before a business meeting, items on the

19   agenda to discuss.

20      But there was another agenda item, and that was

21   the rate increases for the coming year.  And in order

22   to make sure that everyone was literally on the same

23   page, Baci prepared a document called the 2007 Rate

24   Increase Plan, which he distributed at this meeting in

25   front of everyone.

1          And on October 25th, 2006, just one day after the

2     Orlando meeting, Glova asked Baci to send him an

3     electronic copy so the two of them could work out the

4     details.  And a few days later, Baci sends it to

5     Glova.

6          And here is what the witnesses testified about the

7     rate plan.  For Greg Glova.

8          "QUESTION:  Now, during the course of the meeting

9     when you were talking about the rate plan, can you

10    just tell us who was present and who was involved in

11    the discussions?"

12         "ANSWER:  Frank Peake, Peter Baci, Gabriel Serra,

13    and myself were all present and active in those

14    discussions."

15         When Peter Baci testified, he was asked, "What

16    agreements were reached regarding the 2007 rate plan

17    during that meeting?

18         "ANSWER:  In general terms, we reached an

19    agreement on this plan.  Afterwards, there was some

20    back and forth on these items between myself and

21    Mr. Glova.  In collective terms, this is what we

22    agreed to do for 2007."

23         "QUESTION:  Who is the 'we'?"

24         "ANSWER:  The four of us that were at the

25    meeting."

1       "QUESTION:  Including Mr. Peake?"

2       "ANSWER:  Yes, sir."

3       And Serra testified about the rate plan too.

4       "QUESTION:  Did you discuss targets for rate

5       increases?"

6       "ANSWER:  Yes."

7       "QUESTION:  Was Mr. Peake present when this

8       document was distributed at the meeting?"

9       "ANSWER:  Yes."

10      "QUESTION:  What was the purpose of this?"

11      "ANSWER:  So that we would put out similar

12      increases to the market, so that when we started

13      negotiating these contracts, we could negotiate along

14      the lines of these rate increases."

15      And this rate plan?  That's price-fixing and

16      that's illegal.  But the big agenda item, at least big

17      for Frank Peake at the Orlando meeting, was the

18      Florida 50/50 market share agreement.  Not so much the

19      agreement itself, but the exceptions to the agreement,

20      especially the exception for refrigerated cargo or

21      reefers.  Even before Mr. Peake joined Sea Star, the

22      companies had an agreement that they would split the

23      market between the fast ships, from Florida to Puerto

24      Rico, right down the middle, 50/50.  Each company got

25      half the business.  That way they didn't have to

1    compete for customers by offering better prices,

2    because they had already divided up the market share

3    and they had already agreed to raise prices.

4        But this 50/50 agreement had an exception.  A big

5    exception for refrigerated cargo.  And since reefers

6    weren't part of the 50/50, Horizon enjoyed a larger

7    market share than Sea Star did.

8        But Serra testified that Peake had a different

9    view of how that reefer market should be split.  Peake

10   didn't think that reefer should be excluded from the

11   50/50.  He didn't like that Horizon had a greater

12   share.

13       You see, reefer cargo was more profitable than the

14   other type of cargo.  So Sea Star was missing out on

15   this additional revenue.  So he did what he normally

16   did anytime he had a problem with Horizon, he reached

17   out to his friend, Gabriel Serra, and he complained to

18   them.  And the two of them worked it out.  They worked

19   it out in Orlando.  As a compromise, Peake and Serra

20   agreed to change the exception to the 50/50 agreement.

21   They decided that Horizon could keep but not exceed

22   its current market share of the reefer market.  And

23   this agreement between Frank Peake and Gabriel Serra

24   that changed the market share agreement for reefers,

25   is key because it not only shows that Frank Peake knew

1    about the 50/50 agreement and was involved in the

2    conspiracy, but here he is, putting his fingerprints

3    all over the agreement and making it his own.

4         Frank Peake wasn't passively going along with the

5    existing conspiracy.  He was actively reshaping it and

6    expanding the scope of this illegal agreement,

7    eliminating more areas of competition.

8         And finally, another agenda item at the Orlando

9    meeting was the growth in Aqua Gulf's market share.

10        Aqua Gulf, as you heard, was both a customer and a

11   competitor.  And there was a threat that their market

12   share was getting too big; that it was putting a

13   threat to the 50/50 balance.  And we know that they

14   discussed Aqua Gulf at this meeting, not just from

15   Serra's testimony but also from the e-mail he sent

16   just a few days after the meeting, to the three other

17   people at the meeting after he had done his homework

18   and checked on the Aqua Gulf data.

19        And look what Serra says in this e-mail, an e-mail

20   to Baci, Glova and Frank Peake:  Read and delete.  Of

21   course.  He knew this was inappropriate.  He knew he

22   shouldn't send this to competitors.  But the Orlando

23   meeting wasn't the only time that Frank Peake and Gabe

24   Serra got together to talk about the conspiracy.

25   Serra testified that they regularly met in San Juan

1    and Florida.

2        I want to talk about just two of those meetings

3    between Frank Peake and Gabe Serra.  Now, you've heard

4    about several more, and they were good friends, they

5    got together every chance they could.  And while most

6    of those conversation during those meetings may not

7    have anything to do with the conspiracy, we know that

8    sometimes they did discuss the conspiracy.  And we

9    know they discussed it at these two meetings.

10       How do you know?  Let's look at the e-mails before

11   these meetings between Baci and Frank Peake.  Look at

12   what information Peter Baci was giving Frank Peake to

13   prepare him for these meetings with Serra.

14       First is the meeting in Ft. Lauderdale, Florida.

15   On August 19, 2005, Baci sends Peake a "Who Shot John"

16   list identifying problems he wanted Peake to raise

17   with Serra, in order to make sure that everything he

18   got back -- everything got back in line with the

19   conspiracy.

20       And as Baci testified, "You said that the 'Who

21   Shot John' list was typically prepared for what type

22   of occasions?"

23       "ANSWER:  It was prepared for meetings that we

24   held between Frank Peake and Gabriel Serra, where they

25   would be discussing fire fighting activity."

1      And as you could see from the e-mail Gabe Serra

2  sent to Frank Peake, he was arriving in Ft. Lauderdale

3  the very next day and they were planning a meeting.

4      In the same way we know about a meeting at the

5  Condado hotel, a hotel right here in San Juan.  Look

6  at this e-mail exchange between Frank Peake and

7  Gabriel Serra on May 31st, 2006, setting up the

8  meeting at the Condado hotel, a hotel where Frank

9  Peake was usually staying.

10      But how do we know this wasn't purely a social

11  meeting?  Let's look at the e-mails right before this

12  meeting, between Frank Peake and Peter Baci, just one

13  day before.  Frank Peake asked him to fax the market

14  share report.  To where?  The Condado hotel.

15      And what do you think they talked about during

16  that meeting between Gabe Serra and Frank Peake?  And

17  the fact that this meeting took place in Puerto Rico

18  is important, because it is just one of the many

19  examples of an act in furtherance of the conspiracy

20  that took place in this district between 2005 and 2008

21  in order to satisfy the venue requirement.

22      Of course, this wasn't the only act in Puerto

23  Rico, as you saw several examples, including e-mails

24  and phone calls about the conspiracy, that Gabe Serra

25  sent from his office and his home right here in Puerto

1    Rico.

2         And the third way, the third way that Frank Peake

3    joined the conspiracy, was through the agreements of

4    the bunker fuel surcharge.  During the time of the

5    conspiracy, fuel costs were on the rise and they were

6    cutting into the bottom line.  And during the time of

7    the conspiracy these surcharges went up constantly.

8    They started adding up because they were charged on a

9    per container basis.  And they raised prices

10   significantly.

11        You heard from Gabriel Lafitte from Burger King,

12   and he recalls this time well.

13        "QUESTION:  Are you familiar with the bunker fuel

14   surcharges that were provided, that were implemented

15   by Sea Star and Horizon during that period?"

16        ANSWER:  Yes."

17        QUESTION:  And did they have any bunker fuel

18   surcharges during that period?"

19        ANSWER:  During that time, certainly almost every

20   month the bunker fuel went up."

21        And the similar amounts and the similar timing

22   between the bunker fuel surcharges from Horizon and

23   Sea Star, that was no coincidence.  Glova, Baci and

24   Serra all testified that one company couldn't have a

25   fuel surcharge in place without the other, because the

1    market share would shift.

2         So they made sure that those increases happened in

3    coordination every chance they could.  Sometimes Glova

4    and Baci couldn't work it out on their own, so they

5    turned to Serra and Peake to get involved.

6         But Peake did more than agree with his friend Gabe

7    Serra on bunker fuel surcharges.  He changed the way

8    they were applied to different routes, and he did this

9    but he didn't do it alone.

10        On April 27th, 2007, Horizon issued an

11   announcement to the trade that it was increasing its

12   bunker fuel surcharge effective May 14th, 2007, from

13   $365 to 390.  And Horizon was worried, worried because

14   after they issued the announcement, Sea Star didn't

15   immediately follow.

16        So who stepped in?  Gabe Serra.

17        And who did he reach out to?  Frank Peake.

18        On May 7th, 2007, Serra sends an e-mail to Peake,

19   to make sure he was watching the news about fuel

20   prices, to encourage him to file a surcharge matching

21   Horizon, just like he had done many times before.  But

22   this wasn't their usual illegal exchange about bunker

23   fuel surcharge.  This time Frank Peake suggests

24   charging different amounts for different ports of

25   origin.  He challenges Serra to be more of an out-of-

the-box thinker.  Peake wanted Serra to stop the
practice for the last 20 years of charging the same
amount of fuel surcharge regardless of the length of
the route.

And this discussion about differentiating fuel
surcharges gave Serra an idea:  Rather than change the
amounts for different routes on the next increase,
like Peake wanted, Serra proposed it should be changed
on the next decrease.  So after e-mailing Glova about
the idea, he e-mails Frank Peake to set up a call, and
they have one, just a few minutes after this e-mail,
lasting for 10 minutes.

Meanwhile, Greg Glova and Peter Baci, they are
keeping tabs on what their bosses were doing and
getting ready to do the dirty work.  Later that same
morning, Glova wrote to Baci asking if Sea Star was
willing to match a fuel surcharge increase.

And Baci replies, "Frank and Gabe spoke last
night, and as a result, Sea Star would not only match
Horizon's fuel surcharge this time, but they should
plan on how to charge different amounts for longer
routes. Just like Peake wanted.  And you could see by
these announcements, that's exactly what happened.

First, Sea Star matched the bunker fuel surcharge
for Horizon for that particular time, just like they

1    had many other times.  And then in a later

2    announcement you see that both Sea Star and Horizon

3    not only charged the same amounts for Florida, but now

4    they charged higher amounts for the longer routes.

5    Just like Peake wanted.

6        And we know this was Peake's idea from the

7    testimony.  As Glova said.  "As between Sea Star and

8    Horizon, whose idea was it to charge the higher fuel

9    surcharge on the longer routes?"

10       ANSWER:  It was Sea Star's idea."

11       QUESTION:  Who at Sea Star was the main advocate

12   or proponent for that agreement?"

13        "ANSWER:  Frank Peake."

14        And Gabe Serra said,

15        "QUESTION:  Whose idea was it to charge different

16   rates for the different routes?"

17        "ANSWER:  To me, it began by Frank."

18        "QUESTION.  Did have you discussions with Mr.

19   Peake about different surcharges for different

20   routes?"

21        "ANSWER:  Yes, we did."

22        The coordination between Horizon and Sea Star over

23   bunker fuel surcharges, that's what makes it a crime.

24   It is not an excuse they coordinated the surcharge

25   because the price of fuel was going up or the

1    companies had agreed a certain amount to recover the

2    cost, or that it even made sense to coordinate them

3    because longer routes burned more fuel.

4        Frank Peake could have done it the right way.  He

5    could have issued his surcharges when he thought he

6    needed to without talking to Horizon.  He could have

7    changed the way the surcharges were applied to longer

8    routes without getting Serra's agreement, but he

9    didn't, because he knew that if his company had a

10   higher fuel surcharge than Horizon, he would lose

11   customers because fuel surcharge was a component of

12   price. And once you agree with a competitor about a

13   surcharge, about the amount and timing, it's a crime.

14       THE COURT:  Forty-five minutes have elapsed.

15       MR. LEE:  Thank you, Your Honor.

16       Frank Peake committed the crime of price-fixing,

17   because he couldn't risk losing customers, he couldn't

18   risk prices coming down.  Because as president of the

19   company, Frank Peake was responsible, responsible for

20   the profitability of Sea Star.  And, as you heard from

21   Peter Baci, before the conspiracy started Sea Star

22   never made a profit.  Baci never received a bonus.

23       "Before the conspiracy began in 2002, had Sea Star

24   ever been a profitable company?"

25       "ANSWER:  No, sir."

1        "QUESTION:  Was it profitable during the

2     conspiracy?"

3        "ANSWER:  It was not profitable in 2002.  It was

4     profitable in 2003 and beyond."

5        "QUESTION.  Had you ever received a bonus at Sea

6     Star before the company became profitable in 2003?"

7        "ANSWER:  No, sir."

8        "QUESTION.  Did you receive bonuses after the

9     company became profitable in 2003?"

10        "ANSWER:  I did."

11        "QUESTION:  In what years?"

12        "ANSWER:  2003, 2004, 2005, all the way through."

13        And Frank Peake knew this.  So in order to make

14     Sea Star profitable, in order to keep her profitable,

15     Frank Peake joined the price-fixing conspiracy, and he

16     stayed in until the end.  And it worked.  Sea Star

17     became profitable.  Of course, all companies, they

18     want to make a profit, and presidents of those

19     companies should try to make their company profitable.

20     But there's a legal way to do it and there's a wrong

21     way to do it.  And the wrong way is how Frank Peake

22     did it.  Because of the conspiracy, Sea Star made

23     money, and Frank Peake reaped the benefits.  He got

24     huge bonuses, bonuses that were tied to Sea Star's

25     profits.  And you can look at how these bonuses are

1    calculated by looking at Government's Exhibit 93.

2    Bonuses on top of a six-figure salary, every year

3    during the conspiracy.

4        Of course, there's nothing wrong with big salaries

5    and there's nothing wrong with big bonuses, but there

6    is something wrong when that money is being made by

7    fixing prices and cheating customers.

8        Frank Peake, he didn't start the conspiracy, but

9    it doesn't matter, he's still responsible for joining

10    the conspiracy for all the years he was in it.  And

11    anyone who joins a conspiracy breaks the law.  It

12    doesn't matter if you're the first ones in, like Glova

13    and Serra, or the last one through the door -- I'm

14    sorry, first ones in like Baci and Serra, or the last

15    one through the door, like Glova.  Once you're in,

16    you're in.  Frank Peake, he may not have started the

17    fire, but he had every opportunity to put it out.  He

18    was the president of Sea Star.  If he had ordered

19    Peter Baci to stop communicating with Horizon, the

20    conspiracy would have been over.  But he didn't.

21    Instead, he supported Baci and stepped in to fix

22    problems he had with Glova.  If Frank Peake refused to

23    conspire with his friend Serra, the conspiracy would

24    have been over.  But he didn't.  Instead, they got

25    together to work out the problems.

1      If Frank Peake allowed Sea Star to really compete,

2      Horizon would also have to really compete, and the

3      conspiracy would have been over.  But he didn't.

4      And at no time did Frank Peake try to put out the

5      fire.  Instead, he tended the flames, time and time

6      again, fixing problems between Baci and Glova,

7      participating in the Orlando meeting, coordinating the

8      bunker fuel surcharge.

9      When you go back in that jury room and you

10     consider all the evidence you've seen in this trial,

11     the testimony of three eyewitnesses identifying Frank

12     Peake's involvement in the conspiracy, the documents

13     that all show Frank Peake's role as a price-fixer,

14     think about it all.  Ask yourself:  Does it make sense

15     that Frank Peake wasn't involved?

16     Don't allow Frank Peake to let his friends and

17     coworkers take the fall for what he knows and you know

18     he did.

19     Frank Peake was in a powerful position, and he

20     seized every advantage to raise prices, making it easy

21     for him to cheat his customers, easy for him to

22     conspire with his friends, easy for him to join the

23     conspiracy.

24     All the evidence in this case, all the witness'

25     testimony, all the e-mails, lead you to find that

CLOSING – DEFENSE – MOSS

1    defendant Frank Peake is guilty.

2         Thank you.

3         THE COURT:  Fifty-five minutes elapsed.

4         The Court made a mistake, only 50 minutes elapsed.

5    He started at 10:14 and he stopped at 11:04, so 50

6    minutes elapsed.

7         Now, the defense is entitled to an hour-and-a-

8    half.  They may divide it appropriately.  They have

9    been authorized to both use time, and it is not the

10   Court's liking to fraction the testimony, but the

11   Court will allow the defense to decide when they ought

12   to stop, if they ought to stop, and considering that

13   the Court's policy is that at one-hour-and-a-half, the

14   Court usually gives the jury a break.

15        But it is up to you to decide, if you want to stop

16   at an appropriate time, you may do so.

17        All right?

18        MS. MOSS:  May it please the Court?

19        THE COURT:  Yes, Ms. Moss.

20                     **CLOSING ARGUMENT**

21        MS. MOSS:  Ladies and gentlemen --

22        THE COURT:  11:09.

23        MS. MOSS:  It's 11:09.

24        I stood before you at the beginning of this case

25   and I told you that Frank Peake is innocent.  Now I

CLOSING – DEFENSE – MOSS

1    stand before you at the end of this case, after nine

2    days of long testimony, and nothing has changed.

3    Frank Peake is innocent.

4        Before I go on, I just want to tell you, my heart

5    is racing now and I am nervous, because for the last

6    nine days I've had Mr. Peake's life weighing down on

7    my shoulders.  For the last 13 months, Mr. Marks and I

8    have had Mr. Peake's life weighing down on our

9    shoulders.  I apologize for being nervous.  And I

10   don't have any fancy charts to show you or PowerPoint

11   presentations.  I'm just going to talk to you.

12       Mr. Lee spoke in his closing argument about what

13   the Government has to prove.  And I'm going to talk to

14   you about proof, because when the Government brings a

15   case, charges a person with a crime, indicts a person

16   with a crime, they have to prove their case before you

17   can ever convict someone.  They have to bring you

18   evidence.  They have to give you tools in order to

19   decide the case.  They have to bring you proof.  Not

20   just any proof, not just any evidence.  They have to

21   bring you reliable, credible, unbiased evidence so

22   that you can make a decision in this case.

23       But what have they brought to you in this case?

24   What have they proved to you in this case?  I submit

25   it's nothing.  They've given you nothing to show you

CLOSING – DEFENSE – MOSS

1    that Frank Peake was involved in this conspiracy.

2         And some of you may be saying, well, what about --

3    Mr. Lee just stood up here for 50 minutes, what about

4    everything that he said?  Well, that's not evidence.

5    We have to look at the evidence that you heard during

6    the trial.  And instead of bringing you reliable,

7    credible unbiased evidence, what did they show you?

8         Instead of bringing you proof, they relied on the

9    testimony of three criminals, three *chotas*, three

10   snitches, and these witnesses presenting themselves to

11   you with the confidence that they would not be

12   doubted, with the confidence that you would just take

13   whatever they had to say and believe it.

14        But remember what I told you in my opening

15   statement?  That just because they say it's so,

16   doesn't make it so.  Just because they say it, doesn't

17   mean that it's the truth.

18        The Judge is going to tell you witnesses,

19   particularly Government cooperators, are not presumed

20   truthful.  They're not presumed honest.  They are not

21   presumed credible.  And the Judge is going to read you

22   a warning in a little while when he reads you the

23   instructions about the law, and he's going to tell you

24   that these people here, Baci, Gabriel Serra, Gregory

25   Glova, these people have a reason to make up stories

CLOSING — DEFENSE — MOSS

1    and to exaggerate their testimony because they wanted

2    to help themselves.

3        And, frankly, if your priest had gotten up on the

4    stand or Judge Dominguez had gotten up on the stand

5    and testified and said all those things about Frank,

6    I'd be cringing the whole time.  I would have crawled

7    underneath the table.

8        But that's not what we had here.  We had three

9    biased, prejudiced witnesses who had gotten huge

10   benefits from the Government.  That's what you heard

11   from.

12       I did not crawl under that table.  I stand up here

13   honored to represent Frank Peake, because I know and

14   you know these people lied, that they are liars and

15   that they lied for years.  They got really good at

16   lying.  They got really good at deceiving.  They got

17   really good at keeping secrets.

18       But the truth?  We didn't hear that here.  Now,

19   unfortunately, I don't have the pleasure and the luck

20   to be able to practice here in Puerto Rico in front of

21   Judge Dominguez all the time.  I practice in Miami.

22   Not so bad.  And in Miami, in all of our courtrooms,

23   every single courtroom, there's a sign, it stands

24   above the Judge's head, and what that sign says, and

25   it exists here also, is that "We who labor here seek

CLOSING – DEFENSE – MOSS

1    only the truth."  We who work and toil in this

2    courtroom seek only the truth.

3        So what is the truth here?  Well, I'm sure you've

4    all heard of an old saying, an old saying called "the

5    devil is in the details."  The devil is in the

6    details.  And I was thinking about this saying last

7    night, as I was thinking about this moment that I was

8    going to come before you.  I was reminded of something

9    that had happened when I was in law school, when I was

10   in law school one semester when I was preparing for

11   final exams.

12       And in law school final exams are a big thing,

13   because that final exam that you take at the end of

14   the semester, that is your entire grade.  Everything

15   that you did before that, the rest of the semester, it

16   doesn't matter; it's that one exam.

17       Now, we were getting ready for final exams.  And

18   there were two guys in my class, two guys in my class

19   who had studied really hard all semester, who had read

20   the law, who knew all the cases.  So the weekend

21   before the exam -- the exam was early Monday morning

22   at 9:00.  The weekend before the exam, they said:

23   We're going to go out of town, we're going to go to

24   Tampa.  We're going to have a good time, we're just

25   going to relax.  So they went out of town, they went

CLOSING – DEFENSE – MOSS

1          to Tampa.  They partied, they relaxed, they had a good

2          time.  They said, we'll go back on Sunday afternoon,

3          we'll get back in time, we'll be fine for the exam.

4              Sunday afternoon rolls along, and they're saying:

5          We're still having a good time, you know, we're going

6          to stay a little bit longer, you know, we'll get up

7          really early on Monday morning and we'll drive back to

8          Miami and we'll take the exam.  Monday morning comes

9          and they overslept.  They missed the exam.

10             So what do they say in their mind?  Oh, my gosh.

11     Oh, my gosh.  What are we going to say?  They say, okay,

12     we're going to tell the professor we had a flat tire and

13     that's why we couldn't make it back in time for the exam,

14     we'll tell him we had a flat tire.

15             They go back to Miami, they make it back

16     eventually.  The next day, they said, "Professor, please,

17     we had a flat tire, can we please take the exam now?"

18             The professor thinks, "Sure, you can take the

19     exam.  Come in tomorrow morning, I'll give you the exam."

20             They come in to take the exam.  They have to sit

21     apart.  That's the way we did it in law school.  They had

22     their test booklet.  They opened up the test booklet.  As

23     they're seated away from each other, they read the exam,

24     and there's one question on the exam.  The question is:

25     Which tire?

**CLOSING — DEFENSE — MOSS**

1       The devil is in the details.  It's easy to tell

2   the big lie.  It's easy to say, oh, Frank Peake was

3   involved, Frank Peake knew all about it, Frank Peake

4   participated.  But the truth is in the details.  The truth

5   is in the details.

6       And if you asked each one of these criminals on

7   the stand, you know, "Who were all the people involved in

8   this conspiracy?  What was the goal of the conspiracy?

9   What was discussed at these so-called conspiratorial

10  meetings?"  They would each give you a different answer.

11  And they each did give you a different answer because the

12  truth is in the details.

13      Now, there was testimony about three meetings that

14  took place.  And Mr. Lee spoke a little bit about the

15  meetings and showed you a little bit of pieces of testimony

16  from some of those meetings.  But let's talk about the

17  details of what these people testified to, because these

18  are the meetings -- and I believe what Mr. Lee said is, "If

19  you want to know that Frank Peake is an insider, you'll

20  look no further than these meetings."

21      What did Gregory Glova say about these meetings,

22  about the four of them getting together?  He said there

23  were two meetings.  There was a meeting in Orlando.  We

24  know they got together in Orlando.  Of course they got

25  together in Orlando.  That there was a meeting a year later

CLOSING – DEFENSE – MOSS

1   in Orlando again.

2          What did Peter Baci say about these meetings?  He

3   said there was a meeting in Orlando, October 2006, and he

4   said that a year later there was a meeting at a world golf

5   village, and what he put on his expense report was

6   Jacksonville International Airport.

7          What did Gabe Serra say?  Gabe Serra said there

8   was one meeting, one meeting in Orlando.  He didn't say

9   there were two meetings.  He didn't say there was another

10  second meeting.  He said there was one meeting.

11         So when you start getting deeper and deeper into

12  the details, you see.  And what was discussed at this

13  meeting, the first meeting?  Well, Mr. Lee picked and chose

14  some of that testimony where they talked about a 2007 plan.

15  And, of course, the witnesses are going to talk about a

16  2007 plan because there was an e-mail that Peter Baci sent

17  to Greg Glova about this 2007 plan.  Not to Frank Peake.

18         So they talked about this 2007 plan.  But what

19  else did Greg Glova say?  He said they talked about

20  undercutting of rates.  Sea Star undercutting Horizon,

21  Horizon undercutting Sea Star.

22         What did Peter Baci say?  Peter Baci said there

23  was no talk about undercutting of rates.  We talked about

24  excluding -- getting rid of that exception to the 50/50

25  rule, the reefer rule.  That's what he said.

**CLOSING - DEFENSE - MOSS**

1    Now, Mr. Glova didn't mention anything about that,

2  getting rid of that exception to the 50/50 rule.  He didn't

3  say that was discussed.  That was Peter Baci.  And what did

4  Gabe Serra say was discussed?  He didn't talk about a 50/50

5  rule.  He didn't really hardly talk about this 2007 plan.

6  He said that the market -- they talked about the market and

7  that they were going to freeze Horizon's market share at

8  52 percent.

9    When you ask them about the details of the

10  meeting, how many meetings, who led the meetings, what was

11  discussed at the meetings, that's when you get down to the

12  details; the truth.

13    And the most important meeting of all, the one

14  that was never even mentioned by Mr. Lee, one that Peter

15  Baci testified about in April of 2002, when this conspiracy

16  was hatched, when this conspiracy was born, a meeting that

17  Frank Peake was nowhere near, that's when Peter Baci says

18  that this conspiracy started.

19    What did Gabriel Serra say about when this

20  conspiracy started?  He said June 2003.

21    MR. SNYDER:  Objection.  Misstates testimony, Your

22    Honor.

23    THE COURT:  Thank you.  If it does, it will be up

24    to the jury to make that determination.

25    MS. MOSS:  And you will be able to rely on what

CLOSING – DEFENSE – MOSS

1    you heard in that witness stand.  They didn't show it

2    to you in their chart, in their closing.  Gabriel

3    Serra said that that conspiracy was hatched in June of

4    2003.

5         You have to keep digging down and digging down in

6    order to get to the details.  And when you dig all the

7    way down, you find the truth, that Frank Peake was not

8    involved.

9         And speaking more about details, let me talk a

10   little bit about one of the witnesses, Gregory Glova.

11   Gregory Glova was the first witness, you remember, on

12   the stand.  The witness who spent more time on the

13   stand than anybody else.  The Government's star

14   witness who explained and laid out everything for you.

15        And what did he say on cross-examination?  He

16   said, "I'm sorry, I don't remember the details."

17        What about how he testified?  And this is very

18   important because the Judge is going to tell you, you

19   decide which witnesses to believe and not believe.

20   And you do this by taking into consideration a

21   witness' conduct and a witness' demeanor.  How did

22   Gregory Glova testify?  What was his demeanor like on

23   the stand?

24        You remember him on direct; it was like a script.

25   The prosecutor asked him a question.  He said, *yes,*

**CLOSING — DEFENSE — MOSS**

1     *sir*, he said, *no, sir*.  He knew all the documents.  He

2     responded immediately.

3          What about, how was he on cross?  He was angry.

4     He was combative.  He wouldn't answer Mr. Markus'

5     questions.  And when he gave him a document to look

6     at, do you remember how he sat there for two, three

7     minutes reading an e-mail that was about 10 lines

8     long?  Thinking, thinking in his mind *what am I going*

9     *to say*?  *How am I going to answer this question*?  *What*

10    *am I going to do*?

11         How did he testify?  Was he credible?  No.  I go

12    back to that sign that's in the Miami courtrooms, "We

13    who labor here seek only the truth."  Truth.  That's

14    not what you heard from Gregory Glova.

15         There's another very important point to that sign.

16    We who labor here, we who toil and work here, seek

17    only the truth.  And that important point is that it's

18    the whole truth, the whole truth.

19         Do you think you have heard the whole truth in

20    this trial?  Do you think that you have been given all

21    of the evidence in this trial?  And remember, it's the

22    prosecutors who have the burden in this case.  The

23    prosecutors who were required to give you all the

24    evidence so that you can determine what is the truth.

25    I'm sure the prosecutor is going to say that "we can

CLOSING – DEFENSE – MOSS

1    pick and choose and decide what evidence we want to

2    present to you, what witnesses we want to provide to

3    you."  But where is the truth?  At the heart of it,

4    there has to be truth.

5        Why did we have to show you the pages upon pages

6    upon pages of Peter Baci's diary?  Remember his

7    notebook where he wrote notes on the conspiracy?  He

8    wrote notes on work.  He wrote notes on senior

9    management meetings.  He took detailed notes for 10

10   years until he had 29 notebooks full of information.

11   And he testified, "I wrote notes about the conspiracy

12   meetings, I wrote notes about what happened in

13   Orlando."

14       Why did we have to show you Peter Baci's notebook?

15   Why did we have to show you the stacks of e-mails that

16   we introduced if the Government is trying to give you

17   the whole truth?  Why did we have to tell you Gregory

18   Glova was keeping a calendar and keeping notes on a

19   calendar?

20       The prosecutors in this case have tailored their

21   evidence, tailored their questions.  Remember what

22   Gabriel Serra said on the stand?  They asked me a very

23   specific question because they practiced it.  They

24   tailored their evidence.  Shame on them.  They're

25   supposed to bring you the truth.

**CLOSING – DEFENSE – MOSS**

1      Where is the F.B.I. agent who interviewed Gregory

2   Glova?

3      Where is the F.B.I. agent who interviewed Peter

4   Baci and who interviewed Gabriel Serra?

5      Where are the 29 notebooks of conspiracy notes

6   that Peter Baci said he kept?  Where are Greg Glova's

7   calendar notes on this conspiracy?  Where is Kevin

8   Gill?  Where is Alex Chisholm?  Where is Bill

9   Stallings?  You haven't heard the whole truth.

10      And you know where you would find the truth in

11   this case?  Not from what they say on the stand today,

12   after they've gotten their benefits, after they've

13   gotten their deals, after they've pointed their

14   fingers.  To find the truth, you would have to look at

15   what was going on at that time.  What did Peter Baci

16   write in that notebook about what happened at the

17   Orlando meeting before he had a reason to be biased,

18   before he had a reason to bow down to the prosecutors?

19      You heard questions in this trial about Mr. Glova,

20   Mr. Serra saying different things to the agent than

21   what they testified to today.  How would you know what

22   the truth is?  Ask the agent.  Ask the unbiased

23   professional law enforcement official who questioned

24   these people, who wrote reports that you've heard

25   about, who got the statements from them that you have

CLOSING – DEFENSE – MOSS

1    never seen.

2        Why don't you have that evidence?  Because that's

3    where the truth is.  That's what the Government didn't

4    bring you.  And all of those things equal a reasonable

5    doubt.

6        The Government is supposed to prove their case

7    beyond and to the exclusion of every reasonable doubt.

8    These are not just words.  You know, if you were

9    involved in a civil case, a civil case where you were

10   suing someone for money because maybe they hit you

11   with their car, there's different levels of proof in a

12   civil case.  All you have to prove is what's called a

13   preponderance of the evidence.  And the Judge showed

14   us at the beginning, all you have to do is –– you have

15   a set of scales, you have to just ever so slightly

16   shift those scales more likely than not.  That's how

17   you prove the case in a civil matter.

18       If the State wanted to take your children away,

19   there's a different level of proof.  They would have

20   to prove by clear and convincing evidence that someone

21   was a danger to their children.  A much heavier

22   shifting of the scales because there's a heavier level

23   of proof.

24       But this is a criminal case, and in a criminal

25   case we have the highest level of proof that exists in

CLOSING – DEFENSE – MOSS

1      the law:  Beyond and to the exclusion of every

2      reasonable doubt.  It's not a shifting of the scales

3      or a heavier tipping of the scales, shifting the

4      scales all the way.

5           MR. SNYDER:  Objection, Your Honor.

6           MS. MOSS:  That's how much --

7           MR. SNYDER:  Misstates the instruction.

8           MS. MOSS:  -- beyond --

9           THE COURT:  The Court will be providing an

10     instruction on reasonable doubt, which may or may not

11     supersede the argument.  This is argument, all right?

12          Go ahead.  You may continue.

13          MS. MOSS:  This is not a civil case.  This is not

14     a tipping of the scales.  This is not a family case.

15          This is a criminal case.  Beyond and to the

16     exclusion of every reasonable doubt.  Because this is

17     a criminal case, it's not money that's at stake here;

18     it's somebody's life that is at stake here, and that's

19     why we take this so seriously, as I'm sure that you

20     will.

21          And in this case, the State has not proved -- the

22     Government has not proved its case beyond and to the

23     exclusion of every reasonable doubt because they

24     couldn't, because Frank Peake is not guilty.

25          Mr. Markus is also going to be speaking with you,

**CLOSING — DEFENSE — MOSS**

1    and he's going to be sharing a little bit more about

2    the documents and about the witnesses, but I thank you

3    for being so patient with us during this trial.  I

4    know it's been a long trial and you've been great.

5         Please continue to take this as seriously as we

6    know you are, and believe that Frank Peake is not

7    guilty.

8         THE COURT:  11:35, 26 minutes elapsed.

9         Does the defense wish to recess now or wish to

10   start?

11       MR. MARKUS:  I think it's a good time to take a

12   break.

13       THE COURT:  Okay.  The Court respects that and

14   therefore provides the jury a 15-minute break at this

15   time.

16       THE DEPUTY MARSHAL:  All rise.

17       (Whereupon a recess was taken.)

18       THE COURT:  They all agree that we should at this

19   time break and let the jury have their lunch,

20   including the defendant; is that right, Mr. Peake?

21       THE DEFENDANT:  Yes, sir.

22       THE COURT:  Okay.

23       (Whereupon the lunch recess was taken.)

24

25                    **CLOSING ARGUMENT**

**CLOSING - DEFENSE - MARKUS**

1    MR. MARKUS:  Thank you, Your Honor.  May it please

2    the Court.

3    THE COURT:  Yes, sir.

4    MR. MARKUS:  This is Frank Peake, ladies and

5    gentlemen, and he is innocent.

6    Good afternoon, everybody.  I hope everybody had a

7    nice lunch.  They stick me right after lunch.

8    Everybody wants a nap.  Me too.  So I'm going to try

9    to get through this as quickly as I can and go through

10   the evidence and what this case is about.

11   But I've been waiting a long time to say it, so

12   let me say it one more time:  Frank Peake is innocent.

13   And I do agree with one thing that Mr. Lee said.  This

14   case is about that second element, right?  We all know

15   there was a conspiracy.  We all know about those

16   secret e-mails and everything else.

17   This case is about whether Frank Peake knowingly

18   joined that conspiracy.  That's what this is all

19   about.

20   And I think one other way that Mr. Lee framed the

21   issue that I agree with is:  Did Mr. Peake compete or

22   did he cheat?  Was he a fighter or was he a cheater?

23   And I think when we go through the evidence now,

24   you're going to see and agree with me that he is a

25   fighter, he's not a cheater.

**CLOSING – DEFENSE – MARKUS**

1    You know, ladies and gentlemen, Mark Twain once

2    said that a lie travels halfway around the world

3    before the truth can put its pants on in the morning.

4    We heard a lot of lies up there on the stand.  A lot.

5    And you saw them.

6         But, you know, each of those three witnesses had a

7    moment of truth; a moment of truth before they could

8    come up with their stories, before they could offer

9    them any benefits or deals or get-out-of-jail-free

10    cards.  They had a moment of truth.

11         Remember Peter Baci?  His moment of truth was he

12    landed on the plane, his wife called him and said,

13    "The F.B.I. is at the house."  Remember?  And he said

14    that was the most frightening moment of my life.

15         So what did he do in that moment of truth?  Did he

16    call the problem fixer, as Mr. Lee said?  Mr. Lee said

17    that Mr. Peake was the problem solver, the fixer.  Did

18    Mr. Baci call the problem solver?  No.

19         Who did Mr. Baci call?  He called a man named Alex

20    Chisholm and he told that man to delete the gmail

21    account.

22         Now, if Mr. Peake was this problem solver, he was

23    the fixer of the conspiracy, who would Mr. Baci have

24    called in that moment of truth?  He would have called

25    Mr. Peake.  But he didn't.  He didn't even speak to

**CLOSING – DEFENSE – MARKUS**

1    Mr. Peake until he got back to Jacksonville.  No calls

2    to the supposed fixer.  Moment of truth number one for

3    their witness.

4        Moment of truth number two:  Gabriel Serra.  He's

5    driving in.  He hears the F.B.I. is at the office.

6    What does he do?  He looks them right in the eye for

7    an hour and he lies.

8        Not just lying to anybody, but lying to the F.B.I.

9    for an hour.  That's longer than Mr. Lee spoke in his

10   closing statement.  And that was a long time.  And he

11   looked them right in the eye and he lied.  It takes a

12   special kind of person to do that, ladies and

13   gentlemen, a special kind of person.

14       You know, when I used to get called to the

15   principal's office in elementary school, I walked in

16   and I cracked like that (gesturing), you know.  Forget

17   about the F.B.I.

18       The third moment of truth for their third

19   witness -- by the way, before I get to Glova, you

20   know, Serra got up on the stand, he says:  Well, now I

21   want to tell the truth.  Now I do.  And I'm friends

22   with Mr. Peake and I'm just telling the truth.  He had

23   his lawyer in the front row objecting to questions.

24   He wouldn't speak to us.

25       When the truth is on your side, you have nothing

CLOSING - DEFENSE - MARKUS

1    to hide, you speak to everybody.  You tell it like it

2    is.  He didn't speak to us.  And the Judge is going to

3    say -- he's going to instruct you, Judge Dominguez,

4    that there's absolutely nothing wrong with being

5    interviewed.  And, yet, this man who says that he was

6    telling the truth, wouldn't even speak to us?  Ask

7    yourselves why.

8        Greg Glova, the third moment of truth.  He's

9    interviewed by the F.B.I.  He mentioned 16 people.

10   Not one of them Frank Peake.  And how do we know that?

11   How do we know that?  Because they wrote out a

12   statement for him.  We went line by line on that

13   statement, and he made changes, over 20 changes to

14   that statement.

15       I wrote down some of them, things he talked about

16   in his statement.  When he began working in the

17   conspiracy -- I'll just take this off and go through

18   it.  You know what, I'll just read it to you, you

19   don't want to look at the screen anyway. I'm all

20   Elmo'd out for now, we'll get to some documents.

21       He talked about Gabe Serra promoting him.  He

22   changed the date; remember that?  He talked about

23   Kevin Gill.  He made sure to change that he didn't

24   know about the conspiracy when he started in that

25   position.  Do you remember he crossed that out?  He

CLOSING - DEFENSE - MARKUS

1    said he went along with Gill and Serra, and that's the

2    way it was done and he was just following orders.  He

3    explained why he participated.  He talked about Sea

4    Star.  He talked about Crowley.  He talked about

5    secret e-mails and his cellular phone.  He talked

6    about pricing.  He talked about market share.  He

7    talked about Walgreens and Wal-Mart and bunker fuel

8    surcharge, about how they were just recovering costs.

9    He spoke about Peter Baci, Gabe Serra and Kevin Gill.

10   And he made sure to add in another person, Tom Farmer.

11       But he didn't add Frank Peake in that moment of

12   truth.

13       He talked about justification, and he signed that

14   statement and it was witnessed by two F.B.I. agents.

15       So we see for each of them what happened in their

16   moment of truth.  No Frank Peake.  No Frank Peake.

17       And I'd like to start off with an e-mail that

18   Mr. Lee didn't mention in his closing, but it was put

19   up on the screen in opening statement by Mr. Snyder.

20   And Mr. Snyder showed you a portion of this e-mail.

21   It's prosecution Exhibit 37.  And I think this e-mail

22   really, in a lot of ways, is the key to this case.  In

23   A lot of ways, it is the key to this case, because you

24   look at what they showed you in opening and it looks

25   so bad, but then when you read the top, you see what

**CLOSING — DEFENSE — MARKUS**

1    this case is all about.

2         So I'll try the Elmo one more time and we'll go

3    through this.

4         THE COURT:  I think it's working.

5         MR. MARKUS:  Yeah, it's me; it's not the Elmo.

6         So you all remember this e-mail; remember the PNW?

7    Mr. Peake was e-mailing Mr. Serra and saying, "You may

8    have a visitor, no mistakes."

9         And Serra writes back, "Don't worry."

10        And Peake says, "I don't want it to be close."

11        And Serra says, "Do you have any doubt we'll hold

12   the line?"

13        "No doubts, just making sure."

14        Now, you look at that e-mail and you say, my

15   goodness, there must be a conspiracy here.  Look at

16   these guys talking about not bidding against each

17   other, right?  It looks bad.

18        In opening statement, Mr. Snyder showed you this

19   part.  And then Ms. Moss had to get up and show you

20   the top, the very top of the e-mail.  What happens?

21   Mr. Serra forwards it to Kevin Gill and he says:  B.S.

22   big time.  B.S. big time.

23        And that's really, in a lot of ways, the key,

24   ladies and gentlemen, because these two guys were

25   poking each other in the chest, B.S.ing each other and

**CLOSING — DEFENSE — MARKUS**

1    going after each other.

2        And how do we know that?  Because on that e-mail

3    where they're discussing holding the line on that

4    Transconex customer, we see another e-mail in

5    prosecution Exhibit 44, where Kevin Gill sends an

6    e-mail to Gabe Serra, and he says, "Just to keep you

7    up to date, Transconex is being watched like a hawk by

8    Sea Star. They're having their salespeople go by each

9    facility several times a day."

10       And they go on to talk about how Sea Star is going

11   to take actions based on any excuse, and there's a

12   point in each competitive marketplace where the rules

13   get thrown out.

14       And so what happens, does Mr. Serra hold the line?

15   Remember, I asked him, "Did you hold the line?"  He

16   said, "No, I took a piece of the business."

17       And I had to press him.  Remember, he tried to

18   fudge there?  I said, "You took all of Sea Star's

19   business after you said you'd hold the line."  He

20   said, "Yeah, actually, I took all of it.  I took all

21   of it."

22       And so what happens after they take all of it?

23   Frank Peake writes an e-mail saying:  Looks like we

24   have paybacks to give.  This is about the Transconex

25   business.  I would like to hear your ideas on a

CLOSING – DEFENSE – MARKUS

1    suitable slap.

2        Here's Frank Peake saying we're going to go after

3    them, because Frank Peake competes.  He doesn't cheat.

4    And that's a perfect example.

5        And, you know, when you talk about old time

6    friends and rivals and competitors, sometimes you've

7    got to look at the whole e-mail, not just half, to see

8    what's going on.

9        You know, I still like to play basketball.  I'm

10   getting up there, but I like to run around on the

11   basketball court.  And sometimes I like to go out, I'm

12   from Miami too and I go to the University of Miami and

13   I play with the young college kids.  And they laugh at

14   me when they see me; who wouldn't, right?

15       And I say, look, I'm getting old, take it easy on

16   me.  That's what I tell them.  And they pat me on the

17   back.  And the first time I get the ball, I drive by

18   them as quick as I can, because I'm just giving them a

19   story, to try so I can beat them.  Now, they learn the

20   next time that I actually have a little bit of a step

21   left; not much, but a little.

22       And that's what happens when you're competing.

23   There's a lot of trash talk that goes on.  You can't

24   just read the words on the page and say, aha, we can

25   tell you what that means.

**CLOSING — DEFENSE — MARKUS**

1      Human beings are more complicated than that.  And

2  so I think that Transconex deal really is a good

3  example of this case in general.

4      Now, I too can't go through every single e-mail

5  that we've seen in this case.  But none of these

6  e-mails are a problem.  And I'm going to try to take

7  the ones that were focused on and go through them with

8  you.

9      But let me just make a point about e-mails for a

10  second.  I think you heard what the F.B.I. did in this

11  case, ladies and gentlemen.  They went through every

12  paper, every e-mail, every desk drawer in everybody's

13  offices, and they went through it and through it and

14  through it with a mindset that Frank was guilty.

15      MR. SNYDER:  Objection, Your Honor.  There is no

16  evidence in the record to support that.

17      THE COURT:  Okay.  Fine.  You may, at your turn,

18  proceed and argue to the contrary.

19      MR. MARKUS:  Ladies and gentlemen, you heard, they

20  went through every piece of paper.  Peter Baci's

21  office was barren.  And they took all those notebooks;

22  remember?

23      Imagine the F.B.I. going through all of our

24  papers, all of the e-mails we've ever written in our

25  life and trying to spin them.  You know, my

**CLOSING — DEFENSE — MARKUS**

1    grandfather told me a story once.  He said there's a

2    way to look at life, you can look at life through

3    clean windows or you can look at life through dirty

4    windows.

5         And if you look at life through dirty windows,

6    everything looks bad, everything looks evil,

7    everything looks dirty, right?  He said, "Son, I want

8    you to look at life through clean windows so you can

9    judge for yourself what's good and what's evil."

10        And that's why we have you all, the jury.  Because

11   they've looked at these e-mails through dirty windows,

12   ladies and gentlemen.  That's how they have proceeded

13   with these e-mails.

14        They assume the worst in people.  They assume

15   those e-mails mean something that they don't.  And so

16   we have you all to look at those e-mails through clean

17   windows, and you all can decide for yourselves what

18   they mean.

19        And so let's go through some of them and see if

20   they really mean what the prosecutor says they do.

21        Remember this one, this list of customers before

22   the October meeting?  This is their very first

23   exhibit.  We know what this is, ladies and gentlemen,

24   this is Gabe Serra saying to Frank Peake:  You stole

25   these customers from me.

**CLOSING — DEFENSE — MARKUS**

1    And what does Frank Peake write back?  He writes

2    back:  Well, you stole these from me.

3        Now, did he use those words?  No.  But that's

4    what's going on there.  Both sides are poking each

5    other in the chest.  They're going after each other.

6    Frank is going after Gabe Serra's business there.

7        There are a lot of highlights on this e-mail right

8    before that October meeting.  But one of the things

9    they have never discussed even 'til now, Mr. Lee

10   didn't talk about it, was predatory actions, predatory

11   items.  Because, you bet, Frank Peake was not happy

12   about predatory actions.  And the market had learned

13   its lesson about predatory pricing and Navieras.

14       Because when predatory pricing happens, the market

15   collapses.  And Navieras went out of business because

16   of it.  And Frank Peake wasn't going to allow for

17   predatory pricing.  And that's not a crime.

18       What about Aqua Gulf?  Because I agree that Aqua

19   Gulf was discussed at that 2006 meeting.  But there's

20   nothing wrong with that, ladies and gentlemen.  Aqua

21   Gulf, remember, was a competitor.  And, remember,

22   after that meeting, Peter Baci sends public

23   information from the piers data.  There's absolutely

24   nothing wrong with that.

25       And then Gabriel Serra corrects the public

**CLOSING — DEFENSE — MARKUS**

1    information.  They're not talking about what to charge

2    Aqua Gulf, the prices and agreements, *how can we agree*

3    *to charge Aqua Gulf this*.  No.  No.  No.  No.  No.

4    They're talking about the public market share data.

5    And Gabriel Serra, all he does in that response is fix

6    it, because it was incorrect, the data that was

7    public.  And there's nothing wrong with that.

8        Speaking of Aqua Gulf, the prosecutor used this

9    e-mail quite a bit where Gabriel Serra talks about

10   you're playing into AGT and Transnow's hand.  And you

11   remember what Mr. Peake says:  He doesn't respond well

12   to threats.  They haven't exceeded the allocation.

13   Don't send me stuff like this.

14       Now, this is very important, ladies and gentlemen,

15   because what was going on here -- and we heard it from

16   Mr. Serra, himself -- Aqua Gulf was a competitor, and

17   they were using Horizon's ships a lot of times.  And

18   what was happening was Frank Peake was buying slots on

19   Horizon ships and selling those slots to Aqua Gulf at

20   a cheaper rate than Horizon.

21       So that's a lot of words; what does that mean?

22   That means Frank Peake was competing to sell Aqua Gulf

23   space, not on his ships but on Horizon's ships, and

24   that infuriated Gabe Serra.  That infuriated him.

25       That's competition.  That's not cheating.  That's

**CLOSING — DEFENSE — MARKUS**

1    competing for Aqua Gulf's business.  And Mr. Peake, he

2    used Horizon's own ships.  Can you imagine how upset

3    the other side was?  And that's why we saw that

4    e-mail.

5        We saw this e-mail from the prosecutor in his

6    closing.  This is competition.  This is Frank Peake

7    saying:  I will fire back.

8        Clean windows, ladies and gentlemen, I'm asking

9    you to look at these e-mails and judge them for

10   yourself, not the spin that those people want to put

11   on them, because, as Ms. Moss explained, they have a

12   reason to exaggerate.  They have a reason not to be

13   honest with you.

14       I mean, let's talk about maybe the worst e-mail

15   you saw in the whole case.  What was the worst one?

16   It wasn't even an e-mail.  Remember that fax that we

17   saw where it was "bcced" to Frank Peake; do you

18   remember that?  And it wasn't actually e-mailed, it

19   was faxed.  There was a line written, "To Greg," on

20   it.  And they looked on everybody's computer, but they

21   didn't show you one example of that fax as an e-mail,

22   and that's because it wasn't sent as an e-mail.

23       And you remember Baci on the stand?  He initially

24   said, well, I would "bcc" someone if I didn't want

25   that person to know if I was sending it.  Remember

**CLOSING – DEFENSE – MARKUS**

1    that?  And I had to correct him because he faxed it so

2    he would show, he would show, trying to intimidate

3    Glova, the kid.  Trying to intimidate Glova.

4        If that e-mail was sent as an e-mail, you know you

5    would have seen it in those binders.  You know you

6    would have seen it as an e-mail and not as a fax.  But

7    you didn't.  But you didn't.

8        What about all those calls, phone records?  Well,

9    those are important.  They didn't ask any of the

10   witnesses about those phone records until the very

11   end, Mr. Serra.  And the phone records, ladies and

12   gentlemen, are the very definition of reasonable

13   doubt, the very definition.

14       Remember the e-mails?  All these e-mails that

15   don't match up with the phone records?  How many times

16   have we seen this one?  Gabe says he hadn't received

17   it from Frank; remember this?  I know I must have

18   shown it a million times.

19       How about this one where there was an e-mail where

20   it says, "Frank is raising this with Gabe as we

21   speak."

22       Now, if you see, this was sent on April 17th,

23   2007.  When you go back into the jury room, make a

24   note to look at the phone records and see if there

25   were any calls in April of 2007, any calls. You won't

CLOSING – DEFENSE – MARKUS

1     see any.  You won't see any.

2          So what does the prosecutor give you?  Excuses.

3     Excuses.  They say, well, if it's not in the phone

4     records, it must have been from the office phone.

5          What are we supposed to do to show that Frank

6     Peake is innocent?  If the evidence shows a call, he

7     must be guilty.  If the evidence doesn't show a call,

8     he must be guilty.  Really?  You can't have it both

9     ways.  You can't have it both ways.

10         So let's talk about that October meeting then.

11    This is important, because when he went up to that

12    October meeting, the prosecutors time and again said

13    remember the TSA agreement was already signed back in

14    March, so there would be no reason to discuss the TSA.

15    And that was very misleading, wasn't it?  Because I

16    had to come up and show you e-mail after e-mail after

17    e-mail after e-mail, month after month after month

18    after month that these guys were talking about TSA

19    after March of 2006.

20         Not just after March, but all the way up to

21    October 19th, 2006, Frank Peake -- this is

22    Exhibit 174, you'll have it back in the jury room,

23    take a look at it -- Frank Peake e-mails with Gabe

24    Serra on October 19th, and this is an e-mail about the

25    Horizon/Sea Star TSA, right before that October

**CLOSING – DEFENSE – MARKUS**

1    meeting.

2        And you heard the evidence from their own

3    witnesses.  The pressure was building, every month,

4    the pressure about service, because Frank was a tough

5    customer and he was upset about how he was being

6    treated and about how Sea Star was being treated as a

7    customer.  And he kept pounding Serra and pounding him

8    and pounding him.

9        And so it was very misleading for them to try to

10   tell you that no e-mails and no discussions happened

11   after March, because we had to show you, not only did

12   discussions happen, they happened over and over and

13   over and over again, all the way up to that October

14   meeting, about the TSA service issues.  And Frank

15   asked for face-to-face meetings again and again.

16       Please, ladies and gentlemen, I can't go through

17   every e-mail, but you'll have those e-mails.  Look at

18   them.  Mr. Peake is saying:  I want to meet with you

19   face to face and talk about this.  This is a problem.

20       We had to show that to you.  This is a court of

21   law.  This is supposed to be about the truth here, as

22   Ms. Moss told you, and you were misled and it's very

23   disappointing.

24       What else was discussed at that 2007 meeting?

25   Well, we know about the predatory pricing from that

**CLOSING — DEFENSE — MARKUS**

1    e-mail.  We know there was probably some poking going

2    on, right, with these guys?  We know Aqua Gulf was

3    discussed as a competitor because there's market share

4    information going back.  And there's nothing wrong

5    about that.  And we know that all of the witnesses,

6    whenever they started talking about the conspiracy,

7    all told different stories.

8        And you know, Ms. Moss told a story, I'm going to

9    tell one too, because there's a great story in the

10   Bible about Rachel.  And Rachel was out bathing one

11   day and two men came up to her and saw her, and they

12   said to her, "You will either sleep with us or we will

13   go to the town and tell the wise men that you did

14   sleep with us."

15       That was a big threat because back then

16   adultery -- Rachel was married -- adultery was a crime

17   punishable by death.  But Rachel held firm and she

18   said, "I will not do that."

19       The two men went back into the town and told the

20   wise men, and the nine wise men brought Rachel before

21   them and said, "You have committed adultery and you

22   must hang for your crimes."  And as they voted one

23   after the other, "Yes, hang, hang, hang," the last

24   wise man said, "Well, hold on a second.  Let's bring

25   each of these men."

**CLOSING — DEFENSE — MARKUS**

1    So they brought in the first man and said, "Where

2    did you sleep with Rachel?"

3        And he said, "By the lake."

4        They brought the second man and said, "Where did

5    you sleep with Rachel?"

6        He said, "Under the maple tree by the lake."  And

7    then each of them said.

8        We had the same exact thing happen on the stand.

9    When we asked specific questions, "Oh, the whole

10   meeting was about that 2007 document."  Serra said,

11   "No, no, no, no, no, we didn't really talk about it,

12   that was for a future date."  Everybody had a

13   different detail about what happened in that meeting,

14   because when you get down to it, ladies and gentlemen,

15   that's not what happened.  They weren't being honest

16   with you.

17       Sure, they had gripes.  You heard Gabe Serra talk

18   about the gripes that they had, but that's not

19   conspiracy, that's competition, fighting with each

20   other, poking each other.

21       And so if, when you look at that meeting, you

22   remember differences in stories, the Judge will

23   instruct you that you can reject that entirely. You'll

24   hear that instruction.

25       So let's talk about what Mr. Lee said this case is

CLOSING — DEFENSE — MARKUS

1    about.  He said this case is about whether Frank Peake

2    is a competitor or a cheater.  And I'd like to talk to

3    you right now about what the evidence showed about

4    that issue, because I agree with Mr. Lee.

5        And you all know that Frank Peake was competing.

6    I already showed you some e-mails about the slap

7    strategy.  When business was taken away from Mr. Peake

8    and Sea Star, he slapped them back.  You saw e-mails

9    about that.  You saw documents.  You saw Peter Baci's

10   journal about the slap strategy.  That was Mr. Peake's

11   strategy about how to get business.

12       THE COURT:  Thirty-two minutes have elapsed.

13       MR. MARKUS:  Thank you, Judge.

14       You saw documents relating to Mr. Peake hiring a

15   management consultant, a leadership consultant, to try

16   to make the company better.  If there was some

17   conspiracy, if he was cheating, he wouldn't be

18   bringing in people like this.

19       You heard evidence that he improved the ships, the

20   terminal, the equipment.  He was spending money, the

21   company's money, to do these things.  He was out in

22   front.  If there was some agreement to split the

23   market 50/50, you don't need a better terminal, you

24   don't need better ships, you don't need better

25   equipment.  But Frank Peake was competing.  He was

CLOSING – DEFENSE – MARKUS

1      trying to make it better.

2          You heard Mr. Serra talk about him being a tough

3      customer.  That's not something you can turn off and

4      on.  That's who Mr. Peake is.  And you saw it yourself

5      in those e-mails that we showed you.

6          But I think the most important evidence to show

7      that Frank Peake was competing was that third ship.

8      And I want to talk for a couple minutes about the

9      third ship because it just crushes their theory of the

10     case, it totally crushes it, because Mr. Peake had an

11     idea of putting a third ship in the water because he

12     wanted to get more market.

13         If there was cheating with Mr. Peake's

14     involvement, he wouldn't have been pushing for that

15     third ship.  But because he was on the outside of that

16     agreement, he was pushing for it.  And we see e-mails

17     talking about that.

18         And the Judge is going to instruct you the success

19     or the failure of those sorts of things isn't what's

20     important, it's not the success or failure.

21         So let's look at what those e-mails discuss about

22     the third ship and about whether Mr. Peake was about

23     *peace in the valley*, as we heard about Peter Baci, or

24     whether he was about fighting, about competing.

25         Do you remember this e-mail from Kevin Gill,

**CLOSING – DEFENSE – MARKUS**

1    clearly talking about him as an outsider?  "I believe

2    Frank's ego and inexperience in this trade are getting

3    in front of smart leadership.  He doesn't understand

4    the multi carrier Latin Emotion Jones Act trade where

5    the historical Puerto Rico law of physics says that

6    for every action, there is an overreaction that lasts

7    for three years."

8        They're talking about Mr. Peake going after their

9    little agreement; in other words, fighting and being

10   on the outside.  He talks about Peake having an

11   aggressive posture, "negative to us and seeking deals

12   to take share."

13       But what about that third ship?  Mr. Peake was

14   e-mailing the head of the company, Mr. McGee.  And he

15   was talking about pushing -- "they," meaning Horizon,

16   are pushing back hard on our deployment of the third

17   vessel.

18       So what was Mr. Peake's plan?  He says here is the

19   plan:  Let's terminate the TSA we have with Horizon.

20   He wanted to terminate them because he's going to be

21   putting a third ship, he doesn't need to be for them

22   anymore.  We will deploy three vessels.

23       He talks about how they won't sell Horizon any

24   space.  Is this cheating or is this competing, ladies

25   and gentlemen?

**CLOSING – DEFENSE – MARKUS**

1    And he asks Peter Baci to run the numbers on what

2    the third ship would do, and this is Defense Exhibit

3    137.  You still haven't heard the prosecutor discuss

4    it, and I'm going to ask that you look at this exhibit

5    back in the jury room, 137 of the defense, because

6    this is an internal Sea Star document where they start

7    exploring what a third ship would mean, and you see

8    what the projections are.

9    It says, right now, the split between Sea Star and

10    Horizon was Sea Start had 47 percent and Horizon had

11    53 percent.

12    By the way, pause for a moment.  You've heard

13    about this 50/50 deal.  Have you seen any evidence

14    throughout any of this trial that the market share was

15    split 50/50?  It never was.

16    I'm sure you would have seen a fancy graph or a

17    chart showing 50/50 back and forth.  But they never

18    showed you that because the market was never split

19    50/50.

20    What Frank Peake was trying to do was grab more

21    market.  By '06, there would be 50/50.  By '07, Sea

22    Star would have 53 percent, and by mid '07, 55

23    percent.  And I ask you, ladies and gentlemen, does

24    that look like Frank Peake was competing or he had an

25    agreement on a 50/50 split?  Please.  This crushes

**CLOSING — DEFENSE — MARKUS**

1      their theory of the case.

2          And it wasn't just Sea Star that knew Frank Peake

3      was fighting for the business.  Horizon ran the

4      numbers too.  And this is Defense Exhibit 457.  This

5      is Horizon getting nervous about what Frank Peake is

6      doing.

7          And you see here that Kevin Gill says that they're

8      going to lose up to 112 loads if Peake follows through

9      with his idea for a third ship.  Ladies and gentlemen,

10     this is evidence.  This is a dagger through their

11     heart.

12         Forget about proof beyond a reasonable doubt right

13     now.  We have proven to you that Frank did not agree

14     to 50/50.  Why would he be pushing for a third ship?

15         Now, did the third ship work out?  No, it didn't

16     work out.  It was only in the water a couple months.

17     But not because of Frank Peake, he was pushing for it,

18     he was fighting for that market share.

19         In fact, Horizon Lines, you'll see Mr. Serra, if

20     Mr. Peake was working with Mr. Serra on a 50/50 split,

21     why does Mr. Serra send Gill an e-mail saying, "We

22     need to understand what Frank's end game here,"  he's

23     talking about the ship, "and he may give you some

24     indication if you go about it the right way."

25         What Serra is saying to Gill here is:  Go golf

CLOSING — DEFENSE — MARKUS

1    with Neil Perlmutter, that guy at Sea Star, and see if

2    you can find out what's going on.

3        Now, Frank was an insider.  If Frank was part of

4    this 50/50, it would be very simple:  Serra would call

5    up Peake and say, hey, what's going on here?  What

6    about our 50/50?

7        That's exactly the opposite of what happened.  It

8    got so heated between Mr. Serra and Mr. Peake that

9    Serra poked him in the chest.  We all remember this

10   testimony, it was one of the few times we got to laugh

11   during this trial.

12       Does that sound like fighting and competing, or

13   does that sound like cheating?  What about the "Who

14   Shot John" list?  The "Who Shot John List" were lists

15   of customers that were taken away from Sea Star.

16       So, of course, the president wants to know which

17   customers they've lost.  That's not a crime, for the

18   president to know which customers were taken.

19       If anything, that shows competition.  I need to

20   know so I can slap them back.  So I can slap them

21   back.

22       And we know that as hard as Frank fought, he

23   always wanted to do things equitable and legal.

24       They would have you believe that Mr. Peake was

25   evil in this one little area, but in everything else

**CLOSING — DEFENSE — MARKUS**

1    in life, he was legal and perfect and competitive.  It

2    doesn't work like that.  It doesn't work like that.

3        The market.  We haven't heard much about the

4    market from the prosecutors.  We had to bring out

5    about Navieras and what happened before 2002.

6    Remember, before 2002, Navieras was engaged in the

7    predatory pricing, charging so low, that the rates

8    went down so much that Navieras went out and the

9    industry was in shambles.  And Bob McGee's, the head

10   guy, in 2003 made this bold speech after Navieras went

11   out, he said, listen, we all have to raise our rates.

12   The customers were there.  The competitors were there.

13   Everybody in the industry was there.  This wasn't a

14   conspiracy.  This was *we have to fix this market*, *we*

15   *have to raise our rates*.  So, of course, you're going

16   to see rates go up for two reasons:

17       One, one of the five companies is out.  So now

18   we're down to four.  Supply has gone way down.  It's

19   as simple supply and demand.  When one of five

20   companies goes out, you're going to see the prices go

21   up, and that was the culture of the market had

22   changed.

23       So, of course, prices can go up for legitimate

24   good reasons.  We don't want predatory pricing.  We

25   don't want another Navieras.

**CLOSING – DEFENSE – MARKUS**

1    And as prices go up, Mr. Peake understood that if

2    predatory pricing would take place, there would be

3    mutual assured destruction.  Now, we saw that

4    expression used in an e-mail, "mutual assured

5    destruction."  What does that mean?

6        That means if one side starts rate cutting and

7    predatory pricing, the other side is going to do it

8    too, and it's going to circle down.

9        Now, that's not a conspiracy, if you decide we're

10   not going to engage in predatory pricing and we're

11   going to call others out on it when they do.  That's

12   not an agreement.

13       It reminds me of a baseball game.  When a guy hits

14   a home run or another pitcher throws inside, sometimes

15   there has to be some retaliation, right?  But the

16   pitchers know you can't throw at the baseball batter's

17   head.  You've got to hit him on the shoulder or in the

18   hip, because if you throw it at the guy's head, you

19   know what's going to happen when you come up to bat?

20   They're going to throw at your head.  And that's

21   mutual assured destruction.  What happens there is

22   both sides start throwing at each other's head: bench

23   clearing brawl, and instead of playing baseball, we're

24   rolling around in the dirt fighting.

25       It was a different mindset in the industry:  You

**CLOSING — DEFENSE — MARKUS**

1    can't engage in this predatory pricing.

2        Mr. Peake was a good boss and a good president.

3    And you heard about that.  What about the profits and

4    losses of Sea Star?  Is that evidence that Mr. Peake

5    was in a conspiracy, that the company started making

6    money after Navieras went out of business?

7        Actually, if you look at the chart that they

8    showed you of the profits and losses, starting at the

9    date of the conspiracy in 2005, the profit and losses

10   go down.  Take a look at their exhibits when you go

11   back, on profit and loss, starting in 2005, Sea Star's

12   profit and loss goes down.

13       By the way, same with its compensation, it goes

14   down if you look at those numbers.  You know, how dare

15   they say his salary and his bonus make him guilty of

16   this crime.  There's no evidence of a crime.  That is

17   not evidence of a crime.

18       And they can't have it both ways.  Remember when I

19   asked Mr. Serra, "Did you have you a financial

20   interest?"

21       And he looked us all in the eye, and he said,

22   "No."

23       And I said, "What about all your stock options?"

24   Because Horizon is a public company.

25       He said, "Oh, yeah, I have millions of dollars in

CLOSING – DEFENSE – MARKUS

1    options."

2         That right there is a reasonable doubt, ladies and

3    gentlemen.  He looked you in the eye and said that,

4    that he didn't have a financial interest.

5         So there's no crime in trying to get more market

6    as long as it's an internal decision.  And this was

7    Frank's internal strategy.  And you're going to hear

8    from the Judge that internal strategies, there's no

9    problem with.

10        And you see this memo (indicating)?  This is a Sea

11   Star memo written in 2006.  And I asked Mr. Baci

12   whether this was conspiracy related, and he said no.

13        What's Sea Star's strategic key issue?  To try to

14   get 50 percent of the lift.  Because right now they

15   had 48.  There was no 50/50 split.  They were going

16   for it internally.  They wanted to obtain new

17   business.

18        Does that sound like competing or does it sound

19   like cheating?

20        There's other internal documents that I showed

21   you.  I don't have a lot of time left, but you see

22   these documents where Sea Star was trying to achieve

23   50 percent?  Not because of a conspiracy, but because

24   they were fighting for more market because they never

25   had 50 percent of the market.  And Frank wanted more,

**CLOSING – DEFENSE – MARKUS**

1      and that's why he had that third ship strategy.

2           THE COURT:  You have now 15 minutes left.

3           MR. MARKUS:  Thank you, Judge.  Time flies when

4      you're having fun.

5           So, you know, it reminds me a little of this logic

6      game that I learned back in elementary school.  You

7      know, the logic flaw that the prosecutors have is:

8      There was a conspiracy to increase prices.  Prices

9      did, in fact, increase.  Therefore, Frank Peake must

10     have agreed to increase prices.  That's what they've

11     argued to you.

12          How do we know that sort of logic is flawed?  Let

13     me change the example.  All jurors walk through the

14     metal detector in the morning, right?  Greg Glova

15     walked through the metal detector on the morning he

16     testified; therefore, Greg Glova must be a juror.  No,

17     the logic doesn't follow.

18          Just because there's increases in prices doesn't

19     mean that Frank Peake was part of a conspiracy.

20          What are conspiracies, ladies and gentlemen?  They

21     are secret.  By their very definition, secret phones,

22     secret e-mails, falsifying expense reports, initiation

23     meetings.  We heard about all of those things.  None

24     of them had to do with Frank.  Gabe Serra instructed

25     on the secret phones.  Gabe Serra was part of those

**CLOSING – DEFENSE – MARKUS**

1    initiation, in setting them up.

2        Frank Peake didn't do anything in secret, never

3    once, never falsified a report.  Everything was out in

4    the open.  He put on his expense report that he went

5    to Orlando in 2007.  And he put in there that he

6    discussed the 2007 plan for TSA.

7        Now, he doesn't have a whole explanation in his

8    expense report, but we know from those e-mails what

9    was discussed going in to that October report, because

10   Frank Peake was out in the open.

11       Let me hit bunker fuel surcharge real quick before

12   I'm out.  Now, Frank Peake never did one thing wrong

13   with bunker fuel surcharge.  Craig Lee said he could

14   have done it the right way.  He did do it the right

15   way!  He had a formula.  That's not a conspiracy,

16   excuse me, that's not a conspiracy.  He had a formula

17   to determine how to charge bunker fuel.  When it went

18   up, his formula showed how much he should charge, and

19   when it went down, how much to charge.

20       He was transparent.  It was submitted to a

21   Government agency.  The same pump was used, the same

22   vendor was used, the same ships, the same burn rate.

23       So what did they show you?  They showed you an

24   e-mail where Gabe said, "Look at the news, prices have

25   gone up."  And now it's a crime to send the news

**CLOSING — DEFENSE — MARKUS**

1    reports about prices of fuel going up?  Don't blame

2    Frank Peake for the price of fuel going up.  You've

3    got to blame the pump for that.  I mean, I know they

4    want to blame him for a lot, but he's not to blame for

5    the price of fuel going up, I'm sorry.

6        And the fact that prices may have ended up the

7    same, of course all these things were the same.

8        The Judge is going to instruct you that you're

9    allowed to follow someone else.  When someone else

10   publicly files a rate, you're allowed to follow, there

11   is no crime.  Why do you think on the street corners,

12   we see gas stations charging the same amounts?

13   Because they post their numbers, and the gas station

14   across the street posts their numbers.  That doesn't

15   mean that there's a conspiracy.

16       I'm not going to go through these e-mails with

17   you, I don't have time, but look at Defense Exhibits

18   182 and 183, where you see Serra saying Sea Star

19   hasn't followed us because our prices don't justify

20   it.  That, again, crushes their theory on bunker fuel

21   surcharges, because Frank Peake stuck to the formula.

22   He stuck to the formula that he had.  He didn't always

23   follow Horizon, because if the price didn't justify it

24   under his formula, he didn't do it.

25       Regarding the differentiation.  We've heard that

**CLOSING – DEFENSE – MARKUS**

1    Frank Peake's company was a customer of Horizon.

2    Well, of course, they wanted to pay less on the

3    Jacksonville route, and Frank Peake suggested that:

4    Hey, we shouldn't have to pay the same on Jacksonville

5    as for Houston and New Jersey.  He was negotiating for

6    a better rate, and they call it a crime.

7        What about the plea agreements?  I mean, really,

8    their case comes down to three witnesses.  In a lot of

9    ways, I'm reminded of the word that Judge Dominguez

10   used at the beginning of the case, *bizcochito*.

11   Because if you look at this case but without those

12   three witnesses, this case is a piece of cake.  We

13   can't convict a man based on that.  I'm sorry.

14       These people have a reason to lie.  They have a

15   reason to exaggerate.  It reminds me of that sign at

16   the circus that says "Come see the dancing bear."  The

17   dancing bear?  And you go and you see the chains; yank

18   the chain and the bear dances.  They have that plea

19   agreement hanging over their head like chains.  And if

20   they don't get up there and dance, that's when the

21   agreement is pulled, and that's the last thing they

22   want.

23       So thank goodness we have the objective evidence.

24   We showed you those journals by Baci.  They introduced

25   one page of 30 notebooks.  Not one page of those

**CLOSING — DEFENSE — MARKUS**

1    notebooks showed that Frank Peake was involved.

2       We had to show you that Greg Glova kept detailed

3    calendars.  We had to show you that Peter Baci, after

4    he pled guilty, wrote a memo, he and his lawyer, to

5    the Judge, talking about who was involved in the

6    conspiracy and not mentioning Frank Peake; talking

7    about Lenny Shapiro, Gill, Glova, Serra, and no Peake

8    in this whole sentencing memorandum.

9       And Peter Baci kept those detailed journals so

10   that when a day like this came, he had a get-out-of-

11   jail-free card.  He could show, look, all these people

12   were involved, but there is nothing about Frank being

13   involved in that conspiracy.  And you saw, he detailed

14   Lenny Shapiro meetings, Gabe Serra, Greg Glova, Gill

15   e-mails, Orlando.  Nothing about Frank Peake.

16      That's evidence, ladies and gentlemen, that's

17   objective evidence from the time that this happened.

18   Not dancing bears from the stand.

19      And Baci called Mr. Peake from the jail, you

20   heard, again and again, and he told Frank that this is

21   a vindictive process and to plead guilty.  And Frank

22   said no.  Frank is here because he's innocent.  He

23   said no because, ladies and gentlemen, we learned from

24   Proverbs that the guilty flee when no man pursueth and

25   the righteous stand bold as a young lion.  And we are

CLOSING – DEFENSE – MARKUS

1      here today fighting because we are innocent and did

2      not run and we did not plead even though this process

3      is vindictive.  But we believe in it.  We believe in

4      you all and we believe in this jury system, because we

5      saw from the journals who Frank Peake was.

6          We saw from the journals that Frank Peake was

7      about the people and that he wanted to put this third

8      ship in the water, even though it cost money, but we

9      needed it for long-term growth in Puerto Rico.

10          Don't believe me.  Believe what Peter Baci wrote

11      at the time.  If there was a 50/50 split, you wouldn't

12      see Frank Peake saying we need long-term growth with

13      our third ship.

14          THE COURT:  You've got about five minutes.

15          MR. MARKUS:  All right.

16          Other than those three witnesses, who did we have

17      on the stand?  Two witnesses that didn't know Frank,

18      Gabriel Lafitte, who showed Gabe Serra to be a liar.

19      Remember, he said, "Gabe Serra came to me and said

20      there was a gentleman's agreement."  And then I asked

21      Gabe Serra, he said, "I don't remember saying that."

22          It actually shows in a lot of ways how different

23      meetings can be misinterpreted.  The U.S.D.A. guy,

24      Ron Reynolds, why did they call him to talk about

25      school lunches?  Does that have anything to do with

CLOSING — DEFENSE — MARKUS

1    this case?

2         They want you guys to be angry about Puerto Rico.

3    But the Judge is going to instruct you that that's not

4    what this case is about.  Okay?

5         You all are smarter than that.  All right.  When

6    you don't have the evidence on your side, you talk

7    about school lunches being more expensive in Puerto

8    Rico.  And that's not what this case is about.

9         They underestimate you guys, ladies and gentlemen.

10   They want it both ways.  They want that if there's a

11   phone call, he must be guilty; if there's no phone

12   call, he must be guilty.  If there are secret e-mails,

13   he must be guilty; if there are no secret e-mails, he

14   must be guilty.  If there was an initiation meeting,

15   guilty.  No initiation meeting, guilty.  If you're in

16   Baci's journals, you're guilty, and if you're not,

17   you're guilty.  If there's a document found in your

18   office, you're guilty.  If there's no document found

19   in your office, you're guilty.

20        How do you show you're not involved?  I mean, they

21   want it both ways.  They say there's evidence against

22   these guys, but when there's not evidence, guilty too.

23        Come on.  Reasonable doubt is much more than that.

24   Proof beyond a reasonable doubt.

25        I wrote a list of 15 questions, I'm not going to

**CLOSING — DEFENSE — MARKUS**

get a chance to go through those 15 questions because

I've run out of time, with all kinds of reasonable

doubt in the case, but you all know what I'm going to

say at this point.

I've been up here with the witnesses.  I've been

up here now for a long time and you know what I'm

going to say.

And I'm going to sit down now and I'm going to

say, my goodness, you know, I forgot to make all these

arguments, and I'm going to pull what little hair I

have left out and I'm going to apologize to you,

frankly, for not saying everything that I wanted to

say.  But you all know my position.  You do.  And I'm

asking you to go back in that jury room -- you listen

to Mr. Snyder because he's going to get up here now.

I'm not going to have a chance -- I'm going to want to

jump out of my seat when he's talking, but I'm not

going to be able to.  But you know what I'm going to

say in response to his arguments.  You know it.

When you're back in that jury room, you know what

I would say about the things that they're raising.

I'm here, ladies and gentlemen, to tell you that

Frank Peake is innocent.  I'm asking you to find him

innocent.  I'm asking you to do the right thing and

send him home and end this nightmare.  Please.  Frank

**CLOSING – DEFENSE – MARKUS**

1    Peake is innocent.

2         Thank you all very much.

3         THE COURT:  Thank you.

4         United States, 50 minutes.  This next section is

5    going to go 50 minutes; it could go 50 minutes, it

6    could go less.  So if anybody wishes not to take a

7    break, we're going to wait here in place.  Go ahead.

8         (Pause.)

9         Counsel Snyder, sir, it is now 2:35 in my watch.

10   You have 50 minutes.

11        MR. SNYDER:  All right.  Good afternoon, ladies

12   and gentlemen.  At the beginning of trial last week, I

13   stood up here and told you what I thought the evidence

14   would show in this case.  I told you that you'd hear

15   from Greg Glova, Peter Baci, and Gabe Serra about the

16   conspiracy and Frank Peake's participation in it, and

17   you did.

18        I told you you would see documents related to the

19   Office Max contract and how it was fixed by Sea Star

20   and Horizon, and you did.  I told you you would hear

21   from victim witnesses, like Burger King and U.S.D.A.,

22   and you did.

23        And I told you that you would see e-mails to and

24   from Frank Peake, documents written by him in his own

25   words.  And you did.  Documents that showed his

CLOSING – GOVERNMENT – SNYDER

1    participation in the conspiracy.

2        And Ms. Moss and Mr. Markus just stood up here and

3    did what they're supposed to do:  They defended their

4    client.  They made lots of arguments to defend their

5    client.  But the one thing they didn't do is point to

6    any of the evidence that I stood up here a week-and-a

7    half ago, or almost two weeks ago now, and told you

8    that you would see, and say that we didn't show it.

9    You saw every piece of it.  You heard from every

10   witness you were told you would hear from.

11       Instead, they attempted to divert you.  They

12   talked about third ships and TSAs and said *look over*

13   *here*.  They talked about things like Frank Peake being

14   a tough customer and a fighter.  *Look over here*.  They

15   talked about names missing from documents and wanted

16   you to *look over here*.  And they talked and said

17   things about flat tires, signs in courtrooms, clean

18   windows, dirty windows, and wanted you to *look over*

19   *here*.  What they don't want you to look at is all of

20   the evidence that's been presented to you in this case

21   about --

22       THE COURT:  Before you're misled, it's 40 minutes,

23   not 50.

24       MR. SNYDER:  Thank you, Your Honor.

25       THE COURT:  All right.

CLOSING – GOVERNMENT – SNYDER

1      MR. SNYDER:  They tried to explain away a couple

2      of e-mails that you were shown during this trial, and

3      you were shown many, many e-mails by the Government.

4      But they can't explain them all away.  They didn't

5      really try to explain them all away.

6      MR. MARKUS:  Objection, Your Honor.

7      MR. SNYDER:  There's a reason for that.  Because

8      they can't.  Whether you look at them through clean

9      windows or dirty windows, you have to not believe your

10     own eyes to believe that those were legitimate

11     e-mails.

12     Now, Mr. Markus talked a lot during trial and a

13     lot today about the TSA.  He said that Mr. Serra and

14     Mr. Peake had legitimate TSA meetings; that Mr. Peake

15     wasn't doing anything wrong when he had those

16     meetings, that there was nothing illegal about TSA

17     meetings.

18     But that explanation won't float.  You heard over

19     and over again from Greg Glova, Peter Baci and Gabriel

20     Serra, that the TSA agreements between the two

21     companies set prices that Horizon charged Sea Star as

22     a customer.  The TSA was not about prices that Sea

23     Star and Horizon would charge their own customers.

24     Everyone knew they weren't allowed to talk about

25     customer deals, customer contracts, market share

CLOSING – GOVERNMENT – SNYDER

1    splits, bunker fuel surcharge, as part of their TSA

2    discussions.  Peter Baci told you that.

3        And Jaime, could you go ahead and pull up that

4    first quote.

5        Mr. Baci was asked, "Was it your understanding

6    that you were allowed under the Transportation

7    Services Agreement to discuss the rates that they were

8    charged to their commerce?"

9        It says commerce, I believe that may have been

10   customers.

11       "ANSWER:  No, sir."

12       "QUESTION.  Why not?"

13       "ANSWER:  Because it was a violation of the

14   antitrust law."

15       So you heard over and over that everyone knew they

16   weren't supposed to talk about these subjects; that

17   these were taboo, they were off limits, they were

18   illegal.  Market share splits, bunker fuel surcharge

19   increases, everyone knew you were not allowed to touch

20   those things in a TSA meeting or in any other context.

21       Yet you saw document after document where not only

22   Peter Baci, Greg Glova and Gabriel Serra were involved

23   in those communications, but Frank Peake was as well,

24   about specific customer negotiations.

25       They did talk about the 50/50 market share split

CLOSING – GOVERNMENT – SNYDER

1    and they did talk about bunker fuel surcharge changes.

2    Everyone of the witnesses testified about that, Greg

3    Glova, Peter Baci and Gabe Serra.  Each one of them

4    told you that those discussions had nothing to do with

5    the TSAs, and what they told you was backed up by

6    documents, that those forbidden discussions were

7    taking place and that Mr. Peake was part of them.

8         No one denies that Frank Peake and Gabe Serra had

9    discussions about TSAs.  No one is claiming that those

10   discussions were illegal or inappropriate.  No one is

11   claiming that the TSA is the reason that we're here.

12        The reason we're here is because of those other

13   communications.  Those communications about price.

14   Those communications about customer contracts.  Those

15   communications about the Florida 50/50.  Those

16   communications that tie Frank Peake and his

17   co-conspirators together regarding these illegal

18   subjects.  Communications that furthered the

19   conspiracy to raise prices of Puerto Rico freight

20   shipments.  That's why we're here.

21        Frank Peake isn't being prosecuted for negotiating

22   TSAs with Horizon.  We didn't show you lots of TSA

23   documents because that's not reason we're here.  We're

24   here for all of the other things that he talked to

25   Horizon about.

CLOSING – GOVERNMENT – SNYDER

1   Frank Peake is being prosecuted not because he was

2   a tough negotiator of legal TSA agreements.  Frank

3   Peake is being prosecuted for being a negotiator of

4   illegal price-fixing agreements and being a problem

5   fixer for the conspiracy.  Which brings me to another

6   thing that we're not here to talk about and that Mr.

7   Peake isn't being prosecuted for, and that's the third

8   ship that was deployed in the Puerto Rico trade lane.

9   Mr. Markus said, "What about the third ship?"

10   Well, let's talk about the third ship.  I've been

11   waiting to talk to you about the third ship.  They

12   want you to look, way, way, way, over here --

13   MS. MOSS:  Objection, Your Honor.  That's improper

14   argument.

15   MR. SNYDER:  -- at the third ship.

16   THE COURT:  No, no, that is argument.  We will

17   keep on going.  The jury will evaluate it and will

18   make a determination.

19   MR. SNYDER:  The third ship is just like the TSA,

20   it's something legal in and of itself that had nothing

21   to do with the illegal agreements between both

22   companies.

23   Now, the defense argues that by adding a third

24   ship Frank Peake was showing that he was a competitor,

25   that Sea Star was competing.  But the third ship

CLOSING – GOVERNMENT – SNYDER

1    doesn't prove that.  The third ship wasn't about Sea

2    Star as a competitor, it was about Sea Star as a

3    customer, a customer of Horizon.  Frank Peake didn't

4    want to have to buy space on Horizon ships anymore, he

5    didn't want to be a customer of Horizon anymore.  So

6    he decided he wanted to add a third ship.  Adding that

7    third ship shows nothing about Sea Star as a

8    competitor though.

9        In fact, what happened shows that Sea Star was not

10   competing because nothing changed.  Nothing between

11   the companies changed.

12       Peter Baci was asked about the third ship during

13   his cross-examination by Mr. Markus.  When Mr. Markus

14   was trying to suggest that Frank Peake's involvement

15   in deploying the third ship was disrupting the

16   conspiracy or disrupting peace in the valley.

17       And he was asked,

18       "QUESTION:  The strategy that Frank Peake had to

19   put a third ship into the market was not a "peace in

20   the valley" strategy, was it, sir?

21       "ANSWER:  I do not believe that deploying the

22   third ship would have any effect on the peace in the

23   valley or the 50/50 rule."

24       The third ship had nothing to do with the 50/50

25   rule.  They didn't rescind the 50/50 rule for those

1    two months that the third ship was in, was in effect.

2    And why is that?  Because the 50/50 rule, the market

3    share split, the Florida 50/50, always remained in

4    effect.  It was in effect before, it was in effect

5    during, it was in effect after.

6         Ignoring this, ignoring that it had no effect at

7    all, Mr. Markus showed you Defense Exhibit No. 137.

8    He showed you something that never happened and told

9    you to *look over there*.

10        Well, let's go ahead and pull up Exhibit 137.

11   Exhibit 137 -- and this is Defense Exhibit 137 -- says

12   that maybe, maybe, with a third ship Sea Star could

13   increase its market share to 55 percent or higher.

14   But you heard witnesses say that it never happened.

15   Whether Horizon had a third ship or Sea Star had a

16   third ship, nothing ever changed.  The market share

17   was always right around 50/50.  Just like Leonard

18   Shapiro and Gabe Serra first agreed, and just like

19   Frank Peake and Gabe Serra reconfirmed and agreed at

20   the Orlando meeting.  Just like Peter Baci and Greg

21   Glova worked day after day, week after week, month

22   after month, and year after year to achieve.

23        You saw the e-mails that go back and forth between

24   them comparing market share.  You remember Greg Glova

25   sending an e-mail saying:  You guys have the higher

CLOSING - GOVERNMENT - SNYDER

1    lift out of Jacksonville than we do.  Make sure you

2    let Frank know that.

3        That was the 50/50 rule and it was in effect, it

4    was always in effect.  How do we know it always

5    remained in effect?  Because Frank Peake's

6    co-conspirators all told you that it remained in

7    effect.  Greg Glova told you that it remained in

8    effect, Peter Baci told you that, Gabe Serra told you

9    that.  And they all told you that it remained in

10   effect so that both companies weren't fighting for

11   market share, that things were stable and they could

12   increase rates.  You don't have to rely on what Peter

13   Baci or any of them said on the stand here in court,

14   because you can actually look at the documents written

15   at the time and you'll see exactly what happened.

16       So let's go ahead and look at Government's

17   Exhibit 176.  Government Exhibit 176 was one of the

18   secret gmails.  It was sent in November of 2007, after

19   Sea Star should have been at 55 percent based on

20   Exhibit 137.  If Sea Star were competing, its market

21   share should have been skyrocketing according to

22   Exhibit 137.  But what actually happened?  Peter Baci

23   is writing that Sea Star is looking at these stats, as

24   you'll see below, in an e-mail to Greg Glova, looking

25   at these stats we were at 46 percent versus 50 percent

CLOSING – GOVERNMENT – SNYDER

1    the year before.  This, after taking into account the

2    autos, et cetera, as agreed in Orlando.

3        That is the October 2006 Orlando meeting where

4    everybody, including Greg Glova, mentioned discussions

5    about the 50/50 agreement.

6        It therefore looks like we are in need of 70 loads

7    per week to be at 50/50 again.

8        He's saying "to be at 50/50 again," which implies

9    that they have in the past been at 50/50.  The 50/50

10   rule was always in effect.  Far from obliterating the

11   Government's 50/50 case, the third ship is nothing

12   about the 50/50 rule.  The 50/50 rule was the rule of

13   the conspiracy and it was always in effect.

14       Frank Peake may have been a tough customer when it

15   came to the third ship and TSAs.  But Frank Peake, the

16   tough competitor?  Are you a tough competitor when you

17   reach agreements to divide market share equally with

18   your competitors?

19       Are you a tough customer when you talk with your

20   competitor about customer negotiations so that you are

21   essentially rigging your bids to your customers?

22       Are you a tough customer when you're reaching

23   agreements with your competitors about the bunker fuel

24   surcharge?  That's not a tough competitor.  That's a

25   price-fixer.  And that's what Frank Peake is.

CLOSING – GOVERNMENT – SNYDER

1          Mr. Markus also told you some things about the

2     Transconex document, the visitor from the pacific

3     northwest document.  And he talked about the need to

4     look at the documents so you don't accept the spin

5     that gets put on the documents.  But in doing that,

6     Mr. Markus did exactly what he was telling you to

7     caution against, he put his spin on the documents, not

8     a spin that any of the witnesses ever accepted, any of

9     the witnesses who received that.  He put his spin on

10    the documents.  Gabe Serra never said that B.S. meant

11    that he was snowing Frank or he was trash talking to

12    Frank.

13         He said, "When I sent that document, I meant what

14    I said, that I was holding the line, and I was upset

15    with Frank Peake that he would doubt me."

16         So, what he told you you shouldn't do is exactly

17    what he was standing up here and doing.  Consider what

18    the witnesses told you about the documents.  They're

19    the ones that know.  They're the ones that know what

20    they meant when they sent them.  And they know, when

21    they took the stand here, what those documents mean.

22         I want to talk about one more instance of spinning

23    the document.  Can we see Exhibit 32?

24         Jaime, you know that I am blind, can you pull up

25    the doc in the Frank Peak e-mail, on the first page,

CLOSING – GOVERNMENT – SNYDER

1    the line about "never send me an e-mail like this

2    again."

3          This, as I recall from memory -- I'm seeing a very

4    blurry version up there -- is an e-mail from Frank

5    Peake to Gabe Serra, dated, I believe, March 7th,

6    2008.  And he says, "Don't ever send me an e-mail like

7    this again."

8          And Mr. Markus said he sent that because -- he was

9    offended to ever get an inappropriate e-mail like this

10   and he never wanted to see one again because of the

11   sensitive, competitive topics that Mr. Serra was

12   broaching in his e-mail.

13         MR. MARKUS:  Objection.  That's not what I said,

14   Your Honor.

15         THE COURT:  There is obviously a conflict between

16   what you said, what he said.

17         They will decide the conflict.

18         Go ahead. Keep on going.

19         MR. SNYDER:  Let's look at Exhibit Number 34 now.

20   An e-mail that was sent just a couple of weeks later.

21   And let's look at the very first e-mail on the bottom

22   of the screen, Jaime.  Is it on the first page?  There

23   you go.  This is actually an e-mail from Frank Peake

24   to Gabe Serra, just about a week later or two weeks

25   later, March 22nd or 23rd, 2008.

CLOSING – GOVERNMENT – SNYDER

1    What's he doing?  He's e-mailing Gabe Serra to

2    complain about what Sea Star viewed as actions by

3    Horizon that affected their customer relationships.

4    The very same types of things that Gabe Serra was

5    complaining about in the earlier e-mail.

6        If Mr. Peake really meant when he said, "Don't

7    send me an e-mail like this again," if he really meant

8    this is inappropriate, I don't want to see this, I

9    don't want to receive this type of thing, why did he

10   turn around just a few days later and send virtually

11   an identical e-mail?

12       And then, as you see, as you play out the string,

13   as Mr. Lee told you this morning, the next e-mail is

14   Gabe Serra saying, "The communication sure isn't

15   working well, like it used to."

16       Frank Peake responds, "You're right.  We have the

17   same concerns.  Pete has similar complaints."

18       They're acknowledging the conspiracy here.  He's

19   not saying it's inappropriate.  He's saying we've got

20   problems, we need to work together to fix it.

21       That's what you heard from the witnesses, the

22   witness who was involved in this string, Gabe Serra.

23       The defense also wants to point to all the places

24   where Frank Peake's name doesn't appear.  Let's take a

25   look at that argument for a few minutes.  Now, you

CLOSING – GOVERNMENT – SNYDER

1    heard a lot during the trial about a one-and-a-quarter

2    page written statement that Greg Glova signed after

3    the F.B.I. wrote it out for him.  It was a three-hour

4    interview that was summarized into a very hastily

5    scrawled document that would take three minutes to

6    read.  Frank Peake's name does not appear in that one-

7    and-a-quarter page document.  Peter Baci's name

8    appears in it only once despite the fact that Peter

9    Baci's name was undoubtedly mentioned a number of

10    times during that interview.

11        As you may recall from Mr. Glova's direct

12    examination, there were multiple references in the

13    statement to communications with Sea Star or with

14    competitors.  And Mr. Glova told you that people at

15    Sea Star that he was talking about or that would have

16    been covered by those statements included Frank Peake

17    and Peter Baci.  And he talked about an example of

18    this with respect to the bunker fuel surcharge, in his

19    F.B.I. statement, a statement about the bunker fuel

20    surcharge.  And he was asked this question,

21        "QUESTION:  And I believe it also says that, it

22    being the F.B.I. statement, quote, I also used other

23    techniques to further influence the award of contracts

24    to my company and my competitor's companies.  We

25    discussed these on bunker.  Do you see that?"

CLOSING – GOVERNMENT – SNYDER

1    "ANSWER:  Yes, sir."

2    "QUESTION:  Would that statement apply to any

3    individuals at Sea Star?"

4    "ANSWER:  Yes, sir."

5    "QUESTION:  Who?"

6    "ANSWER:  Frank Peake and Peter Baci."

7    And as you saw, Exhibit 49 proves that Frank Peake

8    was involved in bunker surcharge communications with

9    Horizon and that Greg Glova knew about it.  So it's

10   not surprising that Greg Glova said that Frank Peake

11   would have been included in that statement.  And it's

12   also not surprising that Frank Peake wasn't

13   specifically named in that particular statement

14   because nobody else was in that one either.  He just

15   referred to his competitors.

16   Why would Greg Glova write Frank Peake's name when

17   he didn't write anybody else's name down?

18   More importantly, Mr. Glova said he mentioned

19   Frank Peake by name to the F.B.I. that day.  You also

20   heard the tape recorded conversations between Greg

21   Glova and Gabe Serra that both mentioned Frank Peake

22   in those calls, and the F.B.I. was there to hear it

23   and you heard it too.

24   THE COURT:  Twenty minutes have elapsed, which is

25   half your time.

CLOSING – GOVERNMENT – SNYDER

1    MR. SNYDER:  And in those calls you heard about

2    how the conspiracy worked, how Frank Peake was part of

3    it, so that Frank Peake and Gabe Serra could fix

4    problems.  And you heard Gabe Serra say that he had

5    already talked to Frankie, to Frank Peake; not that he

6    was going to, that he already had.  This wasn't a

7    setup by the F.B.I.  Gabe Serra said he had already

8    talked to Frank Peake, even before the F.B.I. had

9    gotten involved, even before Gabe Serra knew that the

10    F.B.I. was waiting for him at his office.  That's the

11    way the conspiracy worked, and you heard it on tape.

12    Why would Gabe Serra make that up?  Like I said,

13    he didn't know the F.B.I. was waiting at his office

14    for him.  He was still in conspiracy mode.  And that

15    conspiracy mode is exactly what you heard about from

16    Greg Glova, Peter Baci and Gabe Serra at trial.  They

17    all said that Gabe Serra's and Frank Peake's major

18    role in the conspiracy was to take care of problems

19    like this, and you heard it happen.

20    The defense also questioned Mr. Baci about a court

21    filing by his lawyer in connection with his

22    sentencing.  It didn't mention Frank Peake by name.

23    But he also recalled that the document talked about

24    how the conspiracy started, about how Gabe Serra and

25    Leonard Shapiro reached the Florida 50/50 agreement,

CLOSING – GOVERNMENT – SNYDER

1    and how Peter Baci and Kevin Gill then implemented it.

2    That's true.  Frank Peake wasn't involved in the

3    conspiracy at that time and he's not been charged with

4    that.

5        You also heard arguments about the notebooks and

6    whether Frank Peake's name was in them, whether it was

7    Greg Glova's calendar entries or Peter Baci's

8    notebooks.  First, neither of the witnesses could

9    remember for sure when they were on the stand whether

10   Frank Peake's name was in them or not.  But more

11   importantly, let's look at all the places that Frank

12   Peake's name was seen during the course of trial.

13       Now, you've seen some of them, but his name was in

14   lots of other documents, lots of other e-mails, all

15   those e-mails that can't be explained away by TSAs or

16   third ships or chest poking; all the conspiracy

17   documents that Frank Peake's name is all over, that he

18   sent, that he received, that talked about what he was

19   doing, as he was doing it, the written record of the

20   conspiracy as it was happening:

21       So let's see where Frank Peake is.  He wasn't in

22   these two documents that were written after the

23   conspiracy was over, after the F.B.I. landed on Greg

24   Glova's doorstep and after Peter Baci had retained a

25   lawyer.

CLOSING – GOVERNMENT – SNYDER

1    So where is he?  Frank Peake is everywhere else.

2    He's in e-mails about beer customers.  Like

3    Exhibit 29, where Peter Baci e-mails a rate proposal

4    to Kevin Gill and "bcc's" Frank Peake.  That's not an

5    innocent information exchange.  It's price-fixing for

6    Kevin Gill and Peter Baci to coordinate the rate

7    proposals, and Frank Peake, he's on it.  Or

8    Exhibit 27, where Frank Peake e-mails Gabe Serra and

9    says, "Hope you didn't do anything.  We are told that

10   we are now hired."

11   Gabe Serra confirms, "Nothing at all."

12   Confirmation that the pricing agreement was being

13   carried out to the customer.

14   Where is Frank Peake's name?  Well, Mr. Markus

15   showed you Exhibit 37, one of the Transconex e-mails,

16   telling Gabe Serra that he didn't want any mistakes on

17   pricing and that he didn't doubt Gabe Serra would hold

18   the line.

19   He was asking Horizon to stay out of Sea Star's

20   way for this customer.  What does that tell you?  What

21   does no mistakes mean?

22   That means that Frank Peake believed that Horizon

23   had agreed to stay out of his way and he was sending a

24   reminder.  That's enough to convict, whether or not

25   Sea Star won that business or Horizon won that

CLOSING – GOVERNMENT – SNYDER

1    business. The agreement is the crime, as you're going

2    to hear from Judge Dominguez.

3        Where's Frank Peake's name?  Frank Peake's name is

4    in the Walgreens' documents, Exhibits 57 and 70.

5        The first one, you see that Peter Baci is telling

6    Greg Glova that Frank and Gabe were talking about a

7    deal where Horizon would pay for container slots that

8    it didn't use in order to make up for the loss of

9    revenue to Sea Star from the loss of the Walgreens

10   business until the 50/50 could be rebalanced.

11       And then you see Frank Peake on the e-mail, the

12   internal e-mail at Sea Star, actually telling the CFO

13   of the company to bill those container slots to

14   Horizon.  There's no other explanation than this

15   relates to the 50/50.

16       Where's Frank Peake's name?  Frank Peake's name is

17   in the Quirch documents, like Exhibit 127, where Peter

18   Baci and Greg Glova e-mail each other that they had to

19   bring their bosses into the numbers because if there

20   had been a mistake in the bids to Quirch.  Just the

21   way the conspiracy worked, if there was a mistake, if

22   there was something that was big that these two

23   couldn't work out themselves, they brought their

24   bosses into it. And that's exactly what Exhibit 127

25   says.

CLOSING – GOVERNMENT – SNYDER

1        Where is Frank Peake's name?  Frank Peake's name

2    is in the DSM e-mail, Exhibit 121.  Exhibit 121

3    says -- DSM is department store merchandise.  And in

4    this e-mail he, Frank Peake, and Gabe Serra, are

5    agreeing on what rate structure to use for this type

6    of cargo.  That's price-fixing, and Frank Peake's name

7    is on it.

8        Where is Frank Peake's name?  His name is in the

9    faxed e-mail regarding the 50/50 agreement, Exhibit

10    73.  That document actually uses the words NB 50/50 or

11    Northbound 50/50.  Mr. Peake can't deny what this

12    e-mail says, so he has to deny that the e-mail was

13    sent.

14        So ask yourselves this:  Does it make sense that

15    Peter Baci would go to the effort of opening up his

16    e-mail, typing out an e-mail, typing a "bcc" line

17    saying that Frank Peake was "bcced," only then hit the

18    print button, and the print button only, rather than

19    the send button.  Ask yourselves if that makes any

20    sense.  Did Peter Baci seem so computer illiterate to

21    you that he would go to all that trouble to do that

22    and then not hit the send button?  You can decide that

23    for yourselves because there's lots of other documents

24    that have Frank Peake's name on it, you don't need to

25    rely just on that one.

CLOSING – GOVERNMENT – SNYDER

1    Where else is Frank Peake's name?  On the many

2    documents showing that he met with Gabe Serra to talk

3    about market share, like the Condado meeting documents

4    that Mr. Lee showed you this morning, the "Who Shot

5    John List," the bunker fuel surcharge documents, and

6    other conspiracy topics.

7    They knew they shouldn't be having these

8    communications.  They knew these were illegal

9    agreements and illegal topics.  This was not an

10   innocent information exchange like the defense

11   suggests.  It's not legitimate to have communications

12   like this with your competitors.  This is not business

13   as usual; it's not business as usual to fix prices,

14   it's not business as usual to break the law.  And

15   Frank Peake was involved in all of it.  You heard that

16   through Peter Baci, Greg Glova and Gabe Serra, and you

17   saw it in the documents, the conspiracy documents, the

18   ones that were written while it was happening.

19   Just look at Exhibit 267, Gabe Serra and Frank

20   Peake trying to avoid being seen together by people

21   that Gabe Serra worked with.  Why?  Because they knew

22   how it was going to appear.  They knew it would look

23   bad.

24   And not only did they know it would look bad, they

25   knew it was bad, because they knew what they were

1    doing.  Where was Frank Peake?  He was secretly

2    peaking up Gabe Serra so they could conspire.

3        Think about that as you deliberate.  Think about

4    this as you deliberate:  What's more reliable, a

5    confession written by someone else summarizing a

6    three-hour interview in a single page-and-a-quarter,

7    or document, after document, after document, that was

8    sent to or from Frank Peake but that describes his

9    conduct at the time during the conspiracy, as it was

10   happening?  You can decide that for yourselves.  You

11   can decide for yourselves where it's more important to

12   find Frank Peake's name.

13       There was a lot of talk about the Orlando meeting,

14   and I just want to touch very briefly on it.

15       There was not a shred of testimony that there was

16   any discussion at that Orlando meeting about any TSA

17   related topic.  Every single person said it was the

18   rate plan, and they didn't even really stand up here

19   and try to take the rate plan on.  That rate plan is

20   what it is, it's as blatant as the witnesses said.

21   And that, everybody agreed, was discussed at Orlando.

22       They said, well, Greg Glova, he didn't say the

23   50/50 was discussed.  But Peter Baci did and Gabe

24   Serra did.  But, actually, Greg Glova did say the

25   50/50 was discussed.  He was shown Exhibit 19, a fax

CLOSING – GOVERNMENT – SNYDER

1    that was sent to him at the Orlando Hyatt by Sam

2    Raymond.  And he said that that fax was sent to him

3    for purposes of having a discussion about the 50/50.

4    So, in fact, all three of them did say that the 50/50

5    rule was discussed at that meeting.

6        You also saw Peter Baci's subsequent e-mail a few

7    minutes ago, where he reminded Greg Glova about the

8    agreement at Orlando about the 50/50 rule.  The same

9    Orlando meeting that Mr. Peake was at.

10        So Orlando is what Orlando is.  There were lots of

11   bad things discussed there, according to the

12   witnesses.  You've seen the documents.  And you

13   haven't heard anything to suggest that there was

14   anything legitimate discussed there.

15        Look at as many TSA documents as you want, but

16   there is not a shred of evidence that anything about

17   the TSA was discussed at the Orlando meeting.

18        THE COURT:  Nine minutes left.

19        MR. SNYDER:  They also make the surprising

20   argument that the Government didn't call enough

21   co-conspirators in this case; that there were more

22   conspirators that they wanted to hear from.  Really?

23        The Government called three co-conspirators of

24   Frank Peake, three co-conspirators who all admitted

25   the conspiracy; three co-conspirators who all pled

CLOSING – GOVERNMENT – SNYDER

1  guilty to the conspiracy; three co-conspirators who

2  all accepted responsibility for the conspiracy; three

3  co-conspirators who all met with Frank Peake, who all

4  testified that they conspired with Frank Peake.  Three

5  co-conspirators who were corroborated by document

6  after document after document.

7       How much more do they really want to see?  And why

8  do you need to hear from an F.B.I. agent?  No F.B.I.

9  agents were conspirators here.  You want to hear from

10  the person who wrote the confession, or do you want to

11  hear from the person who actually confessed, pled

12  guilty, and accepted responsibility for it and

13  appeared here to testify about what he did in the

14  conspiracy?  You can decide that for yourselves.

15       The testimony by just one co-conspirator is enough

16  to support a verdict against Frank Peake.  Testimony

17  by a second co-conspirator corroborates the testimony

18  of the first.  And testimony by the third

19  co-conspirator is just more of the same.  The

20  Government doesn't have any obligation to call every

21  single co-conspirator or to introduce 29 notebooks of

22  handwritten notes, nor do I suspect that you would

23  want us to.

24       And Judge Dominguez is going to give you an

25  instruction, an instruction on this very same issue,

CLOSING – GOVERNMENT – SNYDER

1    that says that, "The Indictment charges the defendant

2    conspired with certain persons and companies that are

3    not now on trial.  There's no requirement that all

4    members of a conspiracy be charged and prosecuted or

5    tried together in one proceeding, and you should not

6    be concerned with or speculate about why certain

7    persons or companies are not on trial or why any

8    persons or companies have not been charged in the

9    Indictment."

10       Now, you heard evidence of deep involvement by

11    other people, like Leonard Shapiro, like Kevin Gill of

12    Horizon, Tom Farmer of Crowley.  But you don't need to

13    worry about them, why you didn't hear from them or

14    where they are now.  You only need to worry about

15    Frank Peake, the president of Sea Star, the man who

16    could have stopped the conspiracy, the man who fixed

17    the conspiracy's problems and the man who fixed prices

18    to his customers.  That's why he's on trial here

19    today, because he chose to participate in the

20    conspiracy through his own actions.  And you heard

21    that through co-conspirator, after co-conspirator,

22    after co-conspirator, and you saw it in document,

23    after document, after document.

24       I'll just touch very, very quickly on the burden

25    of proof.  The Government has the burden of proof

CLOSING – GOVERNMENT – SNYDER

1    beyond a reasonable doubt, the same as in every

2    criminal case in the United States.  And according to

3    Judge Dominguez's instructions which he'll read to

4    you, he'll tell you that the law does not require that

5    the Government prove guilt beyond all possible doubt,

6    Proof beyond a reasonable doubt is sufficient to

7    convict.  Everything else you've heard from the

8    defense on this subject is spin.

9         Secondly, even if you have doubt as to one issue

10   or one witness or one piece of evidence, that's not

11   the same thing as reasonable doubt as to guilt.  The

12   jury instruction that Judge Dominguez is going to read

13   you about the meaning of a conspiracy says, "In

14   determining whether a conspiracy's been proved, you

15   must view the evidence as whole and not piecemeal.

16   You should consider the actions and statements of all

17   the alleged conspirators.  The conspiracy may be

18   inferred from all the circumstances and the actions

19   and statements of the participants."

20        So, if viewing the evidence as a whole, you do not

21   have a doubt based on reason or common sense, you

22   should vote to find this defendant guilty.

23        THE COURT:  Five minutes.

24        MR. SNYDER:  Thank you, Your Honor.

25        Defendant's closing really boils down to the

CLOSING – GOVERNMENT – SNYDER

1    argument that you shouldn't believe his

2    co-conspirators; that they're lying.  Ms. Moss called

3    them snitches because they confessed what they did and

4    what Mr. Peake did.

5        They said you shouldn't believe them when they say

6    that Frank Peake knew about the conspiracy.  They said

7    you shouldn't believe them when they say that Frank

8    Peake was involved in the conspiracy; that they're all

9    lying, that they lied repeatedly.  They need you to

10   believe that.  That somehow when Greg Glova taped that

11   call on search day and asked Gabe Serra to call Frank

12   Peake about Plaza Provisions, that that was a lie

13   somehow.  That Gabe Serra's search day confession to

14   the F.B.I., that that was a lie.  And that all of

15   their testimony here to you, that that's all been a

16   lie.

17       The defense claims you shouldn't believe that

18   Frank Peake was involved in the conspiracy because he

19   didn't communicate every day like Peter Baci and Greg

20   Glova, or he didn't have a gmail account.  Of course,

21   that wasn't his role.  He was the boss.  He didn't

22   want to get his hands dirty.  We know that because

23   Peter Baci told you that.  He was told not to copy

24   Frank Peake on gmails.  But we know that Frank Peake

25   got some of the gmails because, as you recall, his

CLOSING – GOVERNMENT – SNYDER

1    name is in the gmail contact list in the lighthouse123

2    account.  It got there because he was copied on

3    gmails.

4         Frank Peake let Peter Baci do the dirty work, let

5    him get his hands dirty every single day, and now he's

6    trying to get Peter Baci to take the fall all by

7    himself.

8         The defense also claims that you shouldn't believe

9    Gabe Serra because he reached agreements with Lenny

10   Shapiro and because he lied to get a deal from the

11   Government.  But why did Gabe Serra plead guilty?  Why

12   did he agree to go to jail?  He said that he was too

13   busy with other things to get involved day-to-day with

14   the conspiracy.  He didn't have a secret gmail

15   account.  He didn't have a code name.  But he told you

16   that he confessed to the F.B.I. because he knew he was

17   on enough documents that he was going to get caught.

18   He was asked, "If you denied involvement for the first

19   hour, what did you do for the other six?"

20        "ANSWER:  I realized that I knew my involvement of

21   what I was considered to be inappropriate, I felt that

22   there was probably going to be enough evidence and I

23   decided to come forth with the truth."

24        Here is the thing:  Gabe Serra was on virtually

25   all the same documents that Frank Peake was on.  Most

CLOSING – GOVERNMENT – SNYDER

1    of the documents that Gabe Serra knew he was on were

2    his communications with Frank Peake.  He knew those

3    documents made him guilty.  He knew they proved his

4    participation in the conspiracy.  Gabe Serra told you

5    that 90 percent of his communications with Frank Peake

6    were perfectly innocent, perfectly legal, social, TSA,

7    third ship.  The other 10 percent was the problem.

8    The other 10 percent was improper.  The other

9    10 percent was illegal.

10        Here is what he said.  "Sir, if 90 percent of your

11   communications with Frank Peake were legitimate or

12   appropriate, why did you plead guilty?"

13        "ANSWER:  I just heard this once, if a glass is 90

14   percent full of clear water and 10 percent sewer, it's

15   not drinkable.  I knew that 10 percent was enough to

16   have been wrong."

17        Frank Peake's glass of water is infected by that

18   same 10 percent of sewer water as Gabe Serra's.  It's

19   dirty and that 10 percent is enough to find him

20   guilty.

21        THE COURT:  One minute left.

22        MR. SNYDER:  I will wrap up with my minute simply

23   by saying that crimes like price-fixing don't happen

24   and they can't work unless people choose to

25   participate, from presidents of companies down to

1    executives who are responsible for the day-to-day

2    operations.  This trial is about one of those

3    executives, Frank Peake, and you've heard from people

4    who were on the inside of the conspiracy, men who

5    accepted responsibility, men who pled guilty, men who

6    paid the price and agreed to tell the truth.  They

7    told you that Frank Peake participated.

8        Mr. Peake went to trial and he exercised his right

9    to put the Government to its burden of proof, and he

10   had every right to do that.  But we've now shown you

11   the proof, we've shown you beyond a reasonable doubt

12   that Frank Peake chose to join this price-fixing

13   conspiracy, he chose to stay in it, and he chose not

14   to stop it as he could have, as the president of the

15   company.  So he should be held responsible, and in a

16   minute this case is going to be in your hands and

17   you're going to begin your deliberations and you're

18   going to consider the evidence, examine the documents,

19   apply your common sense and apply the law.

20       And after you do, I am confident that you're going

21   to return a guilty verdict, a verdict of guilty

22   against Frank Peake.

23       Thank you.

24       THE COURT:  All right.  The instructions take

25   about an hour.  The Court will give you a 15-minute

1    break at this time.  Thank you.

2         THE DEPUTY MARSHAL:  All rise.

3         THE COURT:  You should not be making any

4    determinations until you hear -- you're ordered --

5    until you hear the instructions.

6         (Jury out.)

7         (Whereupon a recess was taken, after which the

8    following proceedings took place.)

9         THE COURT:  Members of the jury, now that all the

10   evidence is in and the parties have rested, it becomes

11   my duty to instruct you on the applicable law to this

12   case.

13        Duty of the Jury to Find the Facts and Follow the

14   Law.  It is your duty to find the facts from all the

15   evidence admitted in this case.  To those facts, you

16   must apply the law as I give it to you.  The

17   determination of the law is my duty as the presiding

18   Judge in this courtroom.  It is your duty to apply the

19   law exactly as I give it to you whether you agree with

20   it or not.

21        You must not be influenced by any personal likes

22   or dislikes, prejudices or sympathy.  That means that

23   you must decide the case solely on the evidence before

24   you and according to the law.  You will recall that

25   you took an oath promising to do so at the beginning

1        of the case.

2            In following my instructions, you must follow all

3        of them and not single out some and ignore others.

4        They are all equally important.  You must not read

5        into these instructions, or into anything I may have

6        said or done, any suggestion by me as to what verdict

7        you should return.  That is a matter entirely for you

8        to decide.

9            Presumption of Innocence.  Proof beyond a

10       reasonable doubt.  It is a cardinal principle of our

11       system of justice that every person accused of a crime

12       is presumed to be innocent unless and until his or her

13       guilt is established beyond a reasonable doubt.  The

14       presumption is not a mere formality, it is a matter of

15       the most important substance.

16           The presumption of innocence alone may be

17       sufficient to raise a reasonable doubt and to require

18       the acquittal of a defendant.  The defendant before

19       you, Mr. Frank Peake, has the benefit of that

20       presumption throughout the trial and you are not to

21       convict him unless you are persuaded of his guilt

22       beyond a reasonable doubt.

23           The presumption of innocence until proven guilty

24       means that the burden of proof is always on the

25       Government to satisfy you that Mr. Peake is guilty of

the crime with which he is charged beyond a reasonable doubt.  The law does not require that the Government prove guilt beyond all possible doubt.  Proof beyond a reasonable doubt is sufficient to convict.

This burden never shifts to Mr. Peake.  It is always the Government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt by the evidence and the reasonable inferences to be drawn from the evidence.

Mr. Peake has the right to rely upon the failure or inability of the Government to establish beyond a reasonable doubt any essential element of a crime charged against him.

If after a fair and impartial consideration of all the evidence, you have a reasonable doubt as to defendant's guilt of the charged crime, it is your duty to acquit him of that crime.

On the other hand, if after a fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of Mr. Peake's guilt of the crime charged, you should find him guilty of that crime.

Defendant's Constitutional Right Not to Testify. Mr. Peake has a constitutional right not to testify, and no inference of guilt or anything else may be

1    drawn from the fact that the defendant did not

2    testify.  For any of you to draw such an inference

3    would be wrong; indeed, it would be a violation of

4    your oath as a juror.

5        What is Evidence and Inferences.  The evidence

6    from which you are to decide what the facts are

7    consists of the sworn testimony of the witnesses, both

8    on direct and cross-examination, regardless of who

9    called the witness; the exhibits that have been

10   received into evidence, and any fact to which the

11   lawyers have agreed or stipulated.  Although you may

12   consider only the evidence presented in the case, you

13   are not limited, in considering that evidence, to the

14   bald statements made by the witnesses or contained in

15   the documents.

16       In other words, you are not limited solely to what

17   you see and hear as the witnesses testify.  You are

18   permitted to draw from facts that you find to have

19   been proven, such as reasonable inferences as you

20   believe are justified in the light of common sense and

21   personal experience.

22       Kinds of Evidence:  Direct and circumstantial.

23   There are two kinds of evidence, direct and

24   circumstantial.  Direct evidence is direct proof of a

25   fact, such as a testimony of an eyewitness that the

1    witness saw something.  Circumstantial evidence is

2    indirect evidence that is proof of a fact or facts

3    from which you can draw the inference, by reason or

4    common sense, that another fact exists even though it

5    has not been proven directly.

6        You are entitled to consider both kinds of

7    evidence.  The law permits you to give equal weight to

8    both.  But it is for you to decide how much weight to

9    give to any evidence.

10       What is not evidence?  Certain things are not

11   evidence and I will list them for you.

12       One, arguments and statements by lawyers are not

13   evidence.  The lawyers are not witnesses.  What they

14   say in their opening statements, closing arguments,

15   and other items, is intended to help you interpret the

16   evidence.  But it is not evidence.  If the facts, as

17   you remember them from the evidence, differ from the

18   way the lawyers have stated them, your memory of them

19   controls.

20       Two, questions and objections by lawyers are not

21   evidence.  Lawyers have a duty to their clients to

22   object when they believe the question is improper

23   under the rules of evidence.  You should not be

24   influenced by the objection or by my ruling on it.

25   Anything that I have excluded from evidence or ordered

1    stricken and instructed you to disregard is not

2    evidence, you must not consider such items.

3         Anything you may have seen or heard when the Court

4    was not in session is not evidence.  You are to decide

5    the case solely on the evidence received at trial.

6         The Indictment is not evidence.  This case, like

7    most criminal cases, began with an Indictment.  You

8    will have the Indictment before you in the course of

9    your deliberations in the jury room.  That Indictment

10   was returned by a grand jury which heard only the

11   Government's side of the case.  I caution you, as I

12   have before, that the fact that Mr. Peake has had an

13   Indictment filed against him is no evidence whatsoever

14   of his guilt.

15        The Indictment is simply an accusation.  It is the

16   means by which the allegation and the charges of the

17   Government are brought before this Court.  The

18   Indictment proves nothing.

19        Number of Witnesses and Credibility of Witnesses.

20   Whether the Government has sustained its burden of

21   proof does not depend upon the number of witness it

22   has called or upon the number of exhibits it has

23   offered, but instead upon the nature and quality of

24   the evidence presented.  You do not have to accept the

25   testimony of any witness if you find the witness not

credible.  You must decide which witnesses to believe

and which facts are true.  To do this, you must look

at all the evidence, drawing upon your common sense

and your personal experience.

You may want to take into consideration such

factors as a witness' conduct and demeanor while

testifying; their apparent fairness or any bias they

may have displayed; any interest you may discern that

they may have in the outcome of the case; any

prejudice they may have shown; their opportunities for

seeing and knowing the things about which they have

testified; the reasonableness or the unreasonableness

of the events that they have related to you in their

testimony, and any other facts or circumstances

disclosed by the evidence that tends to corroborate or

contradict their version of the events.

Inconsistencies or discrepancies in the testimony

of a witness, or between the testimony of different

witnesses, may or may not cause you to disbelieve or

discredit such testimony.  Two or more persons

witnessing an incident or a transaction may simply see

or hear it differently.  As to the credibility of any

witness, an innocent misrecollection or a failure to

recall is not an uncommon experience.

In weighing the effect of a discrepancy, however,

1    also consider whether it pertains to a matter of

2    importance or an insignificant detail, and consider

3    whether the discrepancy results from innocent error or

4    from intentional falsehood.

5        Therefore, after evaluating a witness' testimony

6    pursuant to this instruction, you have three choices:

7        One, you believe him totally.

8        Two, you reject his testimony totally.

9        And, three, you believe him partially.

10        Caution as to Cooperating Witnesses.  You also

11    have heard the testimony of Peter Baci, Gregory Glova

12    and Gabriel Serra, who were all charged as defendants

13    in a parallel case, were convicted of participating in

14    the instant conspiracy, and entered into cooperation

15    agreements with the Government.  Some people in this

16    position are entirely truthful when testifying.

17    Still, you should consider the testimony of these

18    individuals with particular caution.  They may have

19    had reasons to make up stories or to exaggerate what

20    others did because they wanted to help themselves.

21    You must determine whether the testimony of such

22    witness may have been affected by any interest in the

23    outcome of the instant case, any prejudice for or

24    against Mr. Peake, or by any of the benefits offered

25    by the Government in the plea agreements.

1   You are not to consider their guilty pleas as

2   evidence against Mr. Peake.

3   Impeachment by prior inconsistent statement:  You

4   have heard evidence that before testifying at this

5   trial, some witnesses made a statement concerning the

6   same subject matter as his testimony in this trial.

7   You may consider that earlier statement to help you

8   decide how much of the witness' testimony to believe.

9   If you find that the prior testimony was not

10  consistent with the witness' testimony at the trial,

11  then you should decide whether that affects the

12  believability of the witness' testimony at this trial.

13  Indictment:  The Court includes as part of the

14  instructions the Indictment.  The Indictment is only

15  an accusation, nothing more.  It is not evidence.  It

16  is not proof of guilt or anything else.

17  Judge's Questions.  During the course of a trial,

18  I occasionally asked questions of a witness in order

19  to bring out facts not then fully covered in the

20  testimony.  Do not assume that I hold any opinion on

21  the matters to which my questions are related.

22  Remember, at all times that you, as jurors, are at

23  liberty to disregard all comments of the Court in

24  arriving at your own findings as to the facts.

25  Attorney interviewing witnesses:  It is proper

for, and thus, no improper inference should be made as to attorneys and U.S. attorneys interviewing witnesses prior to trial, as well as meeting and interviewing any witness in preparation for trial.

Charged Offense.  These instructions that I have just provided you are general instructions applicable to all criminal cases.  Now we go to the instructions that have to do with this case in particular.

The Indictment charges a violation of Section 1 of the Sherman Act, which provides, "Every contract, combination or conspiracy in restraint of trade is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal, shall be deemed guilty of an offense against the United States.  The term persons includes individuals, corporations, partnerships, and every other association or organization of every kind and character."

Elements of the Offense.  In order to establish the offense of conspiracy to fix prices, charged in the Indictment, the Government must prove each of these elements beyond a reasonable doubt:

One, that the conspiracy described in the Indictment existed at or about the time alleged.

Two, that the defendant knowingly and

1    intentionally became a member of the conspiracy.

2        And, three, that the conspiracy described in the

3    Indictment either affected interstate commerce in

4    goods or services, or occurred within the flow of

5    interstate commerce in goods or services.

6        If you find from your consideration of all the

7    evidence that each of these elements has been proved

8    beyond a reasonable doubt, then you should find the

9    defendant guilty.

10       If, on the other hand, you find from your

11   consideration of all the evidence that any of these

12   elements has not been proved beyond a reasonable

13   doubt, then you should find the defendant not guilty.

14       Conspiracy Explained.  The type of relationship

15   condemned by the Sherman Act as a conspiracy is often

16   described as "a partnership in crime," in which each

17   person found to be a member of the conspiracy is

18   liable for all acts and statements of other members

19   made during the existence of and in furtherance of the

20   conspiracy.  To create such a relationship, two or

21   more persons must enter into an agreement or mutual

22   understanding that they will act together for some

23   unlawful purpose or to achieve a lawful purpose by

24   unlawful means.  It is the agreement to act together

25   that constitutes the crime, whether the agreement

1   actually is carried out or whether it succeeds or

2   fails, does not matter.

3        In order to establish the existence of a

4   conspiracy the evidence need not show that the members

5   of the conspiracy entered into any express, formal or

6   written agreement, that they met together, or that

7   they directly stated what their objective or purpose

8   was or the details of it, or the means by which the

9   object was to be accomplished.

10        The agreement itself may have been entirely

11   unspoken.  What the evidence must show in order to

12   prove that a conspiracy existed, is that the alleged

13   members of the conspiracy, in some way, came to an

14   agreement or mutual understanding to accomplish a

15   common purpose.

16        Direct proof of a conspiracy may not be available.

17   A conspiracy may, however, be disclosed by the

18   circumstances or by the acts of its members.

19        Therefore, you may infer the existence of a

20   conspiracy from what you find the parties actually did

21   as well as from the words they used.  However,

22   competitors may have legitimate, lawful reasons to

23   have contact with each other.  Mere similarity of

24   conduct among various persons or the fact that they

25   may have associated with one another and may have met

1    or assembled together and discussed common aims and

2    interests, does not necessarily establish the

3    existence of a conspiracy.

4        If actions were taken independently by them solely

5    as a matter of individual business judgment, without

6    any agreement or mutual understanding among them, then

7    there would be no conspiracy.

8        A conspiracy may vary in its membership from time

9    to time.  It may be formed without all the parties

10   coming to an agreement at the same time, knowing all

11   the details of the agreement or knowing who all the

12   other members are.  Thus, you need not find that the

13   defendant agreed specifically to or knew about all the

14   details of the crime, or knew every other

15   co-conspirator or that he participated in each act of

16   the agreement or played a major role.

17       But the Government must prove beyond a reasonable

18   doubt that he knew the essential features and general

19   aims of the conspiracy.

20       Further, it is not necessary that a person agreed

21   to play any particular part in carrying out the

22   agreements or understanding.

23       A person may become a member of a conspiracy even

24   if that person agrees to play only a minor part in the

25   conspiracy, as long as that person has an

understanding of the unlawful nature of the plan and
voluntarily and intentionally joins in it.

Even if the defendant was not part of the
agreement at the very start, he can be found guilty of
conspiracy if the Government proves that he knowingly
joined the agreement later.  It is not essential that
all members acted exactly alike or agreed to play any
particular part in carrying out the agreement.

The unlawful agreement may be shown if the proof
establishes that the parties knowingly worked together
to accomplish a common purpose.  In determining
whether a conspiracy has been proved, you must view
the evidence as a whole and not piecemeal.  You should
consider the actions and statements of all the alleged
conspirators. The conspiracy may be inferred from all
the circumstances and the actions and statements of
the participants.  Acts that are, by themselves,
wholly innocent acts may be part of the sum of the
acts that make up a conspiracy to restrain trade, in
violation of the Sherman Act.  The evidence does not
have to establish that the defendant agreed to all the
means or methods set forth in the Indictment or that
such means or methods were actually used.  Nor does
the evidence have to show that all the persons alleged
to have been members of the conspiracy actually were

1    members.

2         What the evidence must show is that the conspiracy

3    charged existed at or about the time stated in the

4    Indictment and that the defendant knowingly and

5    intentionally became a member of the conspiracy.  A

6    conspiracy only ends when its purpose and objective

7    have been accomplished or all the parties to the

8    conspiracy abandoned or terminate it.

9         Price-fixing.  The Indictment charges the

10    defendant with conspiracy to fix prices.

11         A conspiracy to fix price is an agreement or a

12    mutual understanding between two or more persons from

13    competing companies, to fix, control, raise, lower,

14    maintain, or stabilize the prices charged or to be

15    charged for products or services.

16         A price-fixing conspiracy is commonly thought of

17    as an agreement to establish the same price; however,

18    prices may be fixed in other ways.  Prices or, in this

19    case, freight rates and surcharges are fixed if the

20    range or level of rates or surcharges is agreed upon

21    by the conspirators.  Prices are also fixed if some

22    component of the total price or rate is agreed upon.

23    They are considered fixed because they are agreed

24    upon.  Thus, any agreement to raise a price, to set a

25    maximum price, to stabilize a price, to set a price or

1    price range, to set a component of a rate, to set a

2    surcharge or to maintain a price, is illegal.

3         If you should find that the defendant entered into

4    an agreement to fix prices, it does not matter whether

5    the rates or surcharges agreed upon were reasonable or

6    unreasonable, justifiable or unjustifiable, or harmful

7    or harmless.  If you should find that the defendant

8    entered into an agreement to fix prices, the fact that

9    the defendant or his co-conspirators did not abide by

10   it or that one or more of them may not have lived up

11   to some aspect of the agreement, or that they may not

12   have been successful in achieving their objective, is

13   no defense.  The agreement is the crime even if it is

14   never carried out.

15        If the conspiracy charged in the Indictment is

16   proved, it is no defense that the conspirators

17   actually competed with each other in some manner or

18   that they did not conspire to eliminate all

19   competition.  Nor is it a defense that the

20   conspirators did not attempt to collude with all of

21   their competitors.  Similarly, the conspiracy is

22   unlawful if it did not extend to all services sold by

23   the conspirator or did not affect all of their

24   customers.  Evidence of similarity of business

25   practice of the defendant and alleged co-conspirators,

1     or the fact that they may have charged identical

2     prices for the same goods, does not alone establish an

3     agreement to fix prices, since such activities may be

4     consistent with ordinary and proper competitive

5     behavior in a free and open market.

6          The defendant and alleged conspirators may charge

7     the same prices, may copy each other's price lists or

8     may follow and conform exactly to each other's prices,

9     policies and price changes, and such conduct would not

10    violate the Sherman Act unless you find that it was

11    done pursuant to an agreement between two or more

12    conspirators, as alleged in the Indictment.

13    Nevertheless, you may consider such factors and

14    circumstances, along with all other evidence, in

15    determining whether the evidence of competition,

16    evidence of pricing actually charged, similarity of

17    business practice and similarity of prices, resulted

18    from the independent act or business judges of the

19    defendant and alleged co-conspirators freely competing

20    in the open market, or whether it resulted from an

21    agreement among or between two or more of them.

22         Now I go back to the three elements of the

23    conspiracy.  As previously noted, the second element

24    that the Government must prove beyond a reasonable

25    doubt for you to find the defendant guilty is that the

1    defendant knowingly joined in the conspiracy charged

2    in the indictment.  To act knowingly means to act

3    voluntarily and intentionally, and not because of

4    mistake, accident, or other innocent reason.

5        Therefore, before you may convict the defendant,

6    the evidence must establish that the defendant joined

7    the conspiracy to fix prices with intent to aid or

8    advance the object or purpose of the conspiracy.

9        A person may become a member of a conspiracy

10   without full knowledge of all the details of the

11   conspiracy, the identity of all its members, or the

12   parts they played in the charged conspiracy.

13   Knowledge of the essential nature of the conspiracy is

14   enough.

15       On the other hand, a person who has no knowledge

16   of a conspiracy, but who happens to act in a way which

17   furthers some object or purpose of the conspiracy,

18   does not, thereby, become a member of the conspiracy.

19       Similarly, mere knowledge of a conspiracy, without

20   participation in the conspiracy, is also insufficient

21   to make a person a member of the conspiracy.

22       Mere presence at the scene of the conspiracy is

23   insufficient to make a person a member of the

24   conspiracy, but you may consider it among other

25   factors.

1          Your determination whether the defendant knowingly

2     joined the conspiracy must be based solely on the

3     actions of the defendant as established by the

4     evidence.

5          You should not consider what others may have said

6     or done to join the conspiracy.  Membership of the

7     defendant in this conspiracy must be established by

8     evidence of his own conduct, by what he said or did.

9          If you find that the defendant joined the

10    conspiracy, then the defendant is presumed to remain a

11    member of the conspiracy and is responsible for all

12    action taken in furtherance of the conspiracy until

13    the conspiracy has been completed or abandoned, or

14    until the defendant has withdrawn from the conspiracy.

15         Interstate commerce:  The third element of an

16    offense prohibited by the Sherman Act is that the

17    alleged unlawful conduct must involve interstate trade

18    or commerce.  The Government must prove beyond a

19    reasonable doubt that the conspiracy charged in the

20    Indictment either affected interstate commerce in

21    goods or service or occurred within the flow of

22    interstate commerce in goods or services.  The term

23    *interstate commerce* includes transactions that move

24    between states or between states and other place under

25    the jurisdiction of the United States.

1    Puerto Rico is treated as a state for purposes of

2    interstate commerce.

3    If the conduct charged in the Indictment involves

4    transactions that are now in the flow of commerce --

5    excuse me, no.  If the conduct charged in the

6    Indictment involves transactions that are in the flow

7    of commerce, the interstate commerce element is

8    satisfied and the size of such transaction is of no

9    significance.

10    Statute of Limitations.  The Indictment charges

11    that the alleged conspiracy began at least as early as

12    2005 and continued at least until April 2008.

13    The Government need not prove that the conspiracy

14    existed on those exact dates or that the conspiracy

15    continued for the entire period charged in the

16    Indictment.  It is sufficient if the Government proves

17    beyond a reasonable doubt that the conspiracy existed

18    during or reasonably near the time period alleged in

19    the Indictment and that defendant joined the

20    conspiracy sometime during the period alleged in the

21    Indictment.

22    The grand jury returned its Indictment of the

23    defendant on November 17th, 2011.  There is a

24    five-year statute of limitations which applies to the

25    offense charged.  This means that the defendant cannot

1    be found guilty unless you find, beyond a reasonable

2    doubt, that the conspiracy existed at some point

3    within the period of the statute of limitations,

4    which, for purposes of this case, is the period

5    beginning on November 17th, 2006, and continuing until

6    November 17th, 2011.

7        One way the Government can prove the conspiracy

8    existed in this period is to prove that one or more

9    members of the conspiracy performed some act after

10   November 17th, 2006, and before November 17th, 2011,

11   in furtherance of the purpose and objectives of the

12   conspiracy.

13       You may consider evidence of defendant's conduct

14   prior to November 17th, 2006, insofar as it tends to

15   prove or disprove the existence of the conspiracy and

16   the defendant's acts after that date.

17       Venue.  Before you can find the defendant guilty

18   of committing the crime charged in the Indictment, you

19   must find by a preponderance of the evidence that from

20   at least as early as 2005, and continuing until at

21   least April of 2008, the conspiratorial agreement or

22   some act in furtherance of the conspiracy by any

23   member of the conspiracy occurred in the District of

24   Puerto Rico.

25       To prove something by preponderance of the

1     evidence is to prove it is more likely true than not

2     true.  This is a lesser standard than beyond a

3     reasonable doubt.  It is the only standard that can be

4     proven other than beyond a reasonable doubt.

5          What Not to Consider.  The fact that Puerto Rico

6     may have potentially been affected, or consumers and

7     other prices and/or businesses, is not to be

8     considered by you in your judgment as to guilt or not

9     guilt of the defendant.

10         The effect on businesses, prices, or consumers in

11    Puerto Rico is not an element of the offense.  You are

12    not to decide this case based on pity and sympathy to

13    Puerto Rican business, to Puerto Rico, or to Puerto

14    Rican consumers.  The effect on Puerto Rico is only

15    material as to potentially establishing an effect in

16    interstate commerce and as to establishing venue.

17         This case is about a potential conspiracy in

18    violation of the antitrust law and whether or not the

19    defendant, Mr. Peake, joined the conspiracy, complying

20    with the elements of the offense, as more fully stated

21    in the instructions read to you.

22         Sympathy to Puerto Rico, its business or

23    consumers, does not play any role in your

24    consideration of this case.  Any statement made in

25    opening statement or any question and answer that may

1    have implied or that you may have understood that this

2    case is relating to the effects on Puerto Rico is an

3    erroneous interpretation.  I sternly order you not to

4    take such statements into consideration.

5        So, therefore, any effect on Puerto Rico is not to

6    be considered at all, except as to the potential

7    establishing an effect on interstate commerce and/or

8    to venue, as previously stated.

9        Co-conspirators Not on Trial.  The Indictment

10   charges that the defendant conspired with certain

11   persons and companies that are not on trial. There is

12   no requirement that all members of a conspiracy be

13   charged and prosecuted or tried together in one

14   proceeding.  You should not be concerned with, or

15   speculate about, why certain persons or companies are

16   not on trial, or about why any person or companies

17   have not been charged in the Indictment.

18       Charts and Summaries admitted under Federal Rule

19   of Evidence 1006.  The Government has presented

20   exhibits in the form of charts and summaries.  I

21   decided to admit these charts and summaries in place

22   of the underlying documents that they represent.  You

23   should consider the charts and summaries admitted into

24   evidence as you would any other evidence and assign to

25   them the weight you believe appropriate.

1    Demonstrative Charts and Summaries Not Admitted.

2    Certain charts and summaries have been shown to you in

3    order to help you understand the facts disclosed by

4    books, records, and other documents which are in

5    evidence in the case.  They are not themselves

6    evidence or proof of any facts.  If they do not

7    correctly reflect the facts shown by the evidence in

8    this case, you should disregard these charts and

9    summaries and determine the facts from the underlying

10   evidence.

11   Note-taking.  You have been permitted to take

12   notes during the trial.  Most of you, perhaps all of

13   you, have taken advantage of that opportunity.  You

14   must use your notes only as a memory aid during the

15   deliberations.  You must not give your notes priority

16   over your independent recollection of the evidence,

17   and you must not allow yourself to be unduly

18   influenced by the notes of the jurors.

19   I emphasize that the notes are not entitled to any

20   greater weight than your memories or impressions about

21   the testimony.

22   Now, I come to the instructions as to your

23   deliberations.

24   Duty to Deliberate.  Any verdict must represent

25   the considered judgment of each one of you.  In order

1    to return a verdict, it is necessary that each juror

2    agree to it; in other words, your verdict must be

3    unanimous.

4        It is your duty as jurors to consult with one

5    another and to deliberate in an effort to reach an

6    agreement, if you can do so without violence to your

7    individual judgment.

8        Each of you must decide the case for yourself, but

9    only after an impartial consideration of evidence in

10   the case with your fellow jurors.  In the course of

11   your deliberations, do not hesitate to reexamine your

12   own views and change your opinion if convinced it is

13   erroneous.  But do not surrender your honest

14   conviction as to the weight or the effect of the

15   evidence solely because of the opinion of your fellow

16   jurors, or for the mere purpose of returning a

17   verdict.

18       Remember, at all times, you are not partisans; you

19   are the judges of the facts.  Your sole interest is to

20   determine from the evidence in this case whether the

21   Government has proved its case beyond a reasonable

22   doubt.

23       Consideration of Evidence.  Your verdict must be

24   based solely on the evidence and on the law as I give

25   it to you in these instructions.  However, nothing

1    that I have said or done is intended to suggest what

2    your verdict should be.  That is entirely for you to

3    decide.

4        Jury Not to Consider Punishment.  The punishment

5    provided by law for the offense charged in the

6    Indictment is a matter exclusively within the province

7    of the Judge and should never be considered by you, in

8    any way, in arriving at an impartial verdict as to the

9    guilt or innocence of the defendant, Mr. Frank Peake.

10       Now, Foreperson.  I come now to the last part of

11   the instructions, the rules for your deliberation.

12   When you retire, you will discuss the case with other

13   jurors to reach agreement, if you can do so.  You

14   shall permit your foreperson to preside over your

15   deliberations, and your foreperson will speak for you

16   here in court.  I repeat, your verdict must be

17   unanimous.

18       Communications with the Court.  If it becomes

19   necessary during your deliberations to communicate

20   with the Court, you may send a written note through a

21   marshal, signed by your foreperson or by one or more

22   members of the jury.  No member of the jury shall ever

23   attempt to communicate with the Court by any means

24   other than a signed written note, and the Court will

25   never communicate with any member of the jury on any

subject touching the merits of the case otherwise than
in writing or orally in open court.  If you send out a
question, I will consult with the parties as promptly
as possible before answering it, which may take some
time.  You may continue with your deliberations while
waiting for the answer to any question.  Remember that
you are not to tell anyone, including me, how the jury
stands numerically, or otherwise, until you have
reached a unanimous verdict or have been discharged.

Mr. Flaquer, please take the jury verdict form.

Now I want to read to you what is called the
Verdict Form.  This is simply the written notice of
the decision you will reach in this case.

Jury Verdict Form.  All questions asked in this
jury verdict form are to be determined unanimously by
jury vote.

Count one.  We, the jury, in the above-entitled
action unanimously find defendant, Frank Peake, not
guilty or guilty.

In San Juan, Puerto Rico, this date of January
2013.  Foreperson's signature and date and time.

After you have reached a unanimous agreement on a
verdict, your foreperson will fill in the form that
has been given to you, sign and date it, and advise
the jury officer outside your door that you are ready

1       to return to the courtroom.

2           After you return to the courtroom, your foreperson

3       will deliver the completed verdict form as directed in

4       open court.

5           The foreperson is to be elected among yourselves,

6       he or she will sign any jury verdict form or written

7       question to the Court together with any one of you, if

8       you deem so.

9           Can I see counsel at this time.

10          (Bench conference held off the record with all

11      defense counsel and counsel for the Government, after

12      which the following proceedings took place in open

13      court.)

14          THE COURT:  I have modified the jury verdict form

15      to read, "The question asked in the jury verdict form

16      is to be determined by a unanimous jury vote.

17          "Count one.  We, the jury, in the above action

18      unanimously find defendant, Frank Peake, not guilty or

19      guilty."

20          (Whereupon the following proceedings took place at

21      sidebar.)

22          THE COURT:  Any objections to this change?

23          MR. MARKUS:  No, Your Honor.

24          THE COURT:  Because this sounds like more than one

25      question.

1          MS. MOSS:  Right.

2          THE COURT:  So please amend this accordingly.

3          THE CLERK:  Yes.

4          THE COURT:  Any objections to the instructions?

5          MR. MARKUS:  Judge, in addition to those

6     previously filed --

7          THE COURT:  No, no, mention all of them, mention

8     all of them.

9          MR. MARKUS:  The missing witness instruction.

10    Venue beyond a reasonable doubt.  Our theory of

11    defense instruction, Your Honor.  Maybe I should read

12    that.

13         THE COURT:  Yes, read it, I have no problem.

14         MR. MARKUS:  "Mr. Peake does not contest that

15    there was a conspiracy that existed between Gabriel

16    Serra, Kevin Gill, Gregory Glova, and Peter Baci.

17    Rather, he contends that he did not knowingly and

18    intentionally participate in this conspiracy and did

19    not knowingly and intentionally join the conspiracy as

20    a member.  Mr. Peake further contends that any

21    discussions he had with Gabriel Serra were legitimate

22    and competitive discussions and not anticompetitive

23    conspiracy related.

24         "Mr. Peake also contends that he was competing

25    with Horizon, including on market share and price.

1      Although this is Mr. Peake's defense, the burden

2      always remains on the Government to prove the elements

3      of the offense beyond a reasonable doubt.  If you do

4      not believe the Government has proven beyond a

5      reasonable doubt that Mr. Peake intentionally and

6      knowingly joined the conspiracy, you must find him not

7      guilty."

8           THE COURT:  Anything further?

9           MR. MARKUS:  The only last one, Your Honor, was

10     the one that I had mentioned on Page 18.  I had

11     requested that you also instruct the jury that a

12     witness' refusal to be interviewed by the defense be

13     something that they can consider.

14          THE COURT:  Excuse me?  Read me that instruction.

15          MR. MARKUS:  Yes, Your Honor.

16          "A witness' refusal to be interviewed by one party

17     or the other can be considered by you in determining

18     his credibility."

19          THE COURT:  All right.  I'll take that one first,

20     unless you have anything further.

21          MR. MARKUS:  No, Your Honor, nothing further.

22          THE COURT:  I think we discussed them all in good

23     faith in the charge conference, and I think we're all

24     prepared.

25          MR. MARKUS:  Yes, Your Honor.

1          THE COURT:  So let me simply, briefly, advise you

2      what my opinion is relating to the cooperators being

3      interviewed by the defense.

4          As I understand Roviaro, the defense is entitled

5      to have any cooperator be interviewed, but the

6      decision is on the person being interviewed, away from

7      both the defense and the United States, because the

8      decision is not the Court's, it's not the defense's,

9      and it is not the United States'.

10         Since the decision is as to none, the decision is

11     his, the fact that he does not want to interview, I

12     don't think creates a presumption of anything.

13         That is the position of the Court, unless you want

14     to supplement.

15         MR. SNYDER:  No.

16         THE COURT:  Let's go now to the missing witness

17     instruction.

18         MR. SNYDER:  Obviously, the United States opposes

19     that instruction, because even witnesses that would

20     have been available to the Government -- I believe

21     Bill Stallings was the one that was specifically

22     mentioned, are equally available to the defense.  They

23     could subpoena him.

24         MR. MARKUS:  And our position, Judge, just so the

25     record is clear, is that Bill Stallings was granted

1      full immunity and, therefore, was a special sort of

2      witness that was under the control of the United

3      States.

4          THE COURT:  The position of the Court is the

5      position of the instructions.  The position of the

6      instructions is that the United States does not have

7      to bring in all of the conspirators or the super

8      conspirator.

9          The position of the Court is that the United

10     States brings in whoever they understand is going to

11     prove the elements of the offense.  If it's done with

12     one witness, it's with one witness, if it's done with

13     three, three witnesses.  Further, you could have

14     subpoenaed him.  If you think he was so instrumental,

15     you could have subpoenaed him, and the Court would

16     have granted you the ability to subpoena the witness.

17         Let's go to the next.  The next is the theory of

18     the defense.  What is the position of the United

19     States?

20         MR. SNYDER:  The United States opposes the theory

21     of defense instruction, on the grounds that it really

22     is a surrogate for testimony by the defendant, it's

23     not necessary.  The jury is provided with instruction

24     on the law, not instruction on the arguments of the

25     parties. There's not a theory of prosecution.

1          MR. MARKUS:  Your Honor, I believe the law in the

2     First Circuit is that as long as the theory of defense

3     is an accurate statement of the law and is supported

4     by evidence in the record, it should be given, and,

5     therefore, we request a theory of defense instruction.

6          THE COURT:  The Court understands that the theory

7     of defense proposed -- anyway, you established it very

8     clearly in your argument, and the Court understands

9     that the instruction produced is an invitation to

10     hearsay and to put into evidence the statement of your

11     client, without sitting your client.  So, the Court

12     did not, on this occasion, accept the rule of the

13     defense.

14          MR. SNYDER:  And that accurately summarizes the

15     objection of the Government.

16          THE COURT:  All right.

17          Now, did the Court read any instruction

18     improperly, anything that there may have been a

19     mistake in the reading?

20          MR. MARKUS:  No, Your Honor.

21          MR. SNYDER:  No, Your Honor.  And in fact, you

22     probably corrected a couple of things along the way.

23          THE COURT:  Okay.  Very well.

24          So now I will swear in the marshal, I will

25     separate the alternates, and I will ask them to inform

1    me if they want to start deliberation today or Monday.

2           MR. MARKUS:  Thank you, Your Honor.

3           THE COURT:  This is entirely up to them, it is not

4    my decision.

5           MR. MARKUS:  Your Honor, just the last instruction

6    was the venue beyond a reasonable doubt.

7           THE COURT:  Yes.  The venue beyond a reasonable

8    doubt, thank you.  We did not discuss it.  We did not

9    leave it out on purpose.  You are right, you did also

10   raise this one.

11          The Court understands that the law -- this is the

12   only exception that I know in the First Circuit, and

13   in other circuits, that venue can be proven by

14   preponderance of the evidence.  Okay?

15          MR. MARKUS:  Yes, Your Honor.

16          THE COURT:  All right.  Thank you.

17          (End of discussion at sidebar.)

18          THE COURT:  Okay.  Ladies and gentlemen, this case

19   is now yours.  Mr. Flaquer will send to you in the

20   jury room a copy of the instructions and also a copy

21   of the Indictment for your reference.  The Indictment

22   is not evidence.  But, since you have to -- several

23   instructions refer to the charge.  You may read the

24   charge without, of course, making any reference that

25   that proves anything other than that it is a formal

1    charge.

2         All right.  We will swear in a marshal at this

3    time.

4         Now, while that is occurring, the first thing that

5    the Court wants to know today is a note from you, your

6    decision, the 12 of you, whether you wish to begin

7    deliberations today or you wish to begin on Monday or

8    you wish to come on Saturday.  There are many

9    alternatives to this, but the alternatives are your

10   decisions, not mine.

11        Back when I started here 40 years ago, the Judge

12   made the jury begin in the night.  And that's what

13   happened.  But that is not the custom anymore.  You

14   don't have to follow either custom.  You decide the

15   custom.  All right?

16        So the first matter will be the Court will

17   separate the three alternates -- the two alternates,

18   the two alternates.  The Court will separate the two

19   alternates from the regular panel of 12.  And the

20   Court expects that you will inform the Court if you

21   wish to start tonight or if you wish to start Saturday

22   or if you wish to start Monday.

23        That is your decision.  All right?

24        What did we get from the marshal?

25        THE CSO:  He is on his way, Your Honor.

1          THE COURT:  Okay.  These are the two marshals in

2     charge of the jury.  They will now be sworn in.

3          (Whereupon the deputy marshals were duly sworn.)

4          THE COURT:  Now, we have the two marshals sworn

5     in.  So, Mr. Bruno and marshal, the instructions of

6     the Court are simple:  I want you to be sitting next

7     to the glass door, not next to the door, next to the

8     glass door, so that there's no impression that you're

9     eavesdropping on the United States jury.  All right?

10          THE CSO:  Yes, Your Honor.

11          THE COURT:  It's just to avoid confusion.  All

12     right?

13          Now, one last matter.  We talked about *bizcochito*,

14     which is a piece of cake.  That is relating to the

15     days of jury service.  This is a real case.  It is a

16     serious case.  It is a case to be taken very seriously

17     by you.  Both parties are entitled to your entire

18     attention.  There's no joking there.  The *bizcochito*

19     was related to time, related to time.  This is a short

20     case, I think we complied with terminating this case

21     within seven days.

22          So, I don't want to create any confusion.

23          Thank you very much.  And at this time, marshal,

24     twelve go together and two go together.

25          THE CSO:  All rise.

1        (Jury out.)

2        THE COURT:  All right.  You may be seated at this

3   time.  I have very serious doubts that the jury will

4   begin tonight, but it's their decision.  And in the

5   meantime, so you can see the Dominguez night court in

6   operation, you are going to see five sentences

7   tonight.

8        (Recess.)

9        (Whereupon the following proceedings took place in

10   the presence of the jury.)

11       THE COURT:  Okay.  The Court has received a note

12   by Mr. [Name Redacted] that the jury has selected a

13   foreperson, he's Mr. [Name Redacted], and that the

14   jury has decided to stop for today and to come back on

15   Monday.  This means the following:  This means that on

16   Monday, when all 12 of you have arrived, you send me a

17   note and I will send you the evidence and the jury

18   instructions because I cannot send anything to three

19   of you, four of you, five of you; it's 12.  All right?

20       So when the 12 are ready, you send me the note and

21   the marshal will immediately provide you the

22   instructions and all the evidence.

23       Until Monday then, thank you very much.  Please

24   drive home safely.

25       The hour is 9:00.  If you can make it by 9:00,

1       fine, I will be here.

2           Thank you very much.

3           THE CSO:  All rise.

4           THE COURT:  Have a nice weekend.

5           (Whereupon the jury exited the courtroom.)

6           THE COURT:  Will counsel please approach.

7           (Bench conference on the record.)

8           THE COURT:  My humble experience here of 18 years

9       is that the questions arrive in first three to four

10      hours.  So I need you to be here or at least leave us

11      your phone numbers.

12          MR. SNYDER:  Yes, sir.

13          MR. MARKUS:  Yes, Your Honor.

14          THE COURT:  Because I usually wait about half an

15      hour.  I suggest that you be here because in the

16      morning is when I expect that, if there are any

17      questions, they will have them.  That is my

18      experience.  I think that has been yours, probably

19      yours, Mr. Snyder, also.

20          MR. SNYDER:  Judge, could we inquire about the

21      practice here regarding the two alternate jurors.

22          THE COURT:  The alternate jurors stay in a room.

23          MS. MOSS:  They do?

24          THE COURT:  They stay in a separate room.  The law

25      now is that if they don't come in on Monday, that

1    person goes in, the first one goes in and joins the

2    12, and then you start anew.

3        So if on Monday only 11 show, they go.  If on

4    Wednesday only 11 show, then the instructions will be

5    provided:  We have a new juror, you must begin

6    deliberations anew.

7        MR. MARKUS:  Okay.  Judge, have a nice weekend.

8        THE COURT:  Have a nice weekend.

9        (Whereupon the Court adjourned until Monday,

10   January 28, 2013.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         REPORTER'S CERTIFICATE

2

3          I, ZULMA M. RUIZ, Official Court Reporter for the

4     United States District Court for the District of

5     Puerto Rico, appointed pursuant to the provisions of

6     Title 28, United States Code, Section 753, do hereby

7     certify that the foregoing is a true and correct

8     computer-aided transcript of proceedings had in the

9     within-entitled and numbered cause on the date herein

10    set forth; and I do further certify that the foregoing

11    transcript has been prepared by me or under my

12    direction.

13

14

15

16

17

18

                              S/Zulma M. Ruiz
19                            _____

20                            Official Court Reporter

21

22

23

24

25