## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Plaintiff<br><br>v.<br><br>**FRANK PEAKE**<br>Defendant | **Criminal No. 11-512 (DRD)** |

### OPINION & ORDER

A jury convicted Frank Peake ("Defendant") for violating the Sherman Act, *see* 15 U.S.C. § 1, by engaging in a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services.[1]  *See* Docket No. 1.   Pending before the Court is a motion for new trial based on newly discovered evidence, which includes a request to hold an evidentiary hearing.  *See* Docket No. 246; Fed. R. Crim. P. 33.  The Government admits, at least for argument's sake, that that this undisclosed evidence was unknown or unavailable to Defendant at the time of trial and that Defendant's failure to learn of it did not result from a lack of due diligence. However, the Government urges that the motion be denied as Defendant fails to satisfy the applicable legal standards required to prevail on a Rule 33 motion for new trial.  The Court agrees.  Therefore, the motion for new trial is hereby **DENIED**.

---

[1] The Court notes that the instant case was affirmed by the First Circuit, *see United States v. Peake*, 804 F.3d 81 (1st Cir. 2015), and certiorari was denied by the Supreme Court, *see Peake v. United States*, 84 USLW 3527.  However, the instant controversy was not an appeal issue.  The Court waited for the appellate case to conclude prior to resolving the controversy at bar.  *See* Fed. R. Crim. P. 37(a) ("If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may . . . defer considering the motion").

## I.      FACTUAL OVERVIEW

The instant matter involves a conspiracy amongst three freight carriers, Sea Star Line ("Sea Star"), Horizon Lines ("Horizon"), and Crowley Liner ("Crowley"), to quash and eradicate competition by assenting to fix rates and surcharges for Puerto Rico freight services.  As part of the ongoing conspiracy, various high level employees of the freight carriers, including Defendant, would meet and conspire to raise rates for the upcoming year and would scheme on how to handle upcoming contract negotiations with potential clients.  Defendant, the former President and Chief Executive Officer (CEO) of Sea Star, was alleged to have been one of the masterminds of this conspiracy.

The spectrum of the conspiracy was both extensive and pervasive, as Sea Star earned over $900 million in revenue from Puerto Rico freight services during Defendant's participation in the conspiracy.  The price of the ocean freight, bunker fuel surcharge, port security charge, total assessorial charge, shippers export declaration charge, and intermodal fuel surcharge all increased as a result of the conspiracy.    On January 29, 2013, following a three week trial, Defendant was convicted of violating 15 U.S.C. § 1.

Months after trial, Defendant discovered that William Stallings—a key Government cooperator who *did not* testify in Defendant's trial—had filed a *qui tam* lawsuit against the same corporations that were involved in this criminal conspiracy.[2]  "The lawsuit was filed

---

[2] The Third Circuit adequately explained the origins of the term *qui tam* as follows:

> The term " *qui tam* " is an abbreviation of the phrase " ' *qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.' " *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 509 n. 1 (3d Cir.2007) (quoting *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 n. 1, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)). Generally, *qui tam* actions permit private parties to sue to enforce the law on the Government's behalf and reward successful plaintiffs with part of the recovery. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 647 n. 1 (D.C.Cir.1994).

*United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 231 n.1 (3d Cir. 2013).

under the *qui tam,* or whistleblower, provisions of the False Claims Act, which permit private individuals to sue on behalf of the government for false claims and to share in any recovery." *See* Docket No. 246-2.

The action was filed by Mr. Stallings on January 15, 2013, which is five days after Defendant's criminal trial commenced. The Court emphasizes that said *qui tam* lawsuit was sealed until February of 2014, which is approximately a year after Defendant was found guilty. The action was settled and resulted in Sea Star and Horizon agreeing to pay the Government $1.9 million and $1.5 million respectively. *See* Docket No. 246-2. The settlement resulted in William Stallings pocketing a hefty $512,719. Neither the *qui tam* action itself nor its surrounding circumstances were disclosed to the defense until well after the conclusion of trial.

Consequently, the Court is now confronted with a Rule 33 motion for new trial based on this newly discovered evidence. *See* Fed. R. Crim. P. 33.[3] Specifically, Defendant professes that this newly discovered evidence should be deemed *exculpatory* under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The defense proposes two theories as to how the availability of this evidence would have probably changed the result of trial: (1) the evidence would have impeached the testimony of Ron Reynolds, who is an agent of the United States Department of Agriculture and (2) possession of the evidence

---

[3] Rule 33. New Trial

(a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
(b) Time to File.
    (1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.
    (2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

would have resulted in the defense calling Mr. Stallings to the stand "to testify as to his participation in the conspiracy and [Defendant's] non-participation."   In turn, the Government has three theories as to why disclosure of the *qui tam* action was not required: (1) the information was not in the possession or control of the prosecution team, (2) the information was not *material*, and (3) the information would not have changed the outcome of trial.   *See* Docket No. 253.   Prior to assessing the merits of these arguments, the Court necessarily turns to the applicable standard of review.

## II.   NEWLY DISCOVERED EVIDENCE

A motion for new trial based on newly discovered evidence requires that the Court keep one eye on Rule 33 and the other on the potential constitutional consequences. Combining these two sources of law creates a hybrid standard of review.

### A.  Production of Exculpatory Evidence

In the landmark case *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court ruled "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   *Id.* at 87.   However, this declaration of paramount importance has been heavily litigated and expanded over the years in several diverse ways.

"There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."   *Strickler v. Greene*, 527 U.S. 263, 280

(1999). For the purposes of clarity, some of the subtleties of the three components are set forth below.

With respect to the first element, there is no *Brady* violation unless the evidence in dispute is favorable to the accused. This first cog of the *Brady* framework incorporates the view that "evidence favorable to an accused" (commonly referred to as *Brady* material) encompasses evidence that is either "exculpatory" or "impeaching." This is consistent with the Supreme Court's directive "that the *Brady* duty extends to impeachment evidence as well as exculpatory evidence." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) (per curiam); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." (citing *Napue v. Illinois*, 360 U.S. 264 (1959)); *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused,' *Brady*, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.").

The second component of a *Brady* violation requires the willful or inadvertent suppression of the favorable evidence to the accused. This is also consistent with the liberal interpretation that, in the *Brady* context, "suppression" is not limited to circumstances where it was carried out by the Government intentionally or in bad faith; instead, negligence or inadvertence qualifies as "suppression." *See* 2 Wright, Liepold, Henning & Welling, Federal Practice and Procedure § 256, (4th ed., April 2015 Supplement) ("While *Brady* used the term 'suppression,' it should not be understood to require active removal or hiding of evidence by the government—the issue is whether the

prosecution revealed the evidence in a timely manner, regardless of intent or negligence."); *United States v. Price*, 566 F.3d 900, 907-908 (9th Cir. 2009) ("The term 'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor; sins of omission are equally within Brady's scope. . . . There is no allegation that the trial prosecutor in this case acted willfully, maliciously, or in anything but good faith—but an 'innocent' failure to disclose favorable evidence constitutes a *Brady* violation nonetheless.").  "If evidence highly probative of innocence is in [the prosecutor's] file, he [or she] should be presumed to recognize its significance even if he [or she] has actually overlooked it."  *United States v. Agurs*, 427 U.S. 97, 110 (1976).  Also, it is of critical importance to note that the Supreme Court has "held that the duty to disclose such evidence is applicable even though there has been no request by the accused."  *Strickler*, 527 U.S. at 280 (citing *Agurs*, 427 U.S. at 107).

Of course, in order for the Government to have "suppressed" evidence, said evidence must have been in its possession.  The prosecutor shoulders the heavy burden of disclosing any *Brady* material in possession of any "investigative agencies that are part of the prosecution team," even if the information "never came to the prosecutor's attention."  2 Wright, Liepold, Henning & Welling, Federal Practice and Procedure § 256, (4th ed., April 2015 Supplement) (collecting cases); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

However, "[e]vidence equally available to the defendant by the exercise of due diligence means that the government is not obligated under *Brady* to produce it. . . . Similarly, if the defendant knows about the exculpatory information, then the government's

failure to disclose it is not a *Brady* violation."   2 Wright, Liepold, Henning & Welling, Federal Practice and Procedure § 256, (4th ed., April 2015 Supplement) (collecting cases that are included in the margin).[4]   Once this first prong is satisfied, the analysis shifts to the second.

Finally, the third *Brady* component requires that "prejudice must have ensued."   In order for this final *Brady* hurdle to be satisfied, the suppressed evidence that is favorable to the accused must be "material either to guilt or to punishment."   *See Bucci v. United States*, 662 F.3d 18, 38 (1st Cir. 2011).   Thus, the fact that favorable evidence to the accused was not produced by the Government does not necessarily result in a *Brady* violation.   Evidence is deemed material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   *Bagley*, 473 U.S. at 676 (cited in approval in *Strickler*, 527 U.S. at 280); *see also Kyles*, 514 U.S. at 433-34.   The adjective in "reasonable probability" is important: "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."   *Kyles*, 514 U.S. at 434 (reiterated in *Strickler*, 527 U.S. at 289-90).

---

[4] The treatise collects the following cases that stand for these propositions: *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009); *United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009); *Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007); *United States v. Infante*, 404 F.3d 376, 387 (5th Cir. 2005); *Spirko v. Mitchell*, 368 F.3d 603, 611, (6th Cir. 2004), cert. denied, 544 U.S. 948 (2005); *Wright v. Hopper*, 169 F.3d 695, 702 (11th Cir. 1999), cert. denied, 528 U.S. 934 (1999); *United States v. Dean*, 722 F.2d 92, 95 (5th Cir. 1983); *United States v. Barraza Cazares*, 465 F.3d 327, 335 (8th Cir. 2006), cert. denied, 128 S. Ct. 41 (2007); *Lambert v. Blackwell*, 387 F.3d 210, 265 (3d Cir. 2004), cert. denied, 544 U.S. 1063 (2005); *United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004), cert. denied, 546 U.S. 810 (2005); *United States v. Stewart*, 513 F.2d 957, 600 (2d Cir. 1975); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982), cert. denied, 459 U.S. 1174 (1983); *United States v. Prior*, 546 F.2d 1254, 1259 (5th Cir. 1977).

Finally, the Court closes the discussion by echoing the Supreme Court's words of wisdom on the subject:

> The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. **Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.** (emphasis provided).

*Bagley*, 473 U.S. at 675.

## B. Federal Rule of Criminal Procedure 33

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Civ. P. 33(a).  In order to make this "interest of justice" finding, the following four-part showing must normally be made by the defendant:

> (i) that the evidence was unknown or unavailable to him at the time of trial; (ii) that his failure to learn of it did not result from a lack of due diligence; (iii) that the evidence is material, not merely cumulative or impeaching; and (iv) that its availability is likely to bring about an acquittal upon retrial.

*United States v. Connolly*, 504 F.3d 206, 212 (1st Cir. 2007) (citing *United States v. Huddleston*, 194 F.3d 214, 218 (1st Cir.1999); and *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980)).  "Every element of this test (known in this circuit as the '*Wright* test') is essential, and a failure to establish any one element will defeat the motion."  *Id.* (citing *United States v. Maldonado-Rivera*, 489 F.3d 60, 65 (1st Cir. 2007)).  It should be noted that the third requirement of the *Wright* test "categorically discounts 'merely impeaching' evidence as 'immaterial.'"  *Id.* at 213 (citing *Wright*, 625 F.2d at 1019).  Further, the fourth

element of the *Wright* test "demands an *actual* probability that the result would have differed." (emphasis in original). *Id.*

However, the "interest of justice" calculus changes when *Brady* concerns are in play. The First Circuit's connection of the components of a *Brady* violation with the *Wright*-test factors results in a hybrid standard for Rule 33 motions when they are based on newly discovered evidence falling within the realm of *Brady*. Thus, the Rule 33 "interest of justice" equation shifts "when the defendant makes a colorable claim that he would have had access to the newly discovered evidence but for the government's failure to disclose it in accordance with the imperatives of *Brady*." *Id.* at 212 (citing *United States v. González-González*, 258 F.3d 16, 20 (1st Cir. 2001)). The Court proceeds to identify the elements of such a claim.

At the outset, it should be noted that the first two *Wright*-test requirements—(i) that the evidence was unknown or unavailable to a defendant at the time of trial, and (ii) that a defendant's failure to learn of it did not result from a lack of due diligence—remain the same when the newly discovered evidence falls within the scope of *Brady*.[5] *Id.* at 213. However, as per First Circuit precedent, the last two *Wright*-test requirements—(iii) that the evidence is material, not merely cumulative or impeaching, and (iv) that its availability is likely to bring about an acquittal upon retrial—are modified in the following manner:

> . . . in a *Brady* scenario, [the third and fourth] elements are replaced with the unitary requirement that the defendant establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S.

---

[5] It is worth noting that these first two *Wright* factors are consistent with the previous discussion of *Brady* jurisprudence. "Evidence equally available to the defendant by the exercise of due diligence means that the government is not obligated under *Brady* to produce it. . . . Similarly, if the defendant knows about the exculpatory information, then the government's failure to disclose it is not a *Brady* violation." 2 Wright, Liepold, Henning & Welling, Federal Practice and Procedure § 256, (4th ed., April 2015 Supplement). Thus, it comes as no surprise that the First Circuit left these "interest of justice" factors intact.

667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (characterizing that "reasonable probability" as sufficient to "undermine[ ] confidence in the outcome of the trial").

*Id.*[6]

Summarizing, in order to prevail on a motion for new trial on the basis of newly discovered exculpatory evidence, a defendant must establish the following: (i) that the evidence was unknown or unavailable to the defendant at the time of trial; (ii) that the defendant's failure to learn of it did not result from a lack of due diligence; and (iii) that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[7]

### III.    LEGAL ANALYSIS

As Defendant's motion for new trial is premised upon the Government's failure to disclose exculpatory evidence, the Court must use the hybrid standard described above.  If Defendant is unable to meet this standard, then there is no need to address the more onerous Rule 33 standard for newly discovered non-exculpatory evidence.

The Government concedes, as it must, that the first two requirements—(i) that the evidence was unknown or unavailable to Defendant at the time of trial, and (ii) that

---

[6] The Court emphasizes the distinction drawn between the *Wright* test's "actual probability" standard and a *Brady* violation's "reasonable probability" standard.  It is beyond reproach that, from a defendant's perspective, the "actual probability" standard is more onerous than its counterpart.

[7] The Court also highlights the following *Connolly* passage:

. . . the *Wright* test categorically discounts "merely impeaching" evidence as "immaterial." *Wright*, 625 F.2d at 1019. When a *Brady* violation is involved, however, the *Wright* materiality inquiry disappears as a distinct element, with the result that undisclosed impeachment evidence, if it suffices to undermine confidence in the outcome of the trial, may carry the day. *See, e.g., Bagley*, 473 U.S. at 682, 105 S.Ct. 3375 (applying *Brady* test to impeachment evidence); *United States v. Dumas*, 207 F.3d 11, 16 (1st Cir.2000) ("[W]e recognize that impeachment evidence, if powerful enough, could constitute grounds for a new trial...."). (emphasis in original).

*Id.* at 213.

Defendant's failure to learn of it did not result from a lack of due diligence—have been satisfied. Therefore, all that remains is for Defendant to establish a "**reasonable probability** that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (emphasis provided). *Bagley*, 473 U.S. at 682; *see also Kyles*, 514 U.S. at 434; and *Connolly*, 504 F.3d at 213. In order to adequately address the issue, the Court must evaluate the newly discovered evidence in light of the evidence that was actually presented at trial.

### A. Ample Trial Evidence

Much of the evidence discussed was provided by three cooperating witnesses: Gregory Glova, Peter Baci, and Gabriel Serra. As demonstrated below, their testimony is quite consistent. Thus, much of their testimony serves to corroborate each other's version of facts.

Although the evidence at trial showed that Sea Star's Peter Baci and Horizon's Gregory Glova handled the day-to-day operations of the conspiracy, it was Defendant—the top executive of Sea Star—and Gabriel Serra—the top executive of Horizon—who ultimately resolved the difficult issues that confronted the conspiracy. Tr. Vol. 2 at 57-59; Tr. Vol. 5 at 17-21, 24-26; Tr. Vol. 7 at 56-59, 85-86. The First Circuit has a similar take on the evidence adduced at trial:

> For example, during a meeting in Orlando in 2006, [Defendant] coordinated with Horizon Lines executives to resolve existing disputes by agreeing to keep the market shares at their current levels, rather than reinstating the split in effect prior to his joining the conspiracy in 2005. Later that year, the market allocation became imbalanced when Walgreens, a major importer of consumer goods to Puerto Rico, decided not to divide freight contracts between Horizon Lines and Sea Star, and instead allocated all of its freight to Horizon Lines. [Defendant] quickly agreed with an executive from Horizon Lines that the company would compensate by shifting cargo to Sea Star vessels or using Transportation Service

Agreements, whereby Horizon Lines would pay Sea Star to carry its cargo even though it had capacity to transport it in its own vessels.

While the conspiracy was in full swing, a Sea Star senior executive working with [Defendant] became a government informant. Based on his description of the conspiracy, the government initiated an extensive investigation that included an FBI search of Sea Star's headquarters in 2008. Four of [Defendant's] co-conspirators were charged with antitrust violations and pleaded guilty before the U.S. District Court for the Middle District of Florida, Jacksonville Division. Following these events, a grand jury in San Juan, Puerto Rico, returned an indictment against [Defendant] in November 2011 on one charge of conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for freight services in interstate commerce between the United States and Puerto Rico.

[Defendant's] co-conspirators testified against him at trial, revealing his involvement in the conspiracy and their discussions about setting surcharges, fees, and market share allocations. One such incident involved an email exchange between [Defendant] and a competitor regarding prices offered to a client in an attempt to "avoid a price war."

*Peake*, 804 F.3d 81, 85 (1st Cir. 2015), cert. denied, (U.S. Oct. 3, 2016).  However, the Court shall delve even deeper into the facts in order to demonstrate the futility of Defendant's plight.

At trial, the jury heard testimony from Mr. Glova, Horizons' Pricing Director for Puerto Rico Freight Services, who testified that he actively participated in the conspiracy from 2005-08.  When he was promoted to director, Kevin Gill, the previous director, explained to him that Sea Star, Horizon, and Crowley had been collectively discussing the shipping rates since 2002 and that the main participants in those communications were Peter Baci and Defendant from Sea Star and Thomas Farmer from Crowley.  The coconspirators would communicate via email, using Gmail accounts with coded names, and/or by telephone.  Whenever there was a pricing dispute, it was Defendant and Gabriel Serra who would converse and make a final determination.

Mr. Glova further indicated that the four of them (Mr. Glova, Mr. Baci, Mr. Farmer, and Defendant) met twice in Orlando, Florida in order to discuss the conspiracy.

According to Mr. Glova, during one of these meetings, the coconspirators discussed and agreed in principle upon the prices and rates of shipping, fuel surcharges, and port surcharges for 2007.  Further, the coconspirators reached agreements regarding the types of cargo included in the "50/50" agreement and conspired to let each other win certain accounts in order to make up for any market share imbalance.[8]  There was also an agreement between Horizon and Sea Star whereby neither company would undercut each other for house accounts.  *See* Tr. Vol. 2 at 78-79, 109; Tr. Vol. 5 at 122-24, 130-32; Tr. Vol. 7 at 114-15, 118-21, 129-32; Trial Exhibits 1, 5-7, 24, and 26.

Also through Mr. Glova, the United States admitted several incriminating emails connecting Defendant to the conspiracy.  As previously alluded to, Mr. Baci and Mr. Glova, tasked with handling the majority of the day-to-day activities of the conspiracy, both used secret email accounts in an attempt to shield their identities.[9]  The majority of the emails sent back and forth between Mr. Glova and Mr. Baci detail the inner workings of the conspiracy, thereby demonstrating how Sea Star and Horizon were able to effectively decrease competition and increase profitability.  Specifically, Mr. Baci and Mr. Glova would constantly plot how to handle bidding for new customer accounts and how to essentially maintain an equal market share of the freight shipping from Florida to Puerto Rico.

Mr. Baci, who worked as the Senior Vice President of Sea Star Line in Jacksonville, Florida from 2002-08, also took the stand, and testified that since 2003 he would report directly to Defendant.  Mr. Baci recounted how Horizon and Sea Star initially started to conspire to fix rates after the Navieras' bankruptcy in 2002, and indicated that he dealt with

---

[8] The "50/50" Rule refers to an agreement between Sea Star and Horizon whereby both companies would strive to maintain an equal market share of all goods being shipped to Puerto Rico.  To be clear, Crowley and Thomas Farmer were not participants in the "50/50" scheme.  Crowley was the least culpable party in the overarching conspiracy as they had the lowest percentage of income.

[9] Peter Baci's email was lighthouse123@gmail.com and Greg Glova's email was southorange@gmail.com.

both Mr. Gill and Mr. Glova.  According to Mr. Baci, they would, at first, communicate via telephone or fax, but that they eventually began using secret email accounts with the hope of disguising their scheme.

Mr. Baci further testified that he would communicate face to face with Mr. Glova, and that Mr. Serra and Defendant would communicate amongst themselves.  Defendant and Mr. Serra were occasionally summoned by Mr. Baci and Mr. Glova to resolve pricing disputes between Horizon and Sea Star.  Additionally, Mr. Baci recounted how Defendant became CEO and President of Sea Star in 2004 and how they would regularly discuss price increases in order to improve Sea Star's profitability.

Lastly, Mr. Baci attested that he, Mr. Serra, Mr. Glova, and Defendant all met on at least three occasions to plan illicit antitrust conduct relating to their respective clients, thereby corroborating Mr. Glova's testimony to that effect.  One of the meetings took place in Orlando, Florida in October of 2006, where the parties met to discuss the "50/50" cargo shipments and the planned rate increases for the following year.  In 2007, all four met again in Jacksonville, Florida to discuss the handling of the upcoming contract negotiations with Aqua Golf.  Similarly, Mr. Baci, Mr. Glova, and Defendant met once more in 2008, this time in New York, to discuss the "50/50" rule.

Further, there was corroborating evidence provided by other coconspirators, as stated herein, coupled with emails signed by and received by Defendant, as well as additional email communications between the other coconspirators implicating Defendant as a participant in the conspiracy.

The members of the jury also heard testimony from Mr. Serra, the former general manager of Horizon's Puerto Rico division.  Serra testified that he and Defendant would

actively discuss price fixing in the Florida ship market, and that Defendant even advocated and obtained an agreement from Horizon to charge higher fuel surcharges on longer routes.[10] Tr. Vol. 2 at 121-23; Tr. Vol. 4 at 91-97; Tr. Vol. 7 at 156-57; Trial Exhibits 49-56. Mr. Serra also indicated that he had met with Mr. Baci, Mr. Glova, and Defendant in Orlando, Florida in October 2006 to discuss the "50/50" market-share agreement between Sea Star and Horizon and the rate increases for the following year.  This constitutes additional corroborative testimony of the other two cooperators.

For many years, the shipping companies had charged the same bunker fuel surcharge on all shipping routes to Puerto Rico, regardless of the fuel costs from their respective suppliers and the length of the routes. At Defendant's insistence, Horizon agreed to start charging higher fuel surcharges on the longer routes, with Sea Star agreeing to match Horizon's May 2007 bunker fuel surcharge increase in return.

Mr. Serra further testified that, on one occasion, Sea Star lost the Walgreens account to Horizon, thereby tipping the market share balance heavily in Horizon's favor. As a result of this imbalance, Defendant and Serra agreed that Horizon would purchase space on Sea Star's ships until Horizon could shift some of its customers over to Sea Star. Tr. Vol. 7 at 88-89; Tr. Exs. 57, 70.

Mr. Serra and Defendant would communicate regularly via email and telephone, but, unlike Mr. Baci and Mr. Glova, they would use their work emails.[11]  Numerous email conversations between Defendant and Mr. Serra were admitted during the Government's case in chief, most of which show Defendant's involvement in the overall scheme.  Dozens

---

[10] For many years, the shipping companies had charged the same bunker fuel surcharge on all shipping routes to Puerto Rico, regardless of the fuel costs from their respective suppliers and the length of the routes. At Defendant's insistence, Horizon agreed to start charging higher fuel surcharges on the longer routes, with Sea Star agreeing to match Horizon's May 2007 bunker fuel surcharge increase in return.

[11]  Frank Peake's email was fpeake@seastarline.com and Gabriel Serra's email was gserra@horizonlines.com.

of emails between Defendant, Mr. Baci, Mr. Glova, and Mr. Serra illustrate that Defendant was actively engaged in the decision-making process, and show how the Horizon and Sea Star executives communicated quite frequently about jointly raising shipping rates and maintaining a level playing field regarding the number of customer accounts each company possessed.

For example, Trial Exhibits 21, 22, 53, 67, 126, 149, 169, 176, 222, and 239 are all prime examples of email conversations between Mr. Baci and Mr. Glova detailing the inner workings of the conspiracy.  Said emails show how Sea Star and Horizon methodically planned out their proposals to potential clients with the goal of maintaining a balanced market share between them.  Both sides would email each other the proposals that they would submit to potential clients and lay out their rate increase plans for the following years.

Additionally, Trial Exhibits 26, 32, and 34 are each email conversations involving Mr. Serra and Defendant, which further implicate Defendant in the price-fixing conspiracy.[12]  In said emails, Defendant and Serra are seen arguing about client accounts,

---

[12] Exhibit 26 contains two emails constituting circumstantial evidence of an agreement relating to market sharing. The last email in the link, sent by Mr. Serra to Mr. Baci and Mr. Glova, with a copy to Defendant, ends with "Read and delete…of course!"

Exhibit 32 contains a three-email conversation between Mr. Serra and Defendant in March 2008.  In the first email, dated March 6, 2008, Mr. Serra confronts Defendant about Sea Star's shipping rates, telling Defendant that "[he] is playing into AGT's and Transnow's hand…do you want me to react? ... they've now given me Paul's numbers." The second email contains Defendant's response, wherein he tells Mr. Serra "please do not ever send me an email like this again! I would like to think that my/our performance in the market over the past 4½ years would at least get me the benefit of the doubt…. To my knowledge we have NOT exceeded our allocation in the NE this year. I am not sure about the reefers, but I will check on that in the AM."  The third and final email is Serra's response, urging Defendant to "see the trend over the last few weeks and let's figure out a plan."  Hence, these three emails clearly portray that there was an already agreed-upon allocation by the members of the conspiracy as to the types of services being offered in the North East and as to the reefers (refrigerated vans).

Exhibit 34 also constitutes evidence of a conspiracy of market sharing, wherein Defendant informs Serra that in "the past 2 weeks you are hurting me. Flexi, Goya, Atek, and [Burger King] [referring to lost clients]. If you are swinging at Crowley you are missing and hitting me [referring to Sea Star]. Not good!" This email is titled

with Defendant stating that "things aren't working as well as they were" and that Mr. Baci had similar complaints.

Furthermore, the Court notes that from August 1, 2003, to April 10, 2008, Mr. Serra and Defendant communicated a total of 319 times using their personal telephones, with 215 calls being initiated by Defendant, which is additional circumstantial evidence corroborating the testimony of the three cooperators.  Trial Exhibit 279.

## B. Defendant's Arguments

Having described the devastating amount of evidence presented against Defendant during trial, the Court now shifts to discuss his two arguments as to why post-trial discovery of the *qui tam* action and its surrounding circumstances merits a new trial.  The Court must evaluate the weight of this newly discovered evidence in light of the overwhelming incriminatory evidence presented at trial.

### i.   Potential Impeachment of Ron Reynolds

First, the defense argues that Ron Reynolds, an agent for the United States Department of Agriculture ("USDA") who testified on behalf of the prosecution, could have been impeached for "improper bias" and "motive" with this newly discovered evidence related to Mr. Stallings' *qui tam* action.  To best understand this argument, the Court must evaluate the circumstances of the case at the time of his testimony, which was in January of 2013.

According to the defense, at the time of Defendant's trial, the Government had a strong financial interest in prevailing on the undisclosed *qui tam* action.  Building on this

---

"Ouch!" In his second email to Serra, sent on March 22, 2008 at 7:19 PM, Defendant is annoyed ("Ouch!") at the fact that "things aren't working as well as they were. Pete [Baci] has similar complaints. Flexi is about fuel and you gave them a BSC discount. Tisk tisk. Goya is about you not charging for the overweight permits. Again tisk tisk. **Same as cutting the rate in my book**." (emphasis added). Serra replies that he will "check them all…you are certainly not the target."

premise, the defense argues that Defendant's conviction would have served to strengthen the Government's position in said *qui tam* action. Therefore, the defense argues that, if the *qui tam* action would have been properly disclosed, there is a "reasonable probability" that the result of the trial would have been different. However, Mr. Reynolds' testimony was relatively insignificant.

Mr. Reynolds testified that the USDA used Sea Star and Horizon to ship goods from the United States to Puerto Rico during the time of the charged price-fixing conspiracy. Moreover, Mr. Reynolds explained that the shipping rates provided to the USDA were final and nonnegotiable, which would arguably tend to make the price-fixing conspiracy simpler to carry out. The defense's corresponding cross-examination was limited to showing that Mr. Reynolds did not know who Defendant or any other alleged coconspirator was.

However, the Government did not call Mr. Reynolds to testify about any of the inner workings of the alleged price-fixing conspiracy or to disclose the identities of any of the conspirators involved. From the prosecutor's perspective, testimony of this nature could be used to prove the interstate commerce element of a Sherman Act violation. *See* 15 U.S.C. § 1; and *Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan*, 649 F.2d 36, 44 (1st Cir. 1981).

Yet, even if Mr. Reynolds' testimony was rendered *entirely* incredible through impeachment, the effect on the case would have been trivial. Even when discounting Mr. Reynolds' testimony, the quality of evidence presented at trial is simply too much for Defendant to overcome. It should be noted that the Government did not even require Mr.

Reynolds' testimony to establish the price-fixing conspiracy's *de minimis* effect on interstate commerce; that void was filled by the testimony of Gabriel Lafitte.[13]

### ii.   William Stallings to the Stand?

The second contention is that the proper disclosure of the *qui tam* action would have prompted the defense to call Mr. Stallings to the stand in an effort to create reasonable doubt.   At the outset, it should be noted that Mr. Stallings—a cooperating witness—was also involved in the conspiracy.   Further, as previously adverted to, Mr. Stallings never testified at Defendant's trial as neither side called him to the stand.

However, if the defense (armed with this newly discovered evidence) called Mr. Stallings to the stand, they would have established that, despite two months of concealed tape recordings, Mr. Stallings lacked any incriminatory recording of Defendant.   This course of action would be consistent with the defense's opening statement.   Therefore, the defense could then presumably argue that, despite Mr. Stallings' significant financial interest in the *qui tam* action and his desire to reduce his exposure to criminal penalties, he was still unable to catch Defendant on tape.   Also, if Mr. Stallings testified in a manner that would hurt Defendant's case, the financial interest in the *qui tam* action may have constituted powerful impeachment evidence.

Of course, the thought that Mr. Stallings' testimony would have saved the day sounds like wishful thinking.   There is only speculation that Mr. Stallings' testimony would have benefitted Defendant's case at all.   All the Court has is the possibility that Mr. Stallings would have been impeached if he testified in the Government's favor—yet he never provided *any* testimony during trial.   It should also be noted that this newly

---

[13] Gabriel Lafitte, who is the president of Latin American Subs, described how his business transported goods from the United States to Puerto Rico by using Sea Star and Horizon.

discovered impeachment evidence pales in comparison to the standard impeachment he surely would have been subjected to as a result of his cooperation to avoid criminal charges.

Moreover, the Court agrees with the Government that calling Mr. Stallings to the stand in order to impeach him with the *qui tam* action "would have opened the door to the admission of . . . guilty pleas and civil settlements that pre-dated the qui tam in order to demonstrate the validity of Stallings's initial complaint to the government in 2008."  Docket No. 253, p. 9.  Such a situation would have effectively nullified any attempt by the defense to argue Mr. Stallings' bias and/or financial interest.

### C. No Reasonable Probability

The Court finds that Defendant has failed to establish a "reasonable probability" that the trial result would have been different.  The arguments provided by the defense are unpersuasive, both individually and cumulatively.  However, the primary reason why the Court finds that Defendant fails to meet the modest "reasonable probability" standard is that the evidence presented against Defendant was simply overwhelming.

One can hardly dent the voluminous record of emails to and from Defendant relating to numerous conspiratorial actions.  In addition, Defendant's various trips to meet with the cooperators in Orlando, Florida—a city that is not bordered by any ocean—to discuss a fair market share allocation between them for freight services is also damaging.  All of the evidence detailed in this opinion and order is simply too much for Defendant to overcome to comply with the appropriate standards under Rule 33.

Therefore, as Defendant fails to meet the modest "reasonable probability" exculpatory evidence standard, he necessarily fails on the more rigorous "actual

probability" non-exculpatory evidence standard.  Hence, Defendant fails to comply under either Rule 33 newly discovered evidence standard.  No evidentiary hearing is justified. The Court need proceed no further.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court hereby **DENIES** Defendant's Rule 33 motion for new trial.  Defendant is unable to establish a "reasonable probability" that the availability of the undisclosed evidence at the time of trial would have resulted in a different outcome.   In light of the massive amount of independently incriminating evidence presented at trial, the undisclosed evidence is not sufficiently weighty to tilt the scales in favor of relief.  No evidentiary hearing is required.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 18th day of October, 2016.

*/S/ Daniel R. Domínguez*
DANIEL R. DOMÍNGUEZ
United States District Judge